## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| ALEXSAM, INC.,<br>*Plaintiff*,<br><br>v.<br><br>SIMON PROPERTY GROUP, L.P.,<br>BLACKHAWK NETWORK, INC.,<br>AMERICAN EXPRESS TRAVEL<br>RELATED SERVICES COMPANY, INC.,<br>U.S. BANK, N.A.<br>*Defendants.* | Case No. 2:19-cv-00331-JRG-RSP<br><br>Judge J. Rodney Gilstrap |
| SIMON PROPERTY GROUP, L.P.,<br>*Third-Party Plaintiff.*<br><br>v.<br><br>BLACKHAWK NETWORK, INC., U.S.<br>BANK, N.A., AMERICAN EXPRESS<br>TRAVEL RELATED SERVICES<br>COMPANY, INC.,<br>*Third-Party Defendants.* | |

## PLAINTIFF'S THIRD AMENDED COMPLAINT

Plaintiff AlexSam, Inc. (hereinafter, "Plaintiff" or "AlexSam"), by and through its undersigned counsel, files this Third Amended Complaint ("TAC") for Patent Infringement against Defendant Simon Property Group, L.P. ("Simon"), Defendant Blackhawk Networks, Inc. ("Blackhawk"), Defendant American Express Travel Related Services Company, Inc. ("American Express"), and Defendant U.S. Bank, N.A. ("U.S. Bank") as follows:

## TABLE OF CONTENTS

I.   NATURE OF THE ACTION ................................................................................ 4

II.  PARTIES ............................................................................................................. 5

    A.   PLAINTIFF ALEXSAM ............................................................................ 5

    B.   DEFENDANT SIMON ............................................................................... 6

    C.   DEFENDANT BLACKHAWK ...................................................................... 6

    D.   DEFENDANT AMERICAN EXPRESS ........................................................... 7

    E.   DEFENDANT U.S. BANK ......................................................................... 7

III. JURISDICTION AND VENUE ........................................................................... 7

    A.   DEFENDANT SIMON ............................................................................... 8

    B.   DEFENDANT BLACKHAWK ...................................................................... 9

    C.   DEFENDANT AMERICAN EXPRESS ......................................................... 10

    D.   DEFENDANT U.S. BANK ....................................................................... 11

IV.  FACTUAL ALLEGATIONS .............................................................................. 12

    A.   THE INVENTIONS EMBODIED IN THE CLAIMS OF THE '608 PATENT. .................. 12

        1.  Background To The Inventions Embodied In The Claims Of The '608 Patent. ...................................................................................... 12

        2.  Priority Date For The Claims Of The '608 Patent. ............................ 19

        3.  For Years, Mr. Dorf Practiced His Patented Inventions. ................... 19

    B.   SETTLEMENT OF PRIOR LITIGATION BETWEEN ALEXSAM, SIMON, AND AMERICAN EXPRESS IN THE EASTERN DISTRICT OF TEXAS. ........................... 19

    C.   ALEXSAM'S BREACH OF CONTRACT SUIT AGAINST WILDCARD IN THE SOUTHERN DISTRICT OF FLORIDA DETERMINED THAT THE LICENSE AGREEMENT WITH SIMON TERMINATED IN 2011. .............................................................. 22

    D.   SIMON'S POST-TERMINATION ACTIVITY. ................................................ 24

    E.   BLACKHAWK'S ACTIVITY. ................................................................... 25

    F.   AMERICAN EXPRESS'S INFRINGING ACTIVITY. ...................................... 27

    G.   U.S. BANK'S INFRINGING ACTIVITY. .................................................... 28

    H.   MASTERCARD LICENSE AND LITIGATION .............................................. 30

COUNT I: INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY SIMON FOR THE SIMON VISA GIFT CARD, THE SIMON AMEX GIFT CARD, AND THE SIMON LOYALTY CARD ................................................................................................. 31

COUNT II: INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY BLACKHAWK FOR THE SIMON VISA GIFT CARD AND THE SIMON LOYALTY CARD ........................... 34

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

COUNT III: INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY BLACKHAWK FOR THE BLACKHAWK ACCUSED PRODUCTS ............................................................. 37

COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY AMERICAN EXPRESS FOR THE SIMON AMEX GIFT CARD .......................................................... 43

COUNT V: INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY AMERICAN EXPRESS FOR THE AMERICAN EXPRESS ACCUSED PRODUCTS ........................................ 46

COUNT VI: INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY U.S. BANK FOR THE SIMON VISA GIFT CARD ............................................................................... 52

COUNT VII: INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY U.S. BANK FOR THE U.S. BANK VISA ACCUSED PRODUCTS ................................................... 54

COUNT VIII: *IN THE ALTERNATIVE* – INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY U.S. BANK FOR THE U.S. BANK-MASTERCARD ACCUSED PRODUCTS .... 60

COUNT IX: DECLARATORY JUDGMENT OF TERMINATION REGARDING MASTERCARD LICENSE (*AGAINST U.S. BANK*) ....................................................... 66

JURY DEMAND ............................................................................................................... 67

PRAYER FOR RELIEF .................................................................................................... 67

**LIST OF EXHIBITS** ................................................................................................... 70

## I.    <u>NATURE OF THE ACTION</u>

1.      This is a patent infringement action to stop Defendants' infringement of Plaintiff's United States Patent No. 6,000,608 (the "'608 Patent" or "Patent-in-Suit"), a copy of which is attached hereto as **Exhibit A**. The '608 Patent expired on or about July 10, 2017.

2.      AlexSam and Simon were parties to a patent infringement case involving the '608 Patent in this District many years ago (hereinafter, the "Prior Texas Litigation"), which was ultimately resolved by Simon's supplier, WildCard Systems, Inc. ("WildCard").

3.      Because WildCard and its successors-in-interest were successful in terminating their license agreement with AlexSam, under which Simon was afforded limited and undefined coverage, and because Simon's products and/or systems have changed since the Prior Texas Litigation, AlexSam brings this suit for patent infringement.

4.      AlexSam and Simon are parties to the above-identified patent infringement case involving the Simon-branded products such as the Simon-branded variable denomination Visa Gift Card (hereinafter the "Simon Visa Gift Card"), Simon-branded variable denomination American Express Gift Card (hereinafter the "Simon AmEx Gift Card"), Simon-branded 5% Back Visa Gift Card (hereinafter "Simon Loyalty Card"), and substantially similar products sold by Simon and/or at Simon properties (hereinafter, "Simon Accused Products").

5.      Through its agreements with Simon, American Express, U.S. Bank, and Blackhawk made, used, provided, sold, offered for sale, advertised, and/or distributed a multifunction card system comprising the Simon Accused Products that are available for customers to purchase at Simon's malls, Simon's outlet malls, and other non-Simon properties.

6.      The non-Simon properties include for example Blackhawk's participating network of grocery stores, drug stores, retailers, and various other merchants.

7.      In addition, Blackhawk made, provided, sold, offered for sale, advertised, and/or

distributed a multifunction card system comprising various gift cards and general purpose reloadable cards ("GPR") cards (hereinafter the "Blackhawk Accused Products," specifically identified below) that are available for customers to purchase at Blackhawk's participating network of grocery stores, drug stores, retailers, and various other merchants in this district and across the country.

8.     U.S. Bank is one of the largest issuers of prepaid cards and gift cards in the country.

9.     U.S. Bank has made, provided, sold, offered for sale, advertised, and/or distributed a multifunction card system comprising various fixed denomination and variable denomination gift cards and GPR cards (hereinafter the "U.S. Bank Accused Products," specifically identified below) that are available for customers to purchase at Simon Malls, as well as other retailers, grocery stores, drug stores, and various other merchants in this district and across the country.

10.     American Express provides a variety of branded and co-branded prepaid and gift card products and services, including a card network, issuing and processing services, merchant transaction processing, point of sale and back office products and services.

11.     American has also made, provided, sold, offered for sale, advertised, and/or distributed a multifunction card system comprising various fixed denomination and variable denomination gift cards and GPR cards (hereinafter the "American Express Accused Products," specifically identified below) that are available for customers to purchase at Simon Malls, as well as other retailers, grocery stores, drug stores, and various other merchants in this district and across the country.

## II.     PARTIES

### A.  PLAINTIFF ALEXSAM

12.     AlexSam is a corporation organized and existing under the laws of the State of Texas.

13.     AlexSam owns the rights to the '608 Patent, having been assigned all right, title and interest in the '608 Patent by the sole inventor, Mr. Robert Dorf. AlexSam possesses all rights thereto, including the exclusive right to exclude others from making, using, selling, offering to sell or importing in this district and elsewhere into the United States the patented invention(s) of the '608 Patent, the right to license the '608 Patent, and to sue for infringement and recover past damages.

### B.  DEFENDANT SIMON

14.     Upon information and belief, Simon is a corporation duly organized and existing under the laws of the State of Delaware.

15.     Upon information and belief, Simon has its principal place of business located at 225 West Washington Street, Indianapolis, Indiana, 46204 (Marion County).

16.     Based upon publicly-available information, Simon may be served through its registered agent, CT Corporation System, 150 West Market Street, Suite 800, Indianapolis, In, 46204 (Marion County).

17.     Based upon publicly-available information, Simon owns and operates Broadway Square which is located at 4601 S. Broadway Ave., Tyler, Texas 75703.

18.     Based upon publicly-available information, Simon owns and operates the Allen Premium Outlets which is located at 820 W. Stacy Road, Allen, Texas 75013.

### C.  DEFENDANT BLACKHAWK

19.     Upon information and belief, Blackhawk is a corporation duly organized and existing under the laws of the State of Arizona.

20.     Upon information and belief, Blackhawk has its principal place of business located at 5918 Stoneridge Mall Road, Pleasanton, California 94588.

21.     Based upon publicly-available information, Blackhawk may be served through its

registered agent, CSC Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 35833.

22. Based upon publicly-available information, Blackhawk owns and operates an office located at 700 State Highway 121 Bypass, Suite 200, Lewisville, Texas 75067.[1]

23. Blackhawk, as a third-party defendant in this matter (*see* Dkt. No. 43), has chosen to waive any objections to personal jurisdiction and/or venue by not raising them in its motion to dismiss. *See* Dkt. Nos. 55 (filed under seal) and 57.

**D. DEFENDANT AMERICAN EXPRESS**

24. Upon information and belief, American Express is a corporation duly organized and existing under the laws of the State of New York.

25. Upon information and belief, American Express has its principal place of business located at Three World Financial Center, 200 Vesey Street, New York, New York 10285.

26. Based upon publicly-available information, American Express may be served through its registered agent, CT Corp System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

**E. DEFENDANT U.S. BANK**

27. Upon information and belief, U.S. Bank is a national association bank with its principal place of business located at 425 Walnut Street, Cincinnati, Ohio 45202.

28. Based upon publicly-available information, U.S. Bank may be served through its registered agent, CT Corp System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## III.    JURISDICTION AND VENUE

29. This action arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. §§ 271, 281, 283, 284, and 285. This Court has subject matter jurisdiction

---

[1] https://www.hawkincentives.com/company-overview, listing this address.

over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338(a).

30.     Jurisdiction and venue are proper because the underlying events giving rise to this lawsuit occurred in Texas and all parties have submitted to the jurisdiction and venue of this Court.

**A.  DEFENDANT SIMON**

31.     The Court has personal jurisdiction over Simon because: Simon has minimum contacts within the State of Texas and in the Eastern District of Texas; Simon has purposefully availed itself of the privileges of conducting business in the State of Texas and in the Eastern District of Texas; Simon has sought protection and benefit from the laws of the State of Texas; Simon regularly conducts business within the State of Texas, and within the Eastern District of Texas, and Plaintiff's causes of action arise directly from Simon's business contacts and other activities in the State of Texas and in the Eastern District of Texas.  Additionally, in resolving the Prior Texas Litigation, Simon consented to personal jurisdiction before this Court and agreed that this Court had "jurisdiction over the subject matter" of that case, which included infringement of the '608 Patent.  *See* **Exhibit C**.

32.     More specifically, Simon, directly and/or through intermediaries, ship, distribute, make, use, import, offer for sale, sell, and/or advertise its branded and un-branded products in the United States, the State of Texas, and the Eastern District of Texas.  Based upon public information, Simon has committed patent infringement in the State of Texas and in the Eastern District of Texas.  Simon solicits customers in the State of Texas and in the Eastern District of Texas.  Simon has many paying customers who are residents of the State of Texas and the Eastern District of Texas and who use Simon's products in the State of Texas and in the Eastern District of Texas.

33.     Venue is proper in this district pursuant to 28 U.S.C. § 1400(b) because Simon has a regular and established place of business in this district, including Broadway Square, 4601 S.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

Broadway Ave., Tyler, Texas 75703 and the Allen Premium Outlets, 820 W. Stacy Road, Allen, Texas 75013, at which upon information and belief, Simon has committed acts of infringement in this district.[2]

34.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Simon has a regular and established place of business in this district, which subjects it to the personal jurisdiction of this Court.

## B. DEFENDANT BLACKHAWK

35.     The Court has personal jurisdiction over Blackhawk because: Blackhawk has minimum contacts within the State of Texas and in the Eastern District of Texas; Blackhawk has purposefully availed itself of the privileges of conducting business in the State of Texas and in the Eastern District of Texas; Blackhawk has sought protection and benefit from the laws of the State of Texas; Blackhawk regularly conducts business within the State of Texas, and within the Eastern District of Texas, and Plaintiff's causes of action arise directly from Blackhawk's business contacts and other activities in the State of Texas and in the Eastern District of Texas.

36.     More specifically, Blackhawk, directly and/or through intermediaries, ship, distribute, make, use, import, offer for sale, sell, and/or advertise its products in the United States, the State of Texas, and the Eastern District of Texas.  Based upon public information, Blackhawk has committed patent infringement in the State of Texas and in the Eastern District of Texas. Blackhawk solicits customers in the State of Texas and in the Eastern District of Texas. Blackhawk has many paying customers who are residents of the State of Texas and the Eastern District of Texas and who use Blackhawk's products in the State of Texas and in the Eastern

---

[2]   SPG has additional properties in Austin, Texas; El Paso, Texas; Garland, Texas; Grand Prairie, Texas; Grapevine, Texas; Cypress, TX Texas San Antonio, Texas; Katy, Texas; McAllen, Texas; Cedar Park, Texas; Midland, Texas; Hurst, Texas; Mercedes, Texas; Round Rock, Texas; San Marcos, Texas; Houston, Texas; and Fort Worth, Texas.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

District of Texas.

37.    Venue is proper in this district pursuant to 28 U.S.C. § 1400(b) because Blackhawk has a regular and established place of business in this district, at which upon information and belief, Blackhawk has committed acts of infringement in this district.

38.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Blackhawk, upon information and belief, has a regular and established place of business in this district, which subjects it to the personal jurisdiction of this Court.

C.  **DEFENDANT AMERICAN EXPRESS**

39.    The Court has personal jurisdiction over American Express because: American Express has minimum contacts within the State of Texas and in the Eastern District of Texas; American Express has purposefully availed itself of the privileges of conducting business in the State of Texas and in the Eastern District of Texas; American Express has sought protection and benefit from the laws of the State of Texas; American Express regularly conducts business within the State of Texas, and within the Eastern District of Texas, and Plaintiff's causes of action arise directly from American Express' business contacts and other activities in the State of Texas and in the Eastern District of Texas.

40.    More specifically, American Express, directly and/or through intermediaries, ship, distribute, make, use, import, offer for sale, sell, and/or advertise its products in the United States, the State of Texas, and the Eastern District of Texas.  Based upon public information, American Express has committed patent infringement in the State of Texas and in the Eastern District of Texas.  American Express solicits customers in the State of Texas and in the Eastern District of Texas.  American Express has many paying customers who are residents of the State of Texas and the Eastern District of Texas and who use American Express' products in the State of Texas and in the Eastern District of Texas.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

41. Venue is proper in this district pursuant to 28 U.S.C. § 1400(b) because American Express has a regular and established place of business in this district, at which upon information and belief, American Express has committed acts of infringement in this district.

42. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because American Express has, upon information and belief, a regular and established place of business in this district, which subjects it to the personal jurisdiction of this Court.

**D. DEFENDANT U.S. BANK**

43. The Court has personal jurisdiction over U.S. Bank because: U.S. Bank has minimum contacts within the State of Texas and in the Eastern District of Texas; U.S. Bank has purposefully availed itself of the privileges of conducting business in the State of Texas and in the Eastern District of Texas; U.S. Bank has sought protection and benefit from the laws of the State of Texas; U.S. Bank regularly conducts business within the State of Texas, and within the Eastern District of Texas, and Plaintiff's causes of action arise directly from U.S. Bank's business contacts and other activities in the State of Texas and in the Eastern District of Texas.

44. More specifically, U.S. Bank, directly and/or through intermediaries, ship, distribute, make, use, import, offer for sale, sell, and/or advertise its products in the United States, the State of Texas, and the Eastern District of Texas. Based upon public information, U.S. Bank has committed patent infringement in the State of Texas and in the Eastern District of Texas. U.S. Bank solicits customers in the State of Texas and in the Eastern District of Texas. U.S. Bank has many paying customers who are residents of the State of Texas and the Eastern District of Texas and who use U.S. Bank's products in the State of Texas and in the Eastern District of Texas.

45. Venue is proper in this district pursuant to 28 U.S.C. § 1400(b) because U.S. Bank has a regular and established place of business in this district, at which upon information and belief, U.S. Bank has committed acts of infringement in this district.

46.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because U.S. Bank has, upon information and belief, a regular and established place of business in this district, which subjects it to the personal jurisdiction of this Court.

## IV.     FACTUAL ALLEGATIONS

47.     The '608 Patent, entitled "Multifunction Card System," was issued on December 14, 1999 after full and fair examination of application number 08/891,261 which was filed with the USPTO on July 10, 1997.  *See* Ex. A.

48.     An *ex parte* Reexamination Certificate was issued on July 10, 2012 based on Reexamination Request 90/009,793 filed on August 2, 2010 which re-affirmed a number of the claims of the '608 Patent.  *See* Ex. A (*ex parte* Reexamination Certificate).  The patentability of claims 1, 3-5, 8-11, 16-19, 23, 26-28, 34, 36, 37, 39-44, 50, 52-54, 57, 58, 60, 62, 63 and 65 was confirmed; the remaining claims were not reexamined.  *See id.*

49.     The '608 Patent expired on July 10, 2017.  *See* Ex. A.

50.     The '608 Patent was assigned to AlexSam, Inc. by the sole inventor, Mr. Robert Dorf.  AlexSam possesses all rights thereto, including the exclusive right to sue for infringement and recover past damages.

### A.  THE INVENTIONS EMBODIED IN THE CLAIMS OF THE '608 PATENT.

51.     The primary purpose of the '608 Patent is to implement a multi-function card, such as a rechargeable pre-paid card, a pre-paid card with a loyalty function, or a medical information card that will perform as normal bank card (credit/debit) to purchase goods and services.  *See* Ex. A, p.1 (Abstract) and col. 3:9-64; *see also* Expert Declaration Of Ivan Zatkovich, attached hereto as **Exhibit B** at ¶¶ 53-55.

### 1.  Background To The Inventions Embodied In The Claims Of The '608 Patent.

52.     Based on the state of technology in 1997, there was a need in the art for a

debit/credit card capable of performing a plurality of functions, which could be accepted by any Point-Of-Sale ("POS") device, and a processing center that could manage this multifunction card system. *See* Ex. A at 1:24-35.

53.     Specifically, in 1997, the banking industry did not use personal computers and instead used large computers, such as Stratus and/or Tandem computers, which were very expensive and not capable of performing transactions using multiple types of functions.  For example, at the time, these computers could only process debit or credit transactions, but not both.

54.     In sum, the specific problem to be solved was that existing technology infrastructure that supported standard bank cards, and the POS devices could not support the special functions of Mr. Dorf's new multifunction card system.  *See* Ex. A at 3:9-11; Ex. B at ¶¶ 53-65.

55.     Mr. Dorf set out to solve the problem by inventing a new multifunction card system that utilized his special-purpose computer, referred to as the "Processing Hub," that worked with the existing banking network and that utilized a bank identification number ("BIN") to allow for the use of a multi-function card.  *See* Ex. A at 3:9-11; Ex. B at ¶¶ 59-65.

56.     Mr. Dorf invented and built a new computer to avoid the limitations of the conventional systems at the time.  *See* Ex. A at 10:65-11:32; Ex. B at ¶¶ 59-65.

57.     Since a POS device and banking network did not support the special transactions of a multi-function card, solutions where proposed by other inventors, vendors, and merchants that primarily fell into three categories:

a.     **Pre-Configured/Pre-activated cards**: Cards were configured and shipped as already activated to retailers and sellers so that specialized card transactions (e.g. activate card) were not required at the POS device.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

    b. **Bypassing the banking network**: By creating a modified POS device, or a separate activation device at the POS, merchants could implement any proprietary function at the Point-of-Sale that (such as activate a card) that would bypass the banking network, and be processed directly by the Issuing bank, for example.

    c. **Activating through a non-POS device**: By providing a separate process to activate prepaid cards, such as a special software station for sales agents, or online / dial in services, the cards could be activated without the need for a standard POS or banking network.

*See* Ex. B at ¶ 46.

58. All three of the foregoing alternative solutions were technically easier to implement than that offered by the '608 Patent. This is because all three of these proposed solutions could be implemented as a standalone self-contained process, without needing to integrate with a banking network for processing specialized multi-function transactions. However, the simpler solutions were not 'consumer friendly' or 'merchant friendly'. For example,

    a. **Pre-Configured/Pre-activated cards:** were not safe (even with zero balance). They could be stolen and used without requiring activation;

    b. **Bypassing the banking network:** required merchants to install modified POS devices, or provide a separate POS device just to perform the specialized transactions such as activating the card; and

    c. **Initiating transaction through a non-POS device**: cards purchased at a retailer could not be activated the POS device. The customer must perform a separate process to activate the card.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

*See* Ex. B at ¶¶ 47-48.

59.     These problems associated with these solutions are why none of these solutions ever became widely implemented in the market place.

60.     The inventions embodied within the claims of the '608 Patent provide technological solutions to the "problems associated with prior art card systems." Ex. A, at 3:9-11; Ex. B at ¶¶ 48-50.  As is explained in the Specification, these limitations occur in three specific technical areas: (1) existing credit and debit cards could only perform a very limited set of electronic transactions (Ex. A at 1:24-29); (2) the pre-paid aspect of these debit cards created security problems in stores, which required them to be activated electronically after they were purchased (Ex. A at 5:23-27); and (3) there was no centralized processing center to handle the specialized transactions of these multi-function cards (Ex. A at 1:33-35).  *See also* Ex. B at ¶¶ 46-76.

61.     Specifically, the inventions embodied within the claims of the '608 Patent provide a technological solution to the existing challenges by offering a multifunction card system that (1) did not have the security problems of pre-activated cards, (2) did not require special hardware for the merchant, and (3) provided all the convenience to consumers of normal bank cards.  *See* Ex. A at 3:9-11; Ex. B at ¶ 46, 56.

62.     An important invention disclosed and claimed within the claims of the '608 Patent was the Processing Hub that: (1) operates as a compatible component of a banking network; (2) communicates with the retailers to perform the specialized multi-card transactions (such as activating the card); (3) allows these specialized functions to be performed on an existing unmodified POS device, and (4) does not interfere with normal debit/credit card functions for purchasing of goods and services at any merchant POS device. *See* Ex. B at ¶¶ 56-65.

63.     The implementation of this new Processing Hub within the banking network was

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

unique, novel, and inventive concept. Specifically, the claimed Processing Hub is "transparent" to the POS device, yet still intercepts and processes all the specialized transactions necessary to support multifunction cards, and still allow merchants to keep their same POS devices. *See* Ex. B at ¶¶ 63, 99-101 and 107.

64.     As described in the specification of the '608 Patent, Mr. Dorf invented a new device and new system that did not previously exist, including a Processing Hub and supporting system. The '608 Patent's Specification describes the Processing Hub as follows: the "processing hub 103, … serves as the nerve center of the system 108." Ex. A at 4:23-24. The Processing Hub can be connected to "any given POS device 105" which allows a retailer to use "the system 108 … to remotely activate or add value or loyalty data to a system card." *Id*. at 5:10-15.

65.     Mr. Dorf's solution is more technically difficult to implement than the other proposed solutions due to the specific components that must be integrated with a banking network and still maintain the compliance with the requirements of this highly regulated transaction process. Although technically more complicated than other proposed solutions, the system disclosed and claimed in the claims of the '608 Patent is more viable to merchants, more marketable, and more user acceptable in the marketplace. *See* Ex. B at ¶¶ 82, 95.

66.     Importantly, each of the problems and limitations of the prior art systems listed above would need to be solved within a complex regulated transactional network. Therefore, any solution to these problems would require a reasonably sophisticated technical solution. Mr. Dorf provided this solution by inventing new cards, new devices, and a new system. *See* Ex. A at 3:9-11. A large portion of this system is illustrated in Figure 2 of the '608 Patent, as reproduced below:

**PLAINTIFF'S THIRD AMENDED COMPLAINT**



67.     Mr. Dorf's new Processing Hub accepted transactions from retailer POS devices for the multifunction cards, such as card activation or recharge, and processed and/or transmitted those transactions in order to complete (authorize) those transactions or reject them if not valid. *See* Ex. B at ¶¶ 59-65.

68.     Another component of Mr. Dorf's system is the transaction processor. This component enabled communications between the retailer POS devices and the Processing Hub. The component also provides connectivity to the banking network and therefore must conform to banking network standards and would traditionally be monitored by a bank (e.g. the merchants acquiring bank) to maintain, and in some cases test, those standards. *See* Ex. B at ¶¶ 70-76.

69.     The claims of the '608 Patent describe a flexible system that could be configured in a number of different ways. For example, one of the components of the system provided connectivity between the retailer POS devices and the Processing Hub. *See* Ex. A at 10:65-11:32; Ex. B at ¶ 107.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

70.     The banking network is also a critical aspect of Mr. Dorf's system because the card transaction transmitted to the Processing Hub must also be transmitted to the other banks and financial institutions that participate in these transactions, including the merchant bank, the issuing bank, and 3rd party transaction agents such as merchant acquirers, and card processors acting on behalf of the banks. All of these entities must operate and communicate on a banking network including conforming to all of the standards and regulations controlling the banking network. *See* Ex. A at 4:65-67; Ex. B at ¶¶ 66-69.

71.     Additionally, the combination of the POS device, transaction processor, and Processing Hub into a system that allows for the multifunction card system to access debit card databases and medical databases was not generic or conventional in 1997.  The combination reflects significantly more than any abstract idea.  As thoroughly demonstrated above, the claims of the '608 Patent do not recite a collection of conventional components performing their ordinary functions.  They embody improvements to acknowledged deficiencies in the art, thereby fully reflecting something substantially more than an abstract idea. *See* Ex. B at ¶¶ 77-95.

72.     Moreover, the claims of the '608 Patent to be asserted here are tied to a particular machine - the Processing Hub - and machine system – the multifunction card system.  *See* Ex. B at ¶ 78-87.

73.     The claims of the '608 Patent made possible the use of multifunction cards without the need for separate, stand-alone system and equipment thereby solving a technical problem within the gift card, loyalty card, and medical goods and services industry.  *See* Ex. A at 10:7-47; Ex. B at ¶¶ 83, 89-91.

74.     In particular, a Processing Hub was not previously available in the industry.  *See* Ex. B at ¶¶ 82, 143.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

**2.  Priority Date For The Claims Of The '608 Patent.**

75.     Based upon documentary evidence, the claims of the '608 Patent trace their priority

date to as early as February 23, 1996, but no later than October 1996.  *See* Ex. B at ¶¶ 108-142.

**3.  For Years, Mr. Dorf Practiced His Patented Inventions.**

76.     Shortly after receiving his patents, Mr. Dorf developed a business, Intelligent Card

Solutions, Inc. (ICS), which offered a processing platform to process transactions for Michigan

National Bank, MCI and he had a joint venture with Mr. Ron Lauder of RSL company.  Mr. Dorf

also owned a BIN from MasterCard.

77.     At this time, Mr. Dorf's Processing Hub with ICS allowed his company to process

different types of card products and transactions, such as gift cards, phone cards, and health cards..

78.     In 2003, after working hard to build his business and footprint in the prepaid

market, Mr. Dorf was unable to compete with larger companies.  In reaction to this widespread of

infringement of claims of the '608 Patent and after being forced out of the industry, Mr. Dorf

founded AlexSam in 2003 and assigned all rights to enforce the '608 Patent to AlexSam.

79.     Since its inception in 2003, AlexSam has entered various business and license

agreements to the AlexSam Patents and to Mr. Dorf's know-how.

**B.  SETTLEMENT OF PRIOR LITIGATION BETWEEN ALEXSAM, SIMON, AND AMERICAN EXPRESS IN THE EASTERN DISTRICT OF TEXAS.**

80.     In 2005, AlexSam sued Simon and 11 other defendants in the United States District

Court for the Eastern District of Texas, Marshall Division, alleging infringement of certain claims

of the '608 Patent and of U.S. Patent No. 6,189,787 (the "'787 Patent").  *AlexSam, Inc. v.*

*Datastream Card Services Limited, et al.*, No. 2:03-CV-337-TJW (E.D. Tex. 2005) (described

herein as the "Prior Texas Litigation").

81.     Since 2003, AlexSam has been involved in approximately fourteen (14) cases

before this Court related to its patents, including the most recent case entitled *WEX Health, Inc. v. AlexSam, Inc.,* Case No. 2:17-cv-00733, which was settled and dismissed earlier this year.

82. In the First Amended Complaint filed in the Prior Texas Litigation (Dkt. No. 4 dated October 27, 2003), Simon was added as a defendant.

83. In the Second Amended Complaint filed in the Prior Texas Litigation (Dkt. No. 5 dated November 25, 2003), Simon was listed as a defendant along with its vendor, WildCard Systems, Inc. "WildCard").

84. Simon was served with the Second Amended Complaint on December 15, 2003 (Dkt. No. 6).

85. At that point in the Prior Texas Litigation, WildCard stepped in to indemnify Simon.

86. Simon and WildCard were listed as defendants in the Third Amended Complaint filed in the Prior Texas Litigation (Dkt. No. 14 dated January 12, 2004). Simon and WildCard jointly filed an Answer with counterclaims to the Third Amended Complaint (Dkt. No. 20 dated February 5, 2004).

87. Simon and WildCard were listed as defendants in the Fourth Amended Complaint filed in the Prior Texas Litigation (Dkt. No. 41 dated June 1, 2004). Simon and WildCard jointly filed an Answer with counterclaims to the Fourth Amended Complaint (Dkt. No. 44 dated July 1, 2004).

88. Simon, WildCard, and American Express were listed as defendants in the Fifth Amended Complaint filed in the Prior Texas Litigation (Dkt. No. 51 dated August 30, 2004).

89. American Express was served with the Fifth Amended Complaint on September 13, 2004 (Dkt. No. 80).

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

90.     Simon and WildCard jointly filed an Answer with counterclaims to the Fifth Amended Complaint (Dkt. No. 187 dated May 6, 2005).

91.     On October 22, 2004, American Express filed an Answer with counterclaims to the Fifth Amended Complaint (Dkt. No. 83 dated May 6, 2005)

92.     AlexSam asserted claims 1, 3, 34, 36, 37, 39, 44, 57-58, 60, 62 and 65 of the '608 Patent against Simon for the SIMONgiftcard.

93.     AlexSam asserted claims 1, 8, 34, 36, 37, 44, 57-58, 60, 62, 63 and 65 of the '608 Patent against American Express for the "American Express® Gift Card," the "Be My Guest® Dining Card," and the "Westfield Gift Card by American Express."

94.     The Parties to the Prior Texas Litigation, including AlexSam, American Express, Simon, and WildCard, jointly filed a "Joint Claim Construction and Prehearing Statement" (Dkt. No. 144 dated January 21, 2005).

95.     With respect to American Express, Simon, and WildCard, the Prior Texas Litigation proceeded up to the point of claim construction. *See* Dkt. Nos. 144 ("Joint Claim Construction and Prehearing Statement"); 159 ("Plaintiff AlexSam's Opening Claim Construction Brief"); 161 ("Defendants' Joint Claim Construction Brief"); 184 and 194 (Claim Construction Hearing held April 28, 2005); and 199 (Claim Construction Order issued June 10, 2005).

96.     On June 27, 2005, AlexSam and WildCard signed an agreement (the "WildCard Settlement Agreement") resolving AlexSam's claims against WildCard and its customer, Simon. The WildCard Settlement Agreement included a (i) a Stipulation and Order of Dismissal With Prejudice, and (ii) a Compromise and Settlement Agreement and Release of All Claims.

97.     Although Simon received some coverage under the WildCard Settlement Agreement, Simon was not a party to that agreement and was not provided a license to the '608

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

Patent and '787 Patent.  Rather, upon information and belief, Simon was indemnified by WildCard and was therefore covered by the WildCard Settlement Agreement to the extent it remained in force and Simon remained a customer of WildCard and the product/system met the terms of the agreement.

98.     A Stipulation and Order of Dismissal With Prejudice of AlexSam's claims against Simon and WildCard, filed pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii), was granted on July 13, 2005 (Dkt. No. 232).  *See* Ex. C.  Pursuant to the terms of the Wildcard Settlement Agreement, AlexSam dismissed with prejudice all claims against Simon and Wildcard "that were or could have been asserted in the Lawsuit . . .."  *See id*.

99.     A Stipulation and Order of Dismissal With Prejudice of AlexSam's claims against American Express, filed pursuant to Federal Rule of Civil Procedure 41, was granted on July 1, 2005 (Dkt. No. 221).  *See* **Exhibit D**.

### C. ALEXSAM'S BREACH OF CONTRACT SUIT AGAINST WILDCARD IN THE SOUTHERN DISTRICT OF FLORIDA DETERMINED THAT THE LICENSE AGREEMENT WITH SIMON TERMINATED IN 2011.

100.    The WildCard Settlement Agreement is confidential and therefore cannot be attached to this TAC, but the terms of the agreement allow for its production to counsel of record during discovery in this case under a protective order.

101.    Because Simon was not a party to the WildCard Settlement Agreement, Simon may not have a copy of this agreement and its confidentiality provision prohibits its disclosure without certain conditions being met.

102.    Under the terms of the WildCard Settlement Agreement, WildCard made some royalty payments.  However, WildCard never paid any royalties for Simon.

103.    On June 12, 2015, AlexSam filed suit against WildCard for breach of contract based on its failure to pay all royalties owed.  *AlexSam, Inc. v. WildCard Systems, Inc., et al.*, Case No.

15-cv-61736-Bloom/Valle (S.D. Fla.) (hereinafter the "Florida Litigation").

104.    Simon was not a party to the WildCard Settlement Agreement and therefore was not included a defendant in the Florida Litigation.

105.    However, in the Florida Litigation WildCard and its successors argued that the WildCard Settlement Agreement had terminated in 2009 and, therefore, they had not breached the WildCard Settlement Agreement.

106.    In June 2016, the Court in the Florida Litigation agreed with WildCard and ruled that the WildCard Settlement Agreement had terminated in 2009. All appeals of that decision have concluded, leaving the ruling unchanged. This June 2016 Order in the Florida Litigation was filed under seal by the Court, and therefore cannot be attached to this TAC.

107.    However, on August 2, 2016, the Florida Litigation Court considered AlexSam's motion for reconsideration of the Court's Order finding termination and determined that its finding of termination remained:

> In the Order, the Court determined that the operative Settlement and Licensing Agreement ("SLA") had been terminated in 2009 and entered summary judgment in Defendants' favor on Counts I and II of Plaintiff's Complaint.

*See* **Exhibit E**, p. E-1 (August 2, 2018 Order in the Florida Litigation).

108.    Therefore, upon the termination of the WildCard Settlement Agreement as determined in the Florida Litigation, Simon was no longer covered by WildCard's license to practice the inventions embodied in the claims of the '608 Patent.

109.    Further, upon information and belief, sometime after the 2005 WildCard Settlement Agreement and dismissal of the Prior Texas Litigation, it is believed that Simon no longer works with WildCard to provide its prepaid gift card products and services.

110.    Simon had no license to use the '608 Patented technology other than what coverage

was provided by the WildCard Settlement Agreement.

111.    WildCard and its successor are no longer licensed and haven't been licensed since 2009, and therefore, any coverage provided to Simon by way of the WildCard Settlement Agreement ended in 2009.

**D.  S<small>IMON'S</small> P<small>OST</small>-T<small>ERMINATION</small> A<small>CTIVITY</small>.**

112.    According to public information, Simon owns, operates, advertises, and/or controls the website https://www.simon.com/giftcard/ as well as various retail locations across the county and in the state of Texas (including two such facilities within the Eastern District of Texas), through which Simon sells, advertises, offers for sale, uses, or otherwise provides the Accused Products, including but not limited to the following products under at least the following (hereinafter, the "Accused Products"): Simon-branded variable denomination Visa Gift Card (hereinafter the "Simon Visa Gift Card"), Simon-branded variable denomination American Express Gift Card (hereinafter the "Simon AmEx Gift Card"), Simon-branded 5% Back Visa Gift Card (hereinafter "Simon Loyalty Card").  Evidence obtained from Simon's website as well as other publicly-available documents regarding these products is provided *infra*.

113.    Upon information and belief, the Simon Visa Gift Card operates differently now than it did in 2005.

114.    Upon information and belief, the Simon AmEx Gift Card did not exist in 2005.

115.    Upon information and belief, the Simon Loyalty Card did not exist in 2005.

116.    Upon information and belief, the Accused Products in this case were not sold and/or offered for sale until after the Prior Texas Litigation was dismissed, and as such, these Accused Products would not be subject to the parties' Stipulated Dismissal.  *See generally*, Ex. C.

117.    According to public information, Blackhawk at various retail locations across the county and in the state of Texas (including two Simon mall location facilities within the Eastern

District of Texas) sold, advertised, offered for sale, used, or otherwise provided the multifunction card system, including but not limited to the following products: Simon Visa Gift Card, the Simon Loyalty Card, and substantially similar products sold by Simon and/or at Simon properties. *See infra*.

118. According to public information, American Express at various retail locations across the county and in the state of Texas (including two Simon mall location facilities within the Eastern District of Texas) sold, advertised, offered for sale, used, or otherwise provided the multifunction card system, including but not limited to the following products: Simon AmEx Gift Card and substantially similar products. *See infra*.

119. A chart detailing the infringement of one or more claims of the Count IV Claims by an exemplary American Express Accused Product is provided *infra*. *See* **Exhibit M**.

120. According to public information, U.S. Bank at various retail locations across the county and in the state of Texas (including two Simon mall location facilities within the Eastern District of Texas) sold, advertised, offered for sale, used, or otherwise provided the multifunction card system, including but not limited to the following products: Simon Visa Gift Card and substantially similar products. *See infra*.

E. **Blackhawk's Activity.**

121. Upon information and belief, Blackhawk's infringing multifunction card system contains various components (e.g. gift cards, point of sale devices, direct communications networks, processors), which specifically provide the ability to activate gift and prepaid cards.

122. In one of its roles as a third-party card distributor, Blackhawk made, distributed, sold, and processed gift cards and prepaid cards, through its network of retailers.

123. One example of a distribution method employed by Blackhawk involves using the "gift card mall," which presents a variety of open loop and closed loop gift cards to consumers at

grocery stores, pharmacies, convenience stores and the like. The display rack is referred to as a "mall" because it typically contains dozens of different gift and prepaid cards. Pictured below is an example of a Blackhawk gift card mall:



124.    Blackhawk made, provided, sold, offered for sale, advertised, and/or distributed various infringing products and services, including general purpose reloadable ("GPR") cards, closed loop (private branded, *e.g.* Simon) gift cards, open loop (network-branded e.g. Visa, American Express, or MasterCard) gift cards, and/or other prepaid cards. Blackhawk's products include, but are not limited to, the PayPower™ Visa® Prepaid Cards, and all other substantially similar products (hereinafter, the "Blackhawk Accused Products").

125.    Upon information and belief, Blackhawk produced, and/or controlled the production of, the physical gift and prepaid cards for use within the Blackhawk card system.

126.    Upon information and belief, Blackhawk provided POS devices to these retailers and/or required that the retailer's POS devices have minimum requirements in order to operate within, and communicate with, the Blackhawk card system.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

127.    Upon information and belief, Blackhawk installed and provided direct, private communication lines from retailers, who sold or offered its cards for sale, to their card processers.

128.    Upon information and belief, Blackhawk also operates as an acquirer, aggregating communications from merchants to various card processors.  The retailer connects to Blackhawk using the protocols and methods specified by Blackhawk.  Blackhawk forwards transaction requests from merchants based on the bank identification number in the card data and forwards responses from card processors to the correct merchants.  Blackhawk, or another third party, provides the card processing services.

129.    According to public information, Blackhawk owns, operates, advertises, and/or controls the website, https://www.blackhawknetwork.com/, as well as various office locations and representatives across the country through which Blackhawk sold, advertised, offered for sale, used, or otherwise provided the Blackhawk Accused Products.

130.    A chart detailing the infringement of one or more claims of the Count III Claims by an exemplary Blackhawk Accused Product is provided *infra*.

131.    In or around December 2009, Blackhawk and AlexSam entered into discussions regarding Blackhawk potentially licensing the '608 Patent; however, Blackhawk did not obtain a license.

**F.    AMERICAN EXPRESS'S INFRINGING ACTIVITY.**

132.    American Express made, provided, sold, offered for sale, advertised, and/or distributed various infringing products and services, including general purpose reloadable ("GPR") cards, closed loop (private branded, *e.g.* Simon) gift cards, open loop (network-branded *e.g.* American Express) gift cards, and/or other prepaid cards.  American Express's products include, but are not limited to, the American Express branded fixed denomination gift cards ("American Express Gift Card"), the American Express Serve Card ("AMEX Serve Card"), and

all other substantially similar products (hereinafter, collectively the "American Express Accused Products").

133.    Upon information and belief, the American Express Accused Products operate differently now than they did in 2005.

134.    After the conclusion of the DataStream Litigation, AlexSam communicated with American Express in 2007 regarding how American Express's system and products operated, as well the necessity for a potential license to the '608 Patent.

135.    A chart detailing the infringement of one or more claims of the Count V Claims by exemplary American Express Accused Products is provided *infra*.

136.    According to public information, American Express owns, operates, advertises, and/or controls the website, https://www.amexgiftcard.com/ and https://www.serve.com/, as well as various office locations and representatives across the country through which American Express sold, advertised, offered for sale, used, or otherwise provided the American Express Accused Products.

## G.  U.S. BANK'S INFRINGING ACTIVITY.

137.    U.S. Bank made, provided, sold, offered for sale, advertised, and/or distributed various infringing products and services, including general purpose reloadable ("GPR") cards, closed loop (private branded, *e.g.* Simon) gift cards, open loop (network-branded e.g. Visa) gift cards, and/or other prepaid cards.  U.S. Bank's products include, but are not limited to, U.S. Bank Kroger branded 123 Rewards Reloadable Prepaid Visa Card ("U.S. Bank Visa Prepaid"), U.S. Bank Visa fixed denomination Gift Card ("U.S. Bank Visa Gift Card"), U.S. Bank Visa variable denomination Gift Card ("U.S. Bank Variable Visa Gift Card"), and all other substantially similar products (hereinafter, collectively the "U.S. Bank Visa Accused Products").

138.    A chart detailing the infringement of one or more claims of the Count VII by

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

exemplary U.S. Bank Visa Accused Products is provided *infra***.**

139.     U.S. Bank made, provided, sold, offered for sale, advertised, and/or distributed various infringing products and services, including general purpose reloadable ("GPR") cards, closed loop (private branded, *e.g.* Simon) gift cards, open loop (network-branded e.g. MasterCard) gift cards, and/or other prepaid cards.  U.S. Bank's products include, but are not limited to, U.S. Bank Kroger branded 123 Rewards Reloadable Prepaid MasterCard Card ("U.S. Bank MC Prepaid"), U.S. Bank MasterCard fixed denomination Gift Card ("U.S. Bank MC Gift Card"), U.S. Bank MasterCard variable denomination Gift Card ("U.S. Bank Variable MC Gift Card"), and all other substantially similar products (hereinafter, collectively the "U.S. Bank MasterCard Accused Products").

140.     A chart detailing the infringement of one or more claims of the Count VIII Claims by exemplary U.S. Bank MasterCard Accused Products is provided *infra***.**

141.     According to public information, U.S. Bank owns, operates, advertises, and/or controls       the       website,       https://www.usbank.com/prepaid-visa-gift-card.html       and https://www.serve.com/, as well as various office locations and representatives across the country through which U.S. Bank sold, advertised, offered for sale, used, or otherwise provided the U.S. Bank Visa Accused Products and U.S. Bank MC Accused Products.

142.     Based on the information obtained from U.S. Bank's website, on August 11, 2015, AlexSam sent U.S. Bank a letter (hereinafter, the "2015 Notice Letter to U.S. Bank").  *See* **Exhibit F**.

143.     On August 26, 2015, U.S. Bank responded to the Notice Letter, stating that "U.S. Bank is confident that a license is not necessary."  *See* **Exhibit G**.

144.     Upon information and belief, no further response was ever received, and U.S. Bank

continued to offer its infringing products.

## H. MASTERCARD LICENSE AND LITIGATION

145.    In June 2005, AlexSam and MasterCard International, Inc. entered into a License Agreement which included, among other things, a license to the '608 Patent and included MasterCard's obligation to pay royalties for certain Licensed Transactions that utilize the MasterCard network and/or brand (hereinafter, the "MasterCard Agreement"). Attached hereto as **Exhibit H** is a copy of the MasterCard Agreement.

146.    MasterCard failed to pay royalties to AlexSam for many years and has never paid any royalties to AlexSam for transactions initiated by any of the U.S. Bank MasterCard Accused Products.

147.    Despite attempts to resolve the issues related to these acts of breach, MasterCard refused to pay all outstanding royalties owed.

148.    On May 14, 2015, AlexSam filed a Complaint against MasterCard asserting a claim of breach of contract (hereinafter, "MasterCard Litigation"). *See AlexSam, Inc. v. MasterCard International Inc.*, Case No. 1:15-cv-02799 (E.D. N.Y.).

149.    The License Agreement would automatically terminate upon the expiration of the Licensed Patents in July 2017. *See* Ex. H, at § 7 (termination).

150.    However, MasterCard has raised claims that the License Agreement automatically terminated in 2013 or 2015. *See* **Exhibit I** (counterclaims VI, VII) at pp. I-21 to I-25.[3]

151.    The issue of termination prior to the expiration of the '608 Patent has not been resolved in the MasterCard Litigation, nor by any other court.

_____

[3] The MasterCard Court subsequently declined to entertain the declaratory relief requested in these counterclaims and recharacterized them as affirmative defenses. *See AlexSam, Inc. v. Mastercard, Int'l, Inc.*, E.D. N.Y. No. 1:15-cv-02799, Dkt. No. 31 (November 4, 2015).

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY SIMON FOR THE SIMON VISA GIFT CARD, THE SIMON AMEX GIFT CARD, AND THE SIMON LOYALTY CARD

152. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs above.

153. Simon has directly infringed, either literally or under the doctrine of equivalents, one or more claims of the '608 Patent, including at least Claims **34, 35, 36, 37, 38, 39, 44, 45, 60, 62, 63, 65 and 66** (the "'608 Claims") because it shipped distributed, made, used, imported, offered for sale, sold, and/or advertised the Simon Visa Gift Card, the Simon AmEx Gift Card, and the Simon Loyalty Card (the "VISA/AMEX Cards") as well as substantially similar products sold by Simon and/or at Simon properties.

154. Evidence of Simon's infringement of the '608 Claims by VISA/AMEX Cards is provided in **Exhibit J**.

155. Specifically, Simon's VISA/AMEX Cards infringed the '608 Claims by providing electronic gift certificate cards and electronic gift certificate cards with a loyalty function. *See* Ex. J. In addition, the VISA/AMEX Cards had a BIN approved by the American Banking Association. This BIN allows Simon to activate the VISA/AMEX Cards. *See id.* Simon's VISA/AMEX Cards were available for sale on its website and through various retailers located in this district and throughout the United States. *See id.*

156. Simon was in the business of selling and offering for sale the VISA/AMEX Cards to customers throughout the United States, including within the state of Texas and this district. Simon owned, operated, or leased all equipment in the infringing system, or alternatively exercised direction and control over the operation of all equipment in the infringing system in order to provide the benefit of electronic gift certificate cards and loyalty cards to its customers. Simon employed staff (*e.g.*, sales clerks and an IT department) to operate POS devices in order to interface

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

with, install, configure, manage, monitor, test, and control the processing hub and other equipment in the infringing system. On information and belief, various POS Devices were coupled to the transaction processor at a Simon Mall Property (including the Broadway Square, and the Allen Premium Outlets facilities) and other equipment directly and/or indirectly *via* one or more data networks.

157. Upon information and belief, Simon's use of the infringing networks, the making and configuration of the systems, and the sale of products generated through the use of the systems constitutes direct infringement of one or more of claims 34, 36, 37, 38, 39, 44, and 45 of the '608 Patent (the "'608 System Claims"). On information and belief, Simon installed, tested, configured, and serviced equipment in the infringing system, thereby making and using the systems disclosed in '608 System Claims and infringing those claims under 35 U.S.C. § 271(a).

158. In addition, Simon's VISA/AMEX Cards infringed claim 38. When merchants process refunds and returns at the point-of-sale device, the refund (or recharge) amount and the Simon VISA/AMEX Card's card number used for the original purchase are transmitted to the processing hub, which credits this amount back to the card, and thereby, increases the purchase value of (or recharges) a previously activated card.

159. In particular by using a banking network, loyalty data are associated with electronic gift certificate cards based on usage, i.e. purchases (claim 45).

160. Upon information and belief, Simon has performed the methods claimed in claims 60, 62, 63, 65, and 66 of the '608 Patent (the "'608 Method Claims") during the course of the installation, testing, and/or ordinary operation of the VISA/AMEX Cards.

161. Simon undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed one or more claims of the '608 Patent, which has been duly

issued by the USPTO and is presumed valid. For example, since at least Simon's receipt of the Second Amended Complaint in the Prior Texas Litigation, Simon has been aware of an objectively high likelihood that its actions constituted infringement of one or more claims of the '608 Patent and that the '608 Claims were valid.

162. On information and belief, Simon could not reasonably, subjectively have believed that their actions did not constitute infringement of the '608 System Claims or the '608 Method Claims. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constituted infringement, Simon continued its infringing activities. As such, Simon has willfully infringed one or more of the '608 Claims.

163. On information and belief, Simon has intentionally induced infringement of the '608 Claims and has committed contributory infringement in this district and elsewhere in the United States, by providing the hardware and/or software necessary for their retailers to make or use infringing systems.

164. On information and belief, despite knowledge of the '608 Patent as early as Simon's receipt of the Second Amended Complaint in the Prior Texas Litigation, Simon continued to encourage, instruct, enable, and otherwise cause its customers to sell the VISA/AMEX Cards in a manner which infringes the '608 Claims. Simon received revenue from the provision of and sale of the VISA/AMEX Cards. Simon has specifically intended its retailers and customers to use the VISA/AMEX Cards in its infringing systems in such a way that infringes the '608 Claims by, at a minimum, providing and supporting the VISA/AMEX Cards and instructing its customers on how to use them in an infringing manner, at least through information available on Simon's website including information brochures, promotional material, and contact information. *See* Ex. J.

165. On information and belief, Simon knew that its actions, including, but not limited

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

to any of the aforementioned VISA/AMEX Cards, would induce and have induced infringement by its customers by continuing to sell, support, and instruct its customers on using the VISA/AMEX Cards. *Id.*

166. On information and belief, Simon contributed to the infringement of one or more of the '608 Claims by its retailers. Acts by Simon that contributed to the infringement of these retailers include providing the POS devices and transaction processor which are capable of initiating the activation and loyalty point crediting processes. The use of the transaction processor is especially adapted for use in the infringing systems, and it had no substantial non-infringing uses. On information and belief, Simon knew or should have known that such activities contributed to its retailers' infringement of the '608 Claims.

167. Since its inclusion in the Prior Texas Litigation, Simon knew of the '608 Patent and performed acts that it knew, or should have known, induced and/or contributed to the direct infringement of one or more of the '608 Claims by its retailers.

168. Simon's aforesaid activities have been without authority and/or license from Plaintiff.

169. Plaintiff is entitled to recover from Simon the damages sustained by Plaintiff as a result of Simon's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY BLACKHAWK FOR THE SIMON VISA GIFT CARD AND THE SIMON LOYALTY CARD
### (*JOINT AND CONTRIBUTORY INFRINGEMENT*)

170. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs above.

171. Blackhawk has jointly infringed one or more claims of the '608 Patent, including

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

at least Claims **34, 36, 37, 38, 39, 44, 45, 60, 62, 63, 65 and 66** (the "'Count II Claims") by directing and/or controlling Simon, and other third parties, through a contractual relationship. *See* **Exhibit K**.

172.    Upon information and belief, Blackhawk contracted and/or entered into agreements with Simon, and other third parties, concerning the operation, use and functionality of the Simon Visa Gift Card and the Simon Loyalty Card within multifunction card system in this jurisdiction and elsewhere.

173.    For example, upon information and belief, Blackhawk and Simon had an agreement that required Simon, and other retailers including but not limited to grocery stores and drug stores, to support standardized message formats and activation processes for the Simon Visa Gift Card and the Simon Loyalty Card.

174.    Upon information and belief, Blackhawk's contracts and agreements enabled Blackhawk to direct and/or control the infringing conduct of Simon and other third parties.

175.    Blackhawk has conditioned participation in an activity or receipt of a benefit of its performance of a step or steps and establishes the manner and time of that performance.

176.    For example, as shown in Ex. K and the attachments thereto, the Simon Visa Gift Card and the Simon Loyalty Card could only be activated by Simon or another third-party, *e.g.* another Blackhawk network retailer, by following Blackhawk's instructions on transmitting the necessary activation data in a standardized message format for the Simon Visa Gift Card and the Simon Loyalty Card.

177.    Blackhawk provided, or contracted with third parties who provided, the software, hardware, and/or the Simon Visa Gift Card and the Simon Loyalty Card that established the manner and/or timing of the performance of the steps such as allowing when, where, if and how

the customer uses the Simon Visa Gift Card and the Simon Loyalty Card.

178. To the extent the components of the card system covered by the Count II Claims include hardware or software are provided or owned by third parties, the Simon Visa Gift Card and the Simon Loyalty Card still infringed the Count II Claims because Blackhawk was vicariously liable for the manufacture, sale and use of the patented system by controlling the entire system and deriving a benefit from the use of every element of the entire system.

179. Similarly, to the extent third parties (e.g. retailers or issuing banks) formed or used the patented system, Blackhawk infringed the Count II Claims because the third parties' beneficial use of the Count II Claims was conditioned on using components in an infringing manner as established by Blackhawk and/or Blackhawk conditioned payment to such third party upon providing the infringing component, per contractual agreement.

180. On information and belief, Blackhawk has committed contributory infringement in this district and elsewhere in the United States, by providing the hardware and/or software necessary for Simon to make or use infringing systems.

181. Specifically, Blackhawk has contributed to the infringement of one or more claims of Count II Claims by Simon and other Blackhawk network retailers regarding the Simon Visa Gift Card and the Simon Loyalty Card.

182. Acts by Blackhawk that contributed to the infringement of Simon include providing the banking network and/or Processing Hub, which were capable of connecting, routing, authorizing, approving, declining, and recording activation transactions for the Simon Visa Gift Card and the Simon Loyalty Card.

183. The use of the Processing Hub computers was especially adapted for use in the infringing systems, and it had no substantial non-infringing uses.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

184. On information and belief, Blackhawk knew or should have known that such activities contributed to its customers, subsidiaries, and other third parties' infringement of the Count II Claims by the Simon Visa Gift Card and the Simon Loyalty Card.

185. At least as early as December 2009, Blackhawk knew of the '608 Patent and performed acts that it knew, or should have known, contributed to the direct infringement of one or more of the Count II Claims by Simon and other retailers.

186. Blackhawk's aforesaid activities have been without authority and/or license from Plaintiff.

187. Plaintiff is entitled to recover from Blackhawk the damages sustained by Plaintiff as a result of Blackhawk's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY BLACKHAWK FOR THE BLACKHAWK ACCUSED PRODUCTS
### (DIRECT, JOINT, INDIRECT AND WILLFUL INFRINGEMENT)

188. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs above.

189. Blackhawk has directly infringed, either literally or under the doctrine of equivalents, one or more claims of the '608 Patent, including at least Claims **34, 36, 37, 38, 39, 44, 60, 61, 62, 63, and 65** (the "'Count III Claims") because it shipped, distributed, made, used, imported, offered for sale, sold, and/or advertised a multifunction card system comprising the Blackhawk Accused Products. *See* **Exhibit L**.

190. Specifically, Blackhawk's multifunction card system infringed each and every element of the Count III Claims, either literally or equivalently, a multifunction card system, containing at least one the Blackhawk Accused Products. *See* Ex. L and Attachments thereto. In

addition, the Blackhawk Accused Products contained a bank identification number ("BIN") approved by the American Bankers Association. This BIN allowed Blackhawk to route the Blackhawk Accused Products for activation transactions. *See id.* Blackhawk's Accused Products were available for sale on its website and through various retailers, located in this district and throughout the United States. *See id.*

191. Upon information and belief, Blackhawk's use of the infringing systems, the making and configuration of the systems, and the sale of products generated through the use of the systems constituted direct infringement of one or more of claims 34, 36, 37, 38, 39, and 44 of the '608 Patent (the "Count III System Claims").

192. In addition, Blackhawk's Accused Products infringed claim 38. When merchants process refunds and returns at the point-of-sale device, the refund (or recharge) amount and the Blackhawk Accused Product's card number used for the original purchase are transmitted to the processing hub, which credits this amount back to the card, and thereby, increases the purchase value of (or recharges) a previously activated card.

193. Upon information and belief, Blackhawk and/or its agents performed the methods claimed in claims 60, 61, 62, 63, and 65 of the '608 Patent (the "Count III Method Claims") during the course of the installation, testing, and/or ordinary operation of the Blackhawk Accused Products.

194. By using the infringing system, making and configuring the systems, and selling the Blackhawk Accused Products for use in the system, Blackhawk, its agents, its retailers, and/or its customers have directly infringed one or more of the Count III Claims. *See* Ex. L. On information and belief, Blackhawk installed, tested, configured, and serviced equipment in the infringing system, thereby making and using the systems disclosed in the Count III Claims and

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

infringing those claims under 35 U.S.C. § 271(a).

195.    Upon information and belief, Blackhawk employed staff (e.g., sales representatives and an IT department) to instruct its commercial partners (like Kroger) on the operation of the POS devices in order to interface with, install, configure, manage, monitor, test, and control, the processing hub and other equipment in the infringing system. On information and belief, various POS Devices were coupled to the transaction processor and other equipment directly and/or indirectly via one or more data networks. *See* Ex. L.

196.    Blackhawk was in the business of selling and offering for sale the Blackhawk Accused Products to its customers, subsidiaries, and other third parties throughout the United States, including within the state of Texas and this district. Upon information and belief, Blackhawk owned, operated, or leased all equipment in the infringing system, or alternatively exercised direction and control over the operation of all equipment in the infringing system in order to provide the benefit of the Blackhawk Accused Products to its commercial partners and customers.

197.    Blackhawk has jointly infringed the Count III Claims by directing and/or controlling other parties, including through a contractual relationship. Upon information and belief, Blackhawk contracted and/or entered into agreements with third parties concerning the operation, use and functionality of the Blackhawk Accused Products and multifunction card system within this jurisdiction and elsewhere. For example, upon information and belief, Blackhawk and its retailers had an agreement that required its merchants, including but not limited to grocery stores and drug stores, to support standardized message formats and activation processes for the Blackhawk Accused Products. Upon information and belief, Blackhawk's contracts and agreements enabled Blackhawk to direct and/or control the infringing conduct of the third parties.

198.    Blackhawk conditioned participation in an activity or receipt of a benefit of its performance of a step or steps and established the manner and time of that performance.  For example, as shown in Ex. L and the attachments thereto, the Blackhawk Accused Products could only be activated by a third-party, *e.g.* a retailer, by following Blackhawk's instructions on transmitting the necessary activation data in a standardized message format for the Blackhawk Accused Products.  Blackhawk provided, or contracted with third parties who provide, the software, hardware, and/or the Blackhawk Accused Products that establish the manner and/or timing of the performance of the steps such as allowing when, where, if and how the customer used the Blackhawk Accused Products.

199.    To the extent the components of the card system covered by the Count III Claims include hardware or software were provided or owned by third parties, the Blackhawk Accused Products still infringed the Count III Claims because Blackhawk was vicariously liable for the manufacture, sale and use of the patented system by controlling the entire system and deriving a benefit from the use of every element of the entire system.  Similarly, to the extent third parties (e.g. retailers or issuing banks) formed or used the patented system, Blackhawk infringed the Count III Claims because the third parties' beneficial use of the Count III Claims was conditioned on using components in an infringing manner as established by Blackhawk and/or Blackhawk conditioned payment to such third party upon providing the infringing component, per contractual agreement.

200.    On information and belief, Blackhawk has committed induced infringement of the Count III Claims and has committed contributory infringement in this district and elsewhere in the United States, by providing the hardware and/or software necessary for its retailers and customers to make, sell, or use the infringing multifunction card system.

201. On information and belief, despite knowledge of the '608 Patent as early as December 2009, Blackhawk encouraged, instructed, enabled, and otherwise caused its customers, subsidiaries, and other third parties to make, use or sell the Blackhawk Accused Products in a manner which infringed the Count III Claims. Blackhawk received revenue from the provision of, sale and use of the Blackhawk Accused Products and the card system. Specifically, the benefits to Blackhawk included but were not limited to the higher profitability and increased marketability of its Blackhawk Accused Products. Blackhawk has specifically intended its customers, subsidiaries, and other third parties to use the Blackhawk Accused Products in its infringing systems in such a way that infringed the Count III Claims by, at a minimum, providing and supporting the Blackhawk Accused Products and instructing its customers, subsidiaries, and other third parties on how to use them in an infringing manner, at least through information available on Blackhawk's website including information brochures, promotional material, and contact information. *See* Ex. L.

202. On information and belief, Blackhawk knew that its actions, including, but not limited to any of the Blackhawk Accused Products, would induce and have induced infringement by its customers, subsidiaries, and other third parties by its continuing to sell, support, and instruct them on making, using, or selling the Blackhawk Accused Products. *Id.*

203. On information and belief, Blackhawk has contributed to the infringement of one or more of the Count III Claims by its customers, subsidiaries, and other third parties. Acts by Blackhawk that contributed to the infringement by these customers, subsidiaries, and other third parties include providing the banking network and/or Processing Hub, which were capable of connecting, routing, authorizing, approving, declining, and recording activation transactions for the Blackhawk Accused Products. The use of the Processing Hub computers was especially

adapted for use in the infringing systems, and it had no substantial non-infringing uses. On information and belief, Blackhawk knew or should have known that such activities contributed to its customers, subsidiaries, and other third parties' infringement of the Count III Claims by the Blackhawk Accused Products.

204. Moreover, on information and belief, Blackhawk has contributed to the infringement of one or more of the Count III Claims by its customers, subsidiaries, and other third parties. Acts by Blackhawk that contributed to the infringement of these customers, subsidiaries, and other third parties included providing the Blackhawk Accused Products, which were capable of initiating the activation transactions at approved locations. These debit/medical services cards were especially adapted for use in the infringing systems, and they had no substantial non-infringing uses. On information and belief, Blackhawk knew or should have known that such activities contributed to its customers and/or subsidiaries' infringement of the Count III Claims.

205. At least as early as December 2009, Blackhawk knew of the '608 Patent and performed acts that it knew, or should have known, induced and/or contributed to the direct infringement of one or more of the Count III Claims by its other retailers.

206. Blackhawk undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed one or more of the Count III Claims, which were duly issued by the USPTO and are presumed valid under 35 U.S.C. §282(a). *See* Ex. A. For example, since at least as early as December 2009, Blackhawk has been aware of an objectively high likelihood that its actions constituted infringement of the Count III Claims and that the '608 Patent were valid. *See supra*.

207. On information and belief, Blackhawk could not reasonably, subjectively have believed that its actions did not constitute infringement of the Count III Claims. Despite that

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

knowledge and subjective belief, and the objectively high likelihood that its actions constituted infringement, Blackhawk continued its infringing activities. As such, Blackhawk has willfully infringed the Count III Claims.

208. Blackhawk's aforesaid activities have been without authority and/or license from Plaintiff.

209. Plaintiff is entitled to recover from Blackhawk the damages sustained by Plaintiff as a result of Blackhawk's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY AMERICAN EXPRESS FOR THE SIMON AMEX GIFT CARD
### *(JOINT AND CONTRIBUTORY INFRINGEMENT)*

210. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs above.

211. American Express has jointly infringed one or more claims of the '608 Patent, including at least Claims **34, 36, 37, 38, 44, 60, 62, 63, 65** (the "'Count IV Claims") by directing and/or controlling Simon, and other third parties, through a contractual relationship. *See* **Exhibit M**.

212. Upon information and belief, American Express contracted and/or entered into agreements with Simon, and other third parties, concerning the operation, use and functionality of the Simon AmEx Gift Card and multifunction card system within this jurisdiction and elsewhere.

213. For example, upon information and belief, American Express and Simon had an agreement that requires Simon to support standardized message formats and activation processes for the Simon AmEx Gift Card.

214. Upon information and belief, American Express's contracts and agreements

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

enabled American Express to direct and/or control the infringing conduct of Simon and other third parties.

215. American Express conditioned participation in an activity or receipt of a benefit of its performance of a step or steps and established the manner and time of that performance.

216. For example, as shown in Ex. M and the attachments thereto, the Simon AmEx Gift Card could only be activated by Simon by following American Express's instructions on transmitting the necessary activation data in a standardized message format for the Simon AmEx Gift Card.

217. American Express provided, or contracted with third parties who provided, the software, hardware, and/or the Simon AmEx Gift Card that established the manner and/or timing of the performance of the steps such as allowing when, where, if and how the customer used the Simon AmEx Gift Card.

218. To the extent the components of the card system covered by the Count IV Claims included hardware or software were provided or owned by third parties, the Simon AmEx Gift Card still infringed the Count IV Claims because American Express was vicariously liable for the manufacture, sale and use of the patented system by controlling the entire system and deriving a benefit from the use of every element of the entire system.

219. Similarly, to the extent third parties (e.g. processors or issuing banks) formed or used the patented system, American Express infringed the Count IV Claims because the third parties' beneficial use of the Count IV Claims was conditioned on using components in an infringing manner as established by American Express and/or American Express conditioned payment to such third party upon providing the infringing component, per contractual agreement.

220. On information and belief, American Express has committed contributory

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

infringement in this district and elsewhere in the United States, by providing the hardware and/or software necessary for Simon to make or use infringing systems.

221. Specifically, American Express has contributed to the infringement of one or more claims of Count IV Claims by Simon regarding the Simon AmEx Gift Card.

222. Acts by American Express that contributed to the infringement of Simon included providing the banking network and/or Processing Hub, which were capable of connecting, routing, authorizing, approving, declining, and recording activation transactions for the Simon AmEx Gift Card.

223. The use of the Processing Hub computers was especially adapted for use in the infringing systems, and it had no substantial non-infringing uses.

224. On information and belief, American Express knew or should have known that such activities contributed to its customers, subsidiaries, and other third parties' infringement of the Count IV Claims by the Simon AmEx Gift Card.

225. At least as early as 2005, American Express knew of the '608 Patent and performed acts that it knew, or should have known, contributed to the direct infringement of one or more of the Count IV Claims by Simon. *See* Ex. E.

226. American Express's aforesaid activities have been without authority and/or license from Plaintiff.

227. Plaintiff is entitled to recover from American Express the damages sustained by Plaintiff as a result of American Express's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### COUNT V: INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY AMERICAN EXPRESS FOR THE AMERICAN EXPRESS ACCUSED PRODUCTS
### *(DIRECT, JOINT, INDIRECT AND WILLFUL INFRINGEMENT)*

228.    Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs above.

229.    American Express has directly infringed, either literally or under the doctrine of equivalents, one or more claims of the '608 Patent, including at least Claims **34, 36, 37, 38, 44, 60, 61, 62, 63, and 65** (the "'Count V Claims") because it shipped, distributed, made, used, imported, offered for sale, sold, and/or advertised a multifunction card system comprising the American Express Accused Products. *See* **Exhibit N**.

230.    Specifically, American Express's multifunction card system infringed each and every element of the Count V Claims, either literally or equivalently, a multifunction card system, containing at least one of American Express Accused Products.  *See* Ex. N and Attachments thereto.  In addition, the American Express Accused Products contained a bank identification number ("BIN") approved by the American Bankers Association.  This BIN allowed American Express to route the American Express Accused Products for activation transactions.  *See id.* American Express's Accused Products were available for sale on its website and through various retailers, located in this district and throughout the United States.  *See id.*

231.    Upon information and belief, American Express's use of the infringing systems, the making and configuration of the systems, and the sale of products generated through the use of the systems constituted direct infringement of one or more of claims 34, 36, 37, 38, and 44 of the '608 Patent (the "Count V System Claims").

232.    In addition, Simon's American Express's Accused Products infringed claim 38. When merchants process refunds and returns at the point-of-sale device, the refund (or recharge) amount and the American Express Accused Product's card number used for the original purchase

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

are transmitted to the processing hub, which credits this amount back to the card, and thereby, increases the purchase value of (or recharges) a previously activated card.

233.    Upon information and belief, American Express and/or its agents performed the methods claimed in claims 60, 61, 62, 63, and 65 of the '608 Patent (the "Count V Method Claims") during the course of the installation, testing, and/or ordinary operation of the American Express Accused Products.

234.    By using the infringing system, making and configuring the systems, and selling the American Express Accused Products for use in the system, American Express, its agents, its retailers, and/or its customers have directly infringed one or more of the Count V Claims. *See* Ex. N. On information and belief, American Express installed, tested, configured, and serviced equipment in the infringing system, thereby making and using the systems disclosed in the Count V Claims and infringing those claims under 35 U.S.C. § 271(a).

235.    Upon information and belief, American Express employed staff (e.g., sales representatives and an IT department) to instruct its commercial partners (like Kroger) on the operation of the POS devices in order to interface with, install, configure, manage, monitor, test, and control, the processing hub and other equipment in the infringing system. On information and belief, various POS Devices were coupled to the transaction processor and other equipment directly and/or indirectly via one or more data networks. *See* Ex. N.

236.    American Express was in the business of selling and offering for sale the American Express Accused Products to its customers, subsidiaries, and other third parties throughout the United States, including within the state of Texas and this district. Upon information and belief, American Express owned, operated, or leased all equipment in the infringing system, or alternatively exercised direction and control over the operation of all equipment in the infringing

system in order to provide the benefit of the American Express Accused Products to its commercial partners and customers.

237.    American Express has jointly infringed the Count V Claims by directing and/or controlling other parties, including through a contractual relationship.  Upon information and belief, American Express contracted and/or entered into agreements with third parties concerning the operation, use and functionality of the American Express Accused Products and multifunction card system within this jurisdiction and elsewhere.  For example, upon information and belief, American Express and its retailers had an agreement that required its merchants, including but not limited to grocery stores and drug stores, to support standardized message formats and activation processes for the American Express Accused Products.  Upon information and belief, American Express's contracts and agreements enabled American Express to direct and/or control the infringing conduct of the third parties.

238.    American Express conditioned participation in an activity or receipt of a benefit of its performance of a step or steps and established the manner and time of that performance.  For example, as shown in Ex. N and the attachments thereto, the American Express Accused Products could only be activated by a third-party, *e.g.* a retailer, by following American Express's instructions on transmitting the necessary activation data in a standardized message format for the American Express Accused Products.  American Express provided, or contracted with third parties who provided, the software, hardware, and/or the American Express Accused Products that established the manner and/or timing of the performance of the steps such as allowing when, where, if and how the customer used the American Express Accused Products.

239.    To the extent the components of the card system covered by the Count V Claims include hardware or software were provided or owned by third parties, the American Express

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

Accused Products still infringed the Count V Claims because American Express was vicariously liable for the manufacture, sale and use of the patented system by controlling the entire system and deriving a benefit from the use of every element of the entire system. Similarly, to the extent third parties (e.g. retailers or issuing banks) formed or used the patented system, American Express infringed the Count V Claims because the third parties' beneficial use of the Count V Claims was conditioned on using components in an infringing manner as established by American Express and/or American Express conditioned payment to such third party upon providing the infringing component, per contractual agreement.

240. On information and belief, American Express has committed induced infringement of the Count V Claims and has committed contributory infringement in this district and elsewhere in the United States, by providing the hardware and/or software necessary for its retailers and customers to make, sell, or use the infringing multifunction card system.

241. On information and belief, despite knowledge of the '608 Patent as early as 2007, American Express encouraged, instructed, enabled, and otherwise caused its customers, subsidiaries, and other third parties to make, use or sell the American Express Accused Products in a manner which infringed the Count V Claims. American Express received revenue from the provision of, sale and use of the American Express Accused Products and the card system. Specifically, the benefits to American Express included but are not limited to the higher profitability and increased marketability of its American Express Accused Products. American Express has specifically intended its customers, subsidiaries, and other third parties to use the American Express Accused Products in its infringing systems in such a way that infringed the Count V Claims by, at a minimum, providing and supporting the American Express Accused Products and instructing its customers, subsidiaries, and other third parties on how to use them in

an infringing manner, at least through information available on American Express's website including information brochures, promotional material, and contact information. *See* Ex. N.

242. On information and belief, American Express knew that its actions, including, but not limited to any of the American Express Accused Products, would induce and have induced infringement by its customers, subsidiaries, and other third parties by its continuing to sell, support, and instruct them on making, using, or selling the American Express Accused Products. *Id.*

243. On information and belief, American Express has contributed to the infringement of one or more of the Count V Claims by its customers, subsidiaries, and other third parties. Acts by American Express that contributed to the infringement by these customers, subsidiaries, and other third parties include providing the banking network and/or Processing Hub, which are capable of connecting, routing, authorizing, approving, declining, and recording activation transactions for the American Express Accused Products. The use of the Processing Hub computers was especially adapted for use in the infringing systems, and it had no substantial non-infringing uses. On information and belief, American Express knew or should have known that such activities contributed to its customers, subsidiaries, and other third parties' infringement of the Count V Claims by the American Express Accused Products.

244. Moreover, on information and belief, American Express has contributed to the infringement of one or more of the Count V Claims by its customers, subsidiaries, and other third parties. Acts by American Express that contributed to the infringement of these customers, subsidiaries, and other third parties included providing the American Express Accused Products, which are capable of initiating the activation transactions at approved locations. These debit/medical services cards were especially adapted for use in the infringing systems, and they had no substantial non-infringing uses. On information and belief, American Express knew or

should have known that such activities contribute to its customers and/or subsidiaries' infringement of the Count V Claims.

245.    At least as early as 2005, American Express knew of the '608 Patent and performed acts that it knew, or should have known, induced and/or contributed to the direct infringement of one or more of the Count V Claims by its other retailers.  *See* Ex. E.

246.    American Express undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed one or more of the Count V Claims, which were duly issued by the USPTO and are presumed valid under 35 U.S.C. §282(a).  *See* Ex. A.  For example, since at least as early as 2005, American Express has been aware of an objectively high likelihood that its actions constituted infringement of the Count V Claims and that the '608 Patent was valid.  *See* Ex. N.

247.    On information and belief, American Express could not reasonably, subjectively have believed that its actions did not constitute infringement of the Count V Claims.  Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constituted infringement, American Express continued its infringing activities.  As such, American Express has willfully infringed the Count V Claims.

248.    American Express's aforesaid activities have been without authority and/or license from Plaintiff.

249.    Plaintiff is entitled to recover from American Express the damages sustained by Plaintiff as a result of American Express's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VI: INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY U.S. BANK FOR THE SIMON VISA GIFT CARD
### *(JOINT AND CONTRIBUTORY INFRINGEMENT)*

250.     Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs above.

251.     U.S. Bank has jointly infringed one or more claims of the '608 Patent, including at least Claims **34, 36, 37, 38, 39, 44, 60, 62, 63, 65** (the "'Count VI Claims") by directing and/or controlling Simon, and other third parties, through a contractual relationship. *See* **Exhibit O**.

252.     Upon information and belief, U.S. Bank contracted and/or entered into agreements with Simon, and other third parties, concerning the operation, use and functionality of the Simon Visa Gift Card and multifunction card system within this jurisdiction and elsewhere.

253.     For example, upon information and belief, U.S. Bank and Simon had an agreement that required Simon, and other retailers including but not limited to grocery stores and drug stores, to support standardized message formats and activation processes for the Simon Visa Gift Card.

254.     Upon information and belief, U.S. Bank's contracts and agreements enabled U.S. Bank to direct and/or control the infringing conduct of Simon and other third parties.

255.     U.S. Bank has conditioned participation in an activity or receipt of a benefit of its performance of a step or steps and established the manner and time of that performance.

256.     For example, as shown in Ex. O and the attachments thereto, the Simon Visa Gift Card could only be activated by Simon by following U.S. Bank's instructions on transmitting the necessary activation data in a standardized message format for the Simon Visa Gift Card.

257.      U.S. Bank provided, or contracted with third parties who provided, the software, hardware, and/or the Simon Visa Gift Card that established the manner and/or timing of the performance of the steps such as allowing when, where, if and how the customer used the Simon

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

Visa Gift Card.

258.    To the extent the components of the card system covered by the Count VI Claims included hardware or software are provided or owned by third parties, the Simon Visa Gift Card still infringed the Count VI Claims because U.S. Bank was vicariously liable for the manufacture, sale and use of the patented system by controlling the entire system and deriving a benefit from the use of every element of the entire system.

259.    Similarly, to the extent third parties (e.g. retailers or issuing banks) formed or used the patented system, U.S. Bank infringed the Count VI Claims because the third parties' beneficial use of the Count VI Claims was conditioned on using components in an infringing manner as established by Simon and/or U.S. Bank conditioned payment to such third party upon providing the infringing component, per contractual agreement.

260.    On information and belief, U.S. Bank has committed contributory infringement in this district and elsewhere in the United States, by providing the hardware and/or software necessary for Simon to make or use infringing systems.

261.    Specifically, U.S. Bank has contributed to the infringement of one or more claims of Count VI Claims by Simon regarding the Simon Visa Gift Card.

262.    Acts by U.S. Bank that contributed to the infringement of Simon include providing the banking network and/or Processing Hub, which were capable of connecting, routing, authorizing, approving, declining, and recording activation transactions for the Simon Visa Gift Card.

263.    The use of the Processing Hub computers was especially adapted for use in the infringing systems, and it had no substantial non-infringing uses.

264.    On information and belief, U.S. Bank knew or should have known that such

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

activities contributed to its customers, subsidiaries, and other third parties' infringement of the Count VI Claims by the Simon Visa Gift Card.

265.   At least as early as 2015, U.S. Bank knew of the '608 Patent and performed acts that it knew, or should have known, contributed to the direct infringement of one or more of the Count VI Claims by Simon and other retailers. *See* Ex. O.

266.   U.S. Bank's aforesaid activities have been without authority and/or license from Plaintiff.

267.   Plaintiff is entitled to recover from U.S. Bank the damages sustained by Plaintiff as a result of U.S. Bank's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VII: INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY U.S. BANK FOR THE U.S. BANK VISA ACCUSED PRODUCTS
### (*DIRECT, JOINT, INDIRECT AND WILLFUL INFRINGEMENT*)

268.   Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs above.

269.   U.S Bank has directly infringed, either literally or under the doctrine of equivalents, one or more claims of the '608 Patent, including at least Claims **34, 36, 37, 38, 39, 44, 45, 60, 61, 62, 63, 65, and 66** (the "'Count VII Claims") because it shipped, distributed, made, used, imported, offered for sale, sold, and/or advertised a multifunction card system comprising the U.S. Bank Visa Accused Products. *See* **Exhibit P**.

270.   Specifically, U.S Bank's multifunction card system infringed each and every element of the Count VII Claims, either literally or equivalently, a multifunction card system, containing at least the U.S. Bank Visa Accused Products. *See* Ex. P and Attachments thereto. In addition, the U.S. Bank Visa Accused Products contained a bank identification number ("BIN")

approved by the American Bankers Association. This BIN allowed U.S. Bank to route the U.S. Bank Visa Accused Products for activation transactions. *See id.* The U.S. Bank Visa Accused Products were available for sale on its website and through various retailers, located in this district and throughout the United States. *See id.*

271. Upon information and belief, U.S. Bank's use of the infringing systems, the making and configuration of the systems, and the sale of products generated through the use of the systems constituted direct infringement of one or more of claims 34, 36, 37, 38, 39, 44, and 45 of the '608 Patent (the "Count VII System Claims").

272. In addition, U.S. Bank's Accused Products infringed claim 38. When merchants process refunds and returns at the point-of-sale device, the refund (or recharge) amount and the U.S. Bank Accused Product's card number used for the original purchase are transmitted to the processing hub, which credits this amount back to the card, and thereby, increases the purchase value of (or recharges) a previously activated card.

273. Upon information and belief, U.S. Bank and/or its agents performed the methods claimed in claims 60, 61, 62, 63, 65, and 66 of the '608 Patent (the "Count VII Method Claims") during the course of the installation, testing, and/or ordinary operation of the U.S. Bank Visa Accused Products.

274. By using the infringing system, making and configuring the systems, and selling the U.S. Bank Visa Accused Products for use in the system, U.S. Bank, its agents, its retailers, and/or its customers have directly infringed one or more of the Count VII Claims. *See* Ex. P. On information and belief, U.S. Bank installed, tested, configured, and serviced equipment in the infringing system, thereby making and using the systems disclosed in the Count VII Claims and infringing those claims under 35 U.S.C. § 271(a).

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

275.    Upon information and belief, U.S. Bank employed staff (e.g., sales representatives and an IT department) to instruct its commercial partners, like Kroger on the operation of the POS devices in order to interface with, install, configure, manage, monitor, test, and control, the processing hub and other equipment in the infringing system.  On information and belief, various POS Devices were coupled to the transaction processor and other equipment directly and/or indirectly via one or more data networks.  *See* Ex. P.

276.    U.S. Bank is in the business of selling and offering for sale the U.S. Bank Visa Accused Products to its customers, subsidiaries, and other third parties throughout the United States, including within the state of Texas and this district.  Upon information and belief, U.S. Bank owned, operated, or leased all equipment in the infringing system, or alternatively exercised direction and control over the operation of all equipment in the infringing system in order to provide the benefit of the U.S. Bank Visa Accused Products to its commercial partners and customers.

277.    U.S. Bank has jointly infringed the Count VII Claims by directing and/or controlling other parties, including through a contractual relationship.  Upon information and belief, U.S. Bank contracted and/or entered into agreements with third parties concerning the operation, use and functionality of the U.S. Bank Visa Accused Products and multifunction card system within this jurisdiction and elsewhere.  For example, upon information and belief, U.S. Bank and its retailers have an agreement that requires its merchants, including but not limited to grocery stores and drug stores, to support standardized message formats and activation processes for the U.S. Bank Visa Accused Products.  Upon information and belief, U.S. Bank's contracts and agreements enable U.S. Bank to direct and/or control the infringing conduct of the third parties.

278.    U.S. Bank conditioned participation in an activity or receipt of a benefit of its

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

performance of a step or steps and establishes the manner and time of that performance. For example, as shown in Ex. P and the attachments thereto, the U.S. Bank Visa Accused Products can only be activated by a third-party, *e.g.* a retailer, by following U.S. Bank's instructions on transmitting the necessary activation data in a standardized message format for the U.S. Bank Visa Accused Products. U.S. Bank provided, or contracted with third parties who provide, the software, hardware, and/or the U.S. Bank Visa Accused Products that establish the manner and/or timing of the performance of the steps such as allowing when, where, if and how the customer uses the U.S. Bank Visa Accused Products.

279. To the extent the components of the card system covered by the Count VII Claims include hardware or software are provided or owned by third parties, the U.S. Bank Visa Accused Products still infringe the Count VII Claims because U.S. Bank is vicariously liable for the manufacture, sale and use of the patented system by controlling the entire system and deriving a benefit from the use of every element of the entire system. Similarly, to the extent third parties (e.g. retailers or issuing banks) form or use the patented system, U.S. Bank infringed the Count VII Claims because the third parties' beneficial use of the Count VII Claims is conditioned on using components in an infringing manner as established by U.S. Bank and/or U.S. Bank conditioned payment to such third party upon providing the infringing component, per contractual agreement.

280. On information and belief, U.S. Bank has committed induced infringement of the Count VII Claims and has committed contributory infringement in this district and elsewhere in the United States, by providing the hardware and/or software necessary for its retailers and customers to make, sell, or use the infringing multifunction card system.

281. On information and belief, despite knowledge of the '608 Patent as early as 2015,

U.S. Bank encouraged, instructed, enabled, and otherwise caused its customers, subsidiaries, and other third parties to make, use or sell the U.S. Bank Visa Accused Products in a manner which infringes the Count VII Claims. U.S. Bank received revenue from the provision of, sale and use of the U.S. Bank Visa Accused Products and the card system. Specifically, the benefits to U.S. Bank included but are not limited to the higher profitability and increased marketability of its U.S. Bank Visa Accused Products. U.S. Bank has specifically intended its customers, subsidiaries, and other third parties to use the U.S. Bank Visa Accused Products in its infringing systems in such a way that infringes the Count VII Claims by, at a minimum, providing and supporting the U.S. Bank Visa Accused Products and instructing its customers, subsidiaries, and other third parties on how to use them in an infringing manner, at least through information available on U.S. Bank's website including information brochures, promotional material, and contact information. *See* Ex. P.

282. On information and belief, U.S. Bank knew that its actions, including, but not limited to any of the U.S. Bank Visa Accused Products, would induce and have induced infringement by its customers, subsidiaries, and other third parties because it continued to sell, support, and instruct them on making, using, or selling the U.S. Bank Accused Products. *Id.*

283. On information and belief, U.S. Bank has contributed to the infringement of one or more of the Count VII Claims by its customers, subsidiaries, and other third parties. Acts by U.S. Bank that contributed to the infringement by these customers, subsidiaries, and other third parties include providing the banking network and/or Processing Hub, which are capable of connecting, routing, authorizing, approving, declining, and recording activation transactions for the U.S. Bank Visa Accused Products. The use of the Processing Hub computers is especially adapted for use in the infringing systems, and it has no substantial non-infringing uses. On information and belief,

U.S. Bank knew or should know that such activities contributed to its customers, subsidiaries, and other third parties' infringement of the Count VII Claims by the U.S. Bank Visa Accused Products.

284.     Moreover, on information and belief, U.S. Bank has contributed to the infringement of one or more of the Count VII Claims by its customers, subsidiaries, and other third parties. Acts by U.S. Bank that contributed to the infringement of these customers, subsidiaries, and other third parties included providing the U.S. Bank Visa Accused Products, which are capable of initiating the activation transactions at approved locations. The use of these debit/medical services cards were especially adapted for use in the infringing systems, and they had no substantial non-infringing uses. On information and belief, U.S. Bank knew or should have known that such activities contribute to its customers and/or subsidiaries' infringement of the Count VII Claims.

285.     At least as early as 2015, U.S. Bank knew of the '608 Patent and performs acts that it knew, or should have known, induced and/or contributed to the direct infringement of one or more of the Count VII Claims by its other retailers.

286.     U.S. Bank undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed one or more of the Count VII Claims, which were duly issued by the USPTO and are presumed valid under 35 U.S.C. §282(a). *See* Ex. A. For example, since at least as early as 2015, U.S. Bank has been aware of an objectively high likelihood that its actions constituted infringement of the Count VII Claims and that the '608 Patent is valid. *See* Ex. P.

287.     On information and belief, U.S. Bank could not reasonably, subjectively believe that its actions did not constitute infringement of the Count VII Claims. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constituted infringement, U.S. Bank continued its infringing activities. As such, U.S. Bank has willfully infringed the Count

VII Claims.

288.    U.S. Bank's aforesaid activities have been without authority and/or license from Plaintiff.

289.    Plaintiff is entitled to recover from U.S. Bank the damages sustained by Plaintiff as a result of U.S. Bank's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VIII: *IN THE ALTERNATIVE* – INFRINGEMENT OF U.S. PATENT NO. 6,000,608 BY U.S. BANK FOR THE U.S. BANK-MASTERCARD ACCUSED PRODUCTS
### (*DIRECT, JOINT, INDIRECT AND WILLFUL INFRINGEMENT*)

290.    Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs above.

291.    Plaintiff pleads this claim in the alternative, if the Court finds that the MasterCard Agreement terminated before the expiration of the '608 Patent in Count X.

292.    U.S Bank has directly infringed, either literally or under the doctrine of equivalents, one or more claims of the '608 Patent, including at least Claims **34, 36, 37, 38, 39, 44, 45, 60, 61, 62, 63, 65, and 66** (the "'Count VIII Claims") because it shipped, distributed, made, used, imported, offered for sale, sell, and/or advertised a multifunction card system comprising the U.S. Bank MC Accused Products. *See* **Exhibit P**.

293.    Specifically, U.S Bank's multifunction card system infringes each and every element of the Count VIII Claims, either literally or equivalently, a multifunction card system, containing at least the U.S. Bank MC Accused Products. *See* Ex. P and Attachments thereto. In addition, the U.S. Bank MC Accused Products contain a bank identification number ("BIN") approved by the American Bankers Association. This BIN allows U.S. Bank to route the U.S.

Bank MC Accused Products for activation transactions. *See id.* The U.S. Bank MC Accused Products are available for sale on its website and through various retailers, located in this district and throughout the United States. *See id.*

294. Upon information and belief, U.S. Bank's use of the infringing systems, the making and configuration of the systems, and the sale of products generated through the use of the systems constitutes direct infringement of one or more of claims 34, 36, 37, 38, 39, 44, and 45 of the '608 Patent (the "Count VIII System Claims").

295. In addition, U.S Bank's Accused Products infringed claim 38. When merchants process refunds and returns at the point-of-sale device, the refund (or recharge) amount and the U.S. Bank Accused Product's card number used for the original purchase are transmitted to the processing hub, which credits this amount back to the card, and thereby, increases the purchase value of (or recharges) a previously activated card.

296. Upon information and belief, U.S. Bank and/or its agents performed the methods claimed in claims 60, 61, 62, 63, 65, and 66 of the '608 Patent (the "Count VIII Method Claims") during the course of the installation, testing, and/or ordinary operation of the U.S. Bank MC Accused Products.

297. By using the infringing system, making and configuring the systems, and selling the U.S. Bank MC Accused Products for use in the system, U.S. Bank, its agents, its retailers, and/or its customers have directly infringed one or more of the Count VIII Claims. *See* Ex. P. On information and belief, U.S. Bank installed, tested, configured, and serviced equipment in the infringing system, thereby making and using the systems disclosed in the Count VIII Claims and infringing those claims under 35 U.S.C. § 271(a).

298. Upon information and belief, U.S. Bank employs staff (e.g., sales representatives

and an IT department) to instruct its commercial partners, like Kroger on the operation of the POS devices in order to interface with, install, configure, manage, monitor, test, and control, the processing hub and other equipment in the infringing system. On information and belief, various POS Devices were coupled to the transaction processor and other equipment directly and/or indirectly via one or more data networks. *See* Ex. P.

299.    U.S. Bank was in the business of selling and offering for sale the U.S. Bank MC Accused Products to its customers, subsidiaries, and other third parties throughout the United States, including within the state of Texas and this district. Upon information and belief, U.S. Bank owned, operated, or leased all equipment in the infringing system, or alternatively exercised direction and control over the operation of all equipment in the infringing system in order to provide the benefit of the U.S. Bank MC Accused Products to its commercial partners and customers.

300.    U.S. Bank has jointly infringed the Count VIII Claims by directing and/or controlling other parties, including through a contractual relationship. Upon information and belief, U.S. Bank contracted and/or entered into agreements with third parties concerning the operation, use and functionality of the U.S. Bank MC Accused Products and multifunction card system within this jurisdiction and elsewhere. For example, upon information and belief, U.S. Bank and its retailers had an agreement that required its merchants, including but not limited to grocery stores and drug stores, to support standardized message formats and activation processes for the U.S. Bank MC Accused Products. Upon information and belief, U.S. Bank's contracts and agreements enabled U.S. Bank to direct and/or control the infringing conduct of the third parties.

301.    U.S. Bank conditioned participation in an activity or receipt of a benefit of its performance of a step or steps and established the manner and time of that performance. For

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

example, as shown in Ex. P and the attachments thereto, the U.S. Bank MC Accused Products could only be activated by a third-party, *e.g.* a retailer, by following U.S. Bank's instructions on transmitting the necessary activation data in a standardized message format for the U.S. Bank MC Accused Products. U.S. Bank provided, or contracted with third parties who provided, the software, hardware, and/or the U.S. Bank MC Accused Products that established the manner and/or timing of the performance of the steps such as allowing when, where, if and how the customer used the U.S. Bank MC Accused Products.

302. To the extent the components of the card system covered by the Count VIII Claims included hardware or software were provided or owned by third parties, the U.S. Bank MC Accused Products still infringed the Count VIII Claims because U.S. Bank was vicariously liable for the manufacture, sale and use of the patented system by controlling the entire system and deriving a benefit from the use of every element of the entire system. Similarly, to the extent third parties (e.g. retailers or issuing banks) formed or used the patented system, U.S. Bank infringed the Count VIII Claims because the third parties' beneficial use of the Count VIII Claims was conditioned on using components in an infringing manner as established by U.S. Bank and/or U.S. Bank conditioned payment to such third party upon providing the infringing component, per contractual agreement.

303. On information and belief, U.S. Bank has committed induced infringement of the Count VIII Claims and has committed contributory infringement in this district and elsewhere in the United States, by providing the hardware and/or software necessary for its retailers and customers to make, sell, or use the infringing multifunction card system.

304. On information and belief, despite knowledge of the '608 Patent as early as 2015, U.S. Bank encouraged, instructed, enabled, and otherwise caused its customers, subsidiaries, and

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

other third parties to make, use or sell the U.S. Bank MC Accused Products in a manner which infringed the Count VIII Claims.  U.S. Bank received revenue from the provision of, sale and use of the U.S. Bank MC Accused Products and the card system.  Specifically, the benefits to U.S. Bank included but were not limited to the higher profitability and increased marketability of its U.S. Bank MC Accused Products.  U.S. Bank has specifically intended its customers, subsidiaries, and other third parties to use the U.S. Bank MC Accused Products in its infringing systems in such a way that infringed the Count VIII Claims by, at a minimum, providing and supporting the U.S. Bank MC Accused Products and instructing its customers,  subsidiaries, and other third parties on how to use them in an infringing manner, at least through information available on U.S. Bank's website including information brochures, promotional material, and contact information.  *See* Ex. P.

305.    On information and belief, U.S. Bank knew that its actions, including, but not limited to any of the U.S. Bank MC Accused Products, would induce and have induced infringement by its customers, subsidiaries, and other third parties by its continuing to sell, support, and instruct them on making, using, or selling the U.S. Bank Accused Products.  *Id.*

306.    On information and belief, U.S. Bank has contributed to the infringement of one or more of the Count VIII Claims by its customers, subsidiaries, and other third parties.  Acts by U.S. Bank that contributed to the infringement by these customers, subsidiaries, and other third parties included providing the banking network and/or Processing Hub, which were capable of connecting, routing, authorizing, approving, declining, and recording activation transactions for the U.S. Bank MC Accused Products.  The use of the Processing Hub computers was especially adapted for use in the infringing systems, and it had no substantial non-infringing uses.  On information and belief, U.S. Bank knew or should have known that such activities contributed to

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

its customers, subsidiaries, and other third parties' infringement of the Count VIII Claims by the U.S. Bank MC Accused Products.

307.    Moreover, on information and belief, U.S. Bank has contributed to the infringement of one or more of the Count VIII Claims by its customers, subsidiaries, and other third parties. Acts by U.S. Bank that contributed to the infringement of these customers, subsidiaries, and other third parties included providing the U.S. Bank MC Accused Products, which were capable of initiating the activation transactions at approved locations.  These debit/medical services cards were especially adapted for use in the infringing systems, and they had no substantial non-infringing uses.  On information and belief, U.S. Bank knew or should have known that such activities contribute to its customers and/or subsidiaries' infringement of the Count VIII Claims.

308.    At least as early as 2015, U.S. Bank knew of the '608 Patent and performed acts that it knew, or should have known, induced and/or contributed to the direct infringement of one or more of the Count VIII Claims by its other retailers.

309.    U.S. Bank undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed one or more of the Count VIII Claims, which were duly issued by the USPTO and are presumed valid under 35 U.S.C. §282(a).  *See* Ex. A.  For example, since at least as early as 2015, U.S. Bank has been aware of an objectively high likelihood that its actions constituted infringement of the Count VIII Claims and that the '608 Patent was valid.  *See* Ex. P.

310.    On information and belief, U.S. Bank could not reasonably, subjectively have believed that its actions did not constitute infringement of the Count VIII Claims.  Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constituted infringement, U.S. Bank continued its infringing activities.  As such, U.S. Bank has willfully

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

infringed the Count VIII Claims.

311.    U.S. Bank's aforesaid activities have been without authority and/or license from Plaintiff.

312.    Plaintiff is entitled to recover from U.S. Bank the damages sustained by Plaintiff as a result of U.S. Bank's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## <u>COUNT IX: DECLARATORY JUDGMENT OF TERMINATION REGARDING MASTERCARD LICENSE (*AGAINST U.S. BANK*)</u>

313.    Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs above.

314.    AlexSam asserts that U.S. Bank may not be liable for infringement of Count IX because it may have been sub-licensed under the MasterCard Agreement.  *See supra*, Factual Allegations, §§ G and H.

315.    MasterCard has raised claims that the License Agreement automatically terminated in 2013 or 2015.  *See* **Exhibit I** (counterclaims VI, VII) at pp. I-21 to I-25.

316.    AlexSam maintains that U.S. Bank was not sub-licensed under the MasterCard Agreement, if the MasterCard Agreement terminated.  *See supra*, Factual Allegations, §§ F and G.

317.    A definite and concrete, real and substantial justiciable controversy exists between the AlexSam and U.S. Bank, concerning whether the MasterCard Agreement provided a sublicense for the U.S. Bank MC Accused Products, which is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

318.    AlexSam is entitled to a declaratory judgment regarding whether the MasterCard Agreement terminated prior to the expiration of the '608 Patent.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

319. AlexSam is entitled to a declaratory judgment that if the MasterCard Agreement terminated before the expiration of the '608 Patent whether U.S. Bank is sublicensed under the MasterCard Agreement.

## JURY DEMAND

320. Plaintiff demands a trial by jury on all issues.

## PRAYER FOR RELIEF

321. Plaintiff respectfully requests the following relief:

A. An adjudication that one or more claims of the '608 Patent has been infringed, either literally and/or under the doctrine of equivalents, by the Defendants;

B. An adjudication that Defendants have induced infringement of one or more claims of the '608 Patent;

C. An adjudication that Defendants have contributed to the infringement by its retailers of one or more claims of the '608 Patent;

D. An award of damages to be paid by Defendants adequate to compensate Plaintiff for Defendants' past infringement, including interest, costs, and disbursements as justified under 35 U.S.C. § 284 and, if necessary to adequately compensate Plaintiff for Defendants' infringement, an accounting of all infringing sales including, but not limited to, those sales not presented at trial;

E. An adjudication that Defendants' infringement of one or more claims of the '608 Patent has been willful such that damages may be enhanced under 35 U.S.C. § 284;

F. That this Court declare this to be an exceptional case and award Plaintiff its reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and,

G. Any further relief that this Court deems just and proper.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

Date: <u>May 7, 2021</u>                    Respectfully submitted,

*/s/ Jacqueline K. Burt*
Timothy C. Davis*
W. Lee Gresham, III*
**HENINGER GARRISON DAVIS, LLC**
2224 1st Avenue North
Birmingham, Alabama 35203
Telephone: (205) 326-3336
Facsimile: (205) 326-3332
Email: tim@hgdlawfirm.com
Email: lee@hgdlawfirm.com

Jacqueline K. Burt (GA 425322)*
Jonathan R. Miller (GA 507179)*
Travis E. Lynch (GA 162373)*
**HENINGER GARRISON DAVIS, LLC**
3621 Vinings Slope – Suite 4320
Atlanta, Georgia 30339
Telephone: (404) 996-0861, -0863, -0867
Facsimile: (205) 547-5502, -5506, -5515
Email: jburt@hgdlawfirm.com
Email: jmiller@hgdlawfirm.com
Email: tlynch@hgdlawfirm.com

Steven W. Ritcheson*
**INSIGHT, PLC**
578 Washington Blvd. #503
Marina del Rey, California 90292
Telephone: (424) 289-9191
Facsimile: (818) 337-0383
Email: switcheson@insightplc.com

William Cornelius*
**WILSON, ROBERTSON & CORNELIUS, P.C.**
One American Center
909 ESE Loop 323, Suite 400
Tyler, Texas 75701
Telephone: (903) 509-5004
Facsimile: (903) 509-5091
Email: wc@wilsonlawfirm.com

For Plaintiff, *AlexSam, Inc.*

* admitted to practice in E.D. Tex.

**<u>LIST OF EXHIBITS</u>**

A. U.S. Patent No. 6,000,608

B. Expert Declaration of Ivan Zatkovich

C. Order of Dismissal of AlexSam's Claims Against Simon and WildCard (E.D. Tex. No. 2:03-cv-00337) entered July 13, 2005

D. August 2, 2018 Order in the Florida Litigation

E. *AlexSam, Inc. v. FSV Payment Sys., Ltd*., E. D. Tex. No. 2:03-cv-00337, Order of Dismissal With Prejudice of Defendant American Express Travel Related Services Co., Inc., filed July 1, 2005 (Dkt. No. 221)

F. August 11, 2015 Notice Letter to U.S. Bank

G. August 26, 2015 Letter Response from U.S. Bank

H. License Agreement Between AlexSam, Inc. and MasterCard International, Inc.

I. MasterCard's Answer to AlexSam's Complaint with Counterclaims

J. Evidence of Infringement of Claims of U.S. Patent No. 6,000,608 by the Simon Visa Gift Card, The Simon Amex Gift Card, And Simon Loyalty Card (2 parts)

K. Evidence of Infringement of Claims of U.S. Patent No. 6,000,608 by Blackhawk regarding the Simon Visa Gift Card And Simon Loyalty Card (2 parts)

L. Evidence of Infringement of Claims of U.S. Patent No. 6,000,608 by Blackhawk regarding the Blackhawk Accused Products

M. Evidence of Infringement of Claims of U.S. Patent No. 6,000,608 by American Express regarding the Simon Amex Gift Card

N. Evidence of Infringement of Claims of U.S. Patent No. 6,000,608 by American Express regarding the American Express Accused Products

O. Evidence of Infringement of Claims of U.S. Patent No. 6,000,608 by U.S. Bank regarding the Simon Visa Gift Card

P. Evidence of Infringement of Claims of U.S. Patent No. 6,000,608 by U.S. Bank regarding the U.S. Bank Accused Products (2 parts)

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day a true and correct copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who are deemed to have consented to electronic service.

Dated: <u>May 7, 2021</u>                              <u>*/s/ Jacqueline K. Burt*</u>
                                                      Jacqueline K. Burt

**EXHIBIT A**

**U.S Patent No. 6,000,608**



US006000608A

# United States Patent [19]

## Dorf

[11] **Patent Number:** **6,000,608**

[45] **Date of Patent:** **Dec. 14, 1999**

[54] **MULTIFUNCTION CARD SYSTEM**

[76] Inventor: **Robert E. Dorf**, 904 Bromley Way, Raleigh, N.C. 27615

[21] Appl. No.: **08/891,261**

[22] Filed: **Jul. 10, 1997**

[51] Int. Cl.[6] ................................................. **G06K 5/00**

[52] U.S. Cl. ........................................ **235/380**; 235/375

[58] Field of Search ................................ 235/380, 375, 235/381, 382, 492, 493; 902/1, 2, 8, 10, 12, 22, 24, 25, 26, 27

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,491,725 | 1/1985 | Pritchard | 235/375 |
| 4,700,055 | 10/1987 | Kashkashian, Jr. | 235/379 |
| 4,731,818 | 3/1988 | Clark, Jr. et al. | 235/144 |
| 4,831,647 | 5/1989 | D'Avello et al. | 379/91 |
| 4,900,903 | 2/1990 | Wright et al. | 235/380 |
| 4,951,308 | 8/1990 | Bishop et al. | 379/91 |
| 4,963,722 | 10/1990 | Takeuchi | 235/382.5 |
| 4,990,904 | 2/1991 | Wright et al. | 235/381 |
| 5,101,098 | 3/1992 | Naito | 235/475 |
| 5,144,649 | 9/1992 | Zicker et al. | 379/59 |
| 5,146,067 | 9/1992 | Sloan et al. | 235/381 |
| 5,147,021 | 9/1992 | Maruyama et al. | 194/217 |
| 5,212,369 | 5/1993 | Karlisch et al. | 235/380 |
| 5,227,612 | 7/1993 | Le Roux | 235/379 |
| 5,243,174 | 9/1993 | Veeneman et al. | 235/381 |
| 5,264,689 | 11/1993 | Maes et al. | 235/492 |
| 5,310,997 | 5/1994 | Roach et al. | 235/375 |
| 5,352,876 | 10/1994 | Watanabe et al. | 235/381 |
| 5,409,092 | 4/1995 | Itako et al. | 194/210 |
| 5,440,108 | 8/1995 | Tran et al. | 235/381 |
| 5,450,938 | 9/1995 | Rademacher | 194/206 |

| | | | |
|---|---|---|---|
| 5,469,497 | 11/1995 | Pierce et al. | 379/115 |
| 5,491,326 | 2/1996 | Marceau et al. | 235/381 |
| 5,500,514 | 3/1996 | Veeneman et al. | 235/381 |
| 5,504,808 | 4/1996 | Hamrick, Jr. | 379/144 |
| 5,511,114 | 4/1996 | Stimson et al. | 379/114 |
| 5,513,117 | 4/1996 | Small | 364/479 |
| 5,524,073 | 6/1996 | Stambler | 380/24 |
| 5,530,232 | 6/1996 | Taylor | 235/380 |
| 5,542,081 | 7/1996 | Geronimi | 395/800 |
| 5,557,516 | 9/1996 | Hogan | 364/406 |
| 5,559,885 | 9/1996 | Drexler et al. | 380/23 |
| 5,563,934 | 10/1996 | Eda | 379/144 |
| 5,572,004 | 11/1996 | Raimann | 235/380 |
| 5,577,109 | 11/1996 | Stimson et al. | 379/112 |
| 5,578,808 | 11/1996 | Taylor | 235/380 |
| 5,621,787 | 4/1997 | McKoy et al. | 379/144 |
| 5,652,421 | 7/1997 | Veeneman et al. | 235/381 |
| 5,682,027 | 10/1997 | Bertina et al. | 235/380 |
| 5,815,561 | 9/1998 | Nguyen et al. | 379/115 |

*Primary Examiner*—Thien Minh Le
*Assistant Examiner*—Daniel Felten
*Attorney, Agent, or Firm*—Stroock & Stroock & Lavan LLP

[57] **ABSTRACT**

Disclosed is a multifunction card system which provides a multifunction card capable of serving as a prepaid phone card, a debit card, a loyalty card, and a medical information card. Each card has an identification number comprising a bank identification number which assists in establishing communications links. The card system can be accessed from any existing point-of-sale (POS) device. The POS device treats the card as a credit or debit card and routes transaction data to a processing hub using the banking system. The processing hub coordinates the various databases corresponding to the various functions of the card.

**66 Claims, 2 Drawing Sheets**



PLAINTIFF'S THIRD AMENDED COMPLAINT



*FIG. 1*

**U.S. Patent**     Dec. 14, 1999     Sheet 2 of 2     **6,000,608**



*FIG. 2*

6,000,608

**1**

**MULTIFUNCTION CARD SYSTEM**

FIELD OF THE INVENTION

The present invention relates generally to debit card systems, both bank-issued and non-bank-issued, and more particularly to a multifunction card system that can be accessed by a variety of standard point-of-sale devices, by phone, by fax, or over the Internet.

BACKGROUND OF THE INVENTION

I. Debit Cards

Banking institutions often issue debit cards to their customers to give them access to funds from their savings or checking accounts. Such a debit card might be an on-line debit card or an off-line debit card. On-line debit cards, often referred to as automatic teller machine (ATM) cards, require a personal identification number (PIN) to be entered into an ATM or point-of-sale (POS) device in order to authorize the transaction. Once completed, the transaction clears the bank account immediately. Off-line debit cards function like credit cards, and usually carry the VISA® or MasterCard® logo. A retailer processes the card like a credit card and the customer signs a receipt. The funds then clear the bank account in one to three days.

While such debit cards are extremely useful and provide convenience for bank depositors, they generally do not serve a plurality of functions. Therefore, there is a need in the art for a debit/credit card capable of performing a plurality of functions, such as an electronic gift certificate card, a prepaid phone card, and a loyalty card, all in a real-time secure environment. There is also a need in the art for a system which can provide a card substitute for travelers checks and money orders which can be accepted by any POS device or ATM for financial transactions. Further, there is a need for a processing center which can manage such a multifunction card system.

II. Prepaid Phone Cards

Prepaid card systems are used by the telephone industry to allow customers to prepurchase long distance calling time. Such cards are typically purchased in predefined value increments. The card provides the customer with an amount of long distance calling time equivalent to the predefined value increment.

Each of the cards has an identification number printed or magnetically stored on it. The identification number is also stored in a record in a database maintained by the card issuer. This record also stores the predefined value of the card. When the cards are sent to the retail location from which they will be sold, the corresponding records in the database are activated, thus allowing the card to be used immediately by a customer. To use the card, the customer dials a toll free number to access the card issuer's system, enters the identification number, and then makes the desired long-distance call. During the call, the value of the card in the database is decremented accordingly. When the value of the card is exhausted, the call terminates. If the customer ends the call before the value of the card is exhausted, the remaining value may be used for additional calls. Once the entire value of the card has been used, it is discarded.

These prior art prepaid phone card systems have several disadvantages. First, since the cards are active while on the shelf in the retail location, they may be stolen by a thief and easily used. Second, the prior art systems do not allow the customer to purchase a card having any given value, nor do they allow the customer to recharge the value of the cards once the are depleted.

One way to address some of the drawbacks of prior art prepaid phone card systems would be to install activation

**2**

terminals unique to the prepaid card issuer. This is referred to as a "closed system." U.S. Pat. No. 5,577,109 to Stimson et al. discloses such a closed system. In the Stimson system, the cards are not preactivated. Each of the retail locations from which cards are to be sold is provided with a dedicated activation terminal which allows the retail operator to set the value of the card at the time of the sale. The activation terminal connects to the card issuer's system to pass along the value amount and to request activation of the card. Depleted cards can be recharged in the same manner as they are sold. A serious disadvantage of the Stimson system is that it requires single-function dedicated hardware to be installed in each retail location, resulting in a very inflexible and expensive system.

Thus, there is a need in the art for a prepaid phone card activating system which is easily and inexpensively deployed, and which allows cards to be purchased in varying amounts and to be recharged without requiring the use of a closed system to handle the transactions.

III. Loyalty Cards

Loyalty cards are used to reward consumers for purchasing goods or services. For instance, airlines commonly reward frequent fliers with points for each mile flown with that airline. When the consumer accumulates a certain number of points, he or she is rewarded with free or discounted air fare. In this and other similar systems, the loyalty card issuer directly participates in the sale transaction. Such systems, however, do not allow a manufacturer of a product which is sold by an unrelated retailer to immediately reward the ultimate purchaser of the product with loyalty points. Since the manufacturer does not know of the ultimate sale until much later, if ever, it is difficult for such a manufacturer to conduct a loyalty program. Thus, there is presently no method for creating a product-specific loyalty card as opposed to a retailer-specific card. Nor is there a system for communicating loyalty data to databases not located at the retail establishment.

Furthermore, prior art loyalty programs generally do not credit the consumer's loyalty account in real-time as a purchase transaction takes place. Therefore, the consumer is unable to enjoy the benefits of their added loyalty points immediately. Finally, prior art loyalty programs commonly require significant startup efforts and expenses before the system is operational. Therefore, there is a need in the art for a real-time loyalty card system which is easily deployed, and which is capable of providing a product-specific loyalty card as well as a retailer-specific card. There is also a need for a system which can reward customers automatically for their loyalty and communicate this loyalty reward to databases other than at a retail location.

IV. Information Retrieval

Often, it is important to access certain types of information in a very fast and convenient manner. For example, a person's medical history can be extremely important in assessing the propriety of certain medical procedures during a medical emergency. Presently, in order to obtain a patient's medical history, the patient or his or her doctor must request the appropriate files from the patient's previous doctor(s). It often takes a number of days to receive the requested information. In a medical emergency, this delay is often far too long. Thus, there is a need for patients to have control over their own medical history data. Further, there is a need for this data to be instantly available to the patient, or the patient's doctor if the patient is incapacitated.

V. Multifunction Card

Due to the proliferation of various types of cards (e.g., credit/debit, long-distance calling, loyalty, etc.) over the last

PLAINTIFF'S THIRD AMENDED COMPLAINT

6,000,608

**3**

couple of decades, it has become increasingly difficult to keep track of each individual card. There is a need for a card system which can serve a number of functions, thus allowing the consumer to have one card which may act as their card for financial transactions, long-distance telephone calls, loyalty information, and medical information.

SUMMARY OF THE INVENTION

The present invention solves the problems associated with prior art card systems by providing an improved multifunction card system. The multifunction card system comprises at least one electronic gift certificate card having a unique identification number encoded on it, the identification number comprising a bank identification number corresponding to the multifunction card system; means for receiving electronic gift certificate card activation data from an existing standard retail point-of-sale device when the electronic gift certificate card is swiped through the point-of-sale device, the electronic gift certificate card activation data comprising the unique identification number of the electronic gift certificate card and an electronic gift certificate activation amount; means for activating an account corresponding to the electronic gift certificate card with a value equal to the electronic gift certificate activation amount; and means for allowing a user of the electronic gift certificate card to purchase goods having a value up to the electronic gift certificate activation amount.

The multifunction card system further comprises at least one phone card having a unique identification number encoded on it, the identification number comprising a bank identification number corresponding to the multifunction card system; means for receiving phone card activation data from an existing standard retail point-of-sale device when the phone card is swiped through the point-of-sale device, the phone card activation data comprising the unique identification number of the phone card and a phone card activation amount; means for activating an account corresponding to the phone card with a value equal to the phone card activation amount; and means for allowing a user of the phone card to obtain long distance telephone calling time having a value up to the phone card activation amount.

In a preferred embodiment, the multifunction card system further comprises at least one loyalty card having a unique identification number encoded on it, the identification number comprising a bank identification number corresponding to the multifunction card system; means for receiving loyalty data from an existing standard retail point-of-sale device when the loyalty card is swiped through the point-of-sale device, the loyalty data comprising the unique identification number of the loyalty card and a purchase amount; and means for crediting an account corresponding to the loyalty card with a number of loyalty points proportional to the purchase amount.

Optionally, the multifunction card system of the present invention may also comprise at least one medical information card having a unique identification number associated with it, the medical information card belonging to a patient; a database comprising at least one record corresponding to the medical information card, the record containing medical history information about the patient; and means for allowing an authorized requester to obtain the medical history information about the patient using the unique identification number associated with the medical information card.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will be more fully understood by reference to the following detailed description when con-

**4**

sidered in conjunction with the following drawings wherein like reference numbers denote the same or similar portions or processes shown throughout the several Figures, in which:

FIG. 1 is a block diagram of the multifunction card system of the present invention; and

FIG. 2 is block diagram demonstrating the various ways in which a retail point-of-sale device might connect to the multifunction card system of the present invention.

DETAILED DESCRIPTION OF THE INVENTION

The present invention is a multifunction card system which allows for the activation of prepaid phone cards and the use of Electronic Gift Certificate™ cards, loyalty cards, debit cards, and medical information cards. Further, the system provides for the immediate linkage of these various functions. FIG. 1 illustrates the multifunction card system **108** of the present invention. The system **108** comprises a plurality of cards **101**, a sponsor bank processor **102**, and a processing hub **103**, which serves as the nerve center of the system **108**. If the system **108** is to provide prepaid phone cards, it will also include a prepaid phone card issuer hub **104** maintained by a prepaid phone card issuer. In order to achieve the desired functionality, the system **108** uses existing banking networks in a unique and novel way to gain access to virtually all existing retail point-of-sale (POS) devices **105**. These devices **105** include stand-alone POS terminals, cash registers with POS interfacing, computers with POS interfacing, and other similar devices which can be used to access the banking system. As used herein, POS device includes all such devices, whether data entry is effected by swiping a card through the device or by manual entry.

To access these POS devices, the operator of the system **108** must apply for and obtain a Bank Identification Number (BIN) from the American Banking Association. The BIN serves as a unique identifier of the multifunction card system **108** within the banking network. The BIN is encoded on a magnetic strip **106** on each card **101** in the system **108** as a part of the card's identification number. Alternatively or additionally, the BIN and identification number could be encoded as a bar code, embossed on the surface on the card **101** in numerals for manual entry, or provided by any other means known in the art.

Preferably, the BIN's first digit will be the same number as the first BIN digit used by a popular card issuer. This is because POS devices are preprogrammed to recognize only certain types of cards, such as those issued by VISA® and MasterCard®, American Express®, etc. As a rule, these POS devices must be reprogrammed before they will accept a new type of card. However, since POS devices already recognize cards issued by these popular card issuers, a new type of card will also be recognized by such devices if it has a BIN that begins with the same number used by one of the popular card issuers. Since VISA® and MasterCard® are the most universally accepted cards, the BIN of the multifunction card system **108** of the present invention preferably will begin with the same number used by either VISA® or MasterCard® (i.e., "4" or "5", respectively). By using one of these numbers, the card **101** will be recognized by almost all existing POS devices **105** as a debit or credit card, and its transactions will be automatically routed by the banking system to the correct destination. This occurs regardless of the type of POS device **105** used, since all such devices are designed to interface with the banking network. Although

PLAINTIFF'S THIRD AMENDED COMPLAINT

6,000,608

**5**

the BIN number will preferably begin with a "4" or "5", it may begin with any number that is recognized by POS devices **105**.

The operator of the system **108** should also have a sponsoring bank whose bank processor **102** will serve as the link between the processing hub **103** and the banking network. Alternatively, the operator of the system **108** could itself be a banking institution.

By providing a means for any given POS device **105** to connect to the processing hub **103**, the system **108** allows a retailer to remotely activate or add value or loyalty data to a system card. The method by which this occurs is set forth more fully below in the context of the various functions of the card.

I. Prepaid Phone Card

A plurality of long distance service providers may contract with the operator of the multifunction card system **108** to issue prepaid phone cards **101** for use in the system **108**. Alternatively, a long distance service provider may itself be the operator of the system **108**. The long distance service provider will be referred to as a phone card issuer. A phone card issuer provides prepaid phone cards **101** to retailers who sell the cards **101** at their retail locations. Until activated, the cards **101** have no intrinsic value associated with them. Therefore, they may be placed on store shelves in easily accessible areas without the fear of losses due to theft. When a customer wishes to purchase or recharge one of the cards **101**, he or she informs the sales clerk of the monetary amount desired. Depending upon the system chosen by the particular phone card issuer, this amount may be one of a finite number of predefined amount increments, or may be selected by the customer. The clerk swipes the card **101** through the POS device **105**. Depending upon the amount of customization that has occurred at the retailer's location, there are a number of ways in which the POS device **105** may connect to the system's **108** processing hub **103** to carry out the transaction. FIG. **2** illustrates several of these methods.

The first two methods shown in FIG. **2**, methods A and B, are the most easily deployed, but cost the most on a per-transaction basis. To route information to the processing hub **103**, these methods employ the debit network **107** used by banking institutions. The retailer in method A (retailer A) has a central processor which controls each of its POS devices **105** and connects them to a processor **208** at a bank chosen by the retailer. Retailer B's POS device **105** connects directly to the bank processor **208**. Otherwise, the two methods are the same.

Banking regulations currently require that any transaction taking place over the debit network **107** must result in an actual transfer of funds. Since this phone card activation transaction is not a typical debit transaction, it is presently desirable to keep the official amount of the transaction to a minimum, yet still comply with the banking regulations. Therefore, regardless of the actual sale amount, the clerk enters a nominal transaction amount. In a preferred embodiment, the nominal transaction amount is keyed to the actual transaction amount (e.g., $0.01 nominal=$10.00 actual, $0.02 nominal=$20.00 actual, etc.). Therefore, the actual transaction amount can be ascertained from the nominal amount. In this embodiment, the card could only be activated or recharged in predefined increments. If the card is to have a fixed value, the activation amount could also be encoded on the magnetic strip **106** of the card **101** as part of the card's identification number.

In an alternate embodiment, the card could be activated or recharged in any amount desired by the customer. In this

**6**

case, the nominal transaction amount would be a fixed value, such as $0.01. Once the nominal transaction amount is entered, the actual sale amount could then be entered on the PIN pad of the POS device **105** instead of the personal identification number (PIN) that would normally be entered when using a debit card. By entering the actual sale amount in this manner, it can be any desired amount.

In either case, before it transmits the data, the POS device **105** encrypts the information to be sent. This information includes the identification number read from the card's magnetic strip **106**, the nominal transaction amount, and the actual sale amount if it was entered into the PIN pad. The system **108** contains software which will decrypt and translate the data upon receipt. Once the encryption has taken place, the POS device **105** transmits the data either directly or via the central processor **201** to the bank processor **208**. The bank processor **208** receives the data and transmits it over the debit network **107**. The debit network **107** then forwards the data to the sponsoring bank's processor **102**. As mentioned earlier, the sponsoring bank is one which has agreed to operate as a link between the debit network **107** and the processing hub **103**.

As mentioned earlier, banking regulations as they currently exist require that transactions taking place over the debit network must result in a transfer of funds. Preferably, in order to comply with the banking regulations, the sponsoring bank transfers the nominal amount (e.g., $0.01) from one account belonging to the retailer to another account also belonging to the retailer. The bank processor **102** then forwards the data from the POS device **105** to the processing hub **103**.

In methods C and D, the retailers' central processor **202** or POS device **105**, respectively, again connect to a processor **209** at a retailer-chosen bank. By agreement between the operator of the multifunction card system **108** and the retailer-chosen bank, this bank processor **209** is programmed to recognize the multifunction card system's BIN and to forward the system's transactions directly to the sponsoring bank's processor **102** rather than using the debit network **107**. Since the debit network **107** is not used, it is not necessary to use a nominal sale amount, although such a method would nonetheless work and might be preferred by the retailer for security and bookkeeping purposes. The system **108** could instead be programmed to prompt the clerk for the appropriate information. As in methods A and B, the sponsor bank processor **102** forwards the necessary information to the processing hub **103**. Although methods C and D are more efficient than methods A and B on a per transaction basis, they require some customization at the retailer location to cause the retailer to connect to a bank processor **209** that recognizes the system's BIN.

Methods E and F are the least costly methods of connecting to the processing hub **103** (i.e., directly from the retailer's central processor **203** or from the POS device **105** itself). The connection hub may be made via a toll-free telephone line, a dedicated phone line, over the Internet, or any other standard communication means. Again, however, these methods require the most customization at the retailer location to cause the retailer's system to recognize the multifunction card system's cards and to route their transactions directly to the processing hub **103**. Such customization, however, still does not require reprogramming of the POS devices themselves. The connection method chosen may be adjusted to fit the individual retailer's needs.

Regardless of the method used, the data will eventually arrive at the processing hub **103**. If the transmission has taken place over the debit network **107**, the data must be

PLAINTIFF'S THIRD AMENDED COMPLAINT

6,000,608

7

decrypted using equipment well known in the art for decrypting debit transaction data. Once the data is received and, if necessary, decrypted, the processing hub **103** recognizes the identification number of the card as being associated with a particular prepaid phone card issuer. Next, a security check is performed to verify that this transaction is originating from a retailer that is authorized to sell the prepaid phone cards. If the transaction is originating from an authorized retailer, the transaction will proceed. The processing hub **103** will then forward the card identification number, retail store and POS device information, and amount information to the issuer hub **104** maintained by the prepaid phone card issuer. The issuer hub **104** contains one or more phone card databases **204** which store information about each phone card. When the issuer hub **104** receives the data from the processing hub **103**, it activates the record in the phone card database **204** having the same identification number as the card **101**. The value field in the record is then increased by the appropriate purchased amount. If the card is of a fixed value, the record is simply activated. The issuer hub **104** then returns an authorization number which travels back along the same path to the originating POS device **105**. The customer may then dial the prepaid phone card issuer's toll free number, enter the card number and any required PIN, and obtain long distance calling time having a value up to the value of the card stored in the phone card database **204**.

Each activation or recharge transaction is recorded by the system **108**. At the end of the day, a report is preferably created for each card issuer and retail location so that their accounts can be reconciled. Transfer of funds between these parties may then take place by any commercially acceptable means.

II. Electronic Gift Certificate™ Card

The multifunction card system **108** of the present invention is also capable of providing an Electronic Gift Certificate™ (EGC) card **101** for a retail issuer. Such a card **101** could be sold by the retail issuer for making purchases only in the retail issuer's stores or for use in a plurality of stores. As in the phone card context, the customer would ask the sales clerk for an Electronic Gift Certificate™ card of the desired amount. If the customer already has an Electronic Gift Certificate™ card, he or she might ask the clerk to add the desired amount to the already existing balance. The clerk swipes the card **101** and enters the transaction amount, either directly or using a nominal amount and/or the PIN pad, depending upon whether the debit network **107** is to be used. Using one of the methods discussed above, the data then makes its way to the processing hub **103**.

Alternatively, the activation could occur by processing the card **101** as a typical debit card using the debit network **107**. In such a case, the retail issuer would maintain accounts with the sponsor bank. When an activation transaction takes place, the bank would transfer the activation amount from a general account to an account corresponding to the card. If the card is to be accepted at a number of retail locations, the account corresponding to the card could be opened in the name of the card holder if appropriate paperwork is submitted to the bank. In this manner, the card could be used at any retail location capable of processing debit transactions. This would allow the card to serve as a prepaid card substitute for travelers checks and money orders. Regardless of the way in which the card is processed, the transaction data eventually makes its way to the processing hub **103**.

Upon receipt of the transaction data, the hub **103** recognizes the receipt of the card **101** as being an Electronic Gift Certificate™ card of the retail issuer and activates or recharges the card

8

**101** in the appropriate amount in an EGC database **205** maintained at the processing hub **103**.

Optionally, the Electronic Gift Certificate™ card **101** could also be recharged using a credit card via an on-line connection to the processing hub **103**, such as over the Internet.

Once a card **101** has been activated or recharged, the recipient of the card **101** is allowed to make purchases using the card. If the card is only for use in the retail issuer's stores, the purchase transaction might proceed in much the same manner as the activation process. The clerk would swipe the card **101** and enter the purchase amount. If the transaction is to be transmitted over the debit network, a nominal transaction amount may be used, and the actual amount entered instead of the PIN. A special code is used to indicate that the transaction is a purchase transaction rather than an activation or recharge transaction. If the debit network is used, the code could be the first digit of the PIN, followed by the purchase amount, thus allowing the software of the system **108** to recognize the type of transaction and decrypt the data accordingly.

Upon receipt of the data via one of the methods described above, the processing hub **103** compares the purchase amount to the balance for the card in the EGC database **205**. If the balance is greater than the purchase amount, the processing hub **103** will decrement the record in the database and will send back an approval code which will allow the transaction to proceed. If a sufficient balance is not present, the processing hub **103** will notify the POS device **105** that the transaction may not proceed. Preferably, an automated toll free number is provided for the holder of the card **101** to verify the remaining balance. The processing hub **103** preferably maintains records of all transactions.

If the card **101** is for use in many retail locations, it would instead be processed during purchase transactions as a typical debit card, preferably using the debit network **107**. In this case, either the retail issuer or the cardholder must have an account with the sponsor bank. When a purchase transaction takes place, the clerk or cardholder simply swipes the card and receives back a response in the same manner as a normal debit transaction. If sufficient funds are present in the account corresponding to the card, the transaction will be approved. The sponsor bank then transfers the purchase amount from the retail issuer's or cardholder's account to an account belonging to the retail location at which the purchase occurred, which account may or may not be located at the sponsor bank. The transaction data is then forwarded to the processing hub **103** so that the EGC database **205** can be updated.

In a preferred embodiment, an Electronic Gift Certificate™ card could also be used to obtain long distance calling time in addition to making purchases in the retail issuer's store. The retail issuer could contract with a prepaid phone card issuer to provide the calling time. When the card **101** is activated, the phone card issuer simultaneously creates an entry in its phone card database **204** corresponding to the entry in the EGC database **205**. The card **101** can then be used in exactly the same manner as the prepaid phone card discussed above. In order to prevent the use of the Electronic Gift Certificate™ card simultaneously to make purchases and to obtain long distance calling time, a safety procedure is provided. When the card **101** is used to make a long distance call, the phone card issuer hub **104** instructs the processing hub **103** to seize the record corresponding to the card **101** in the EGC database **205**. With the record seized, the system **108** will not authorize any purchasing activity for the duration of the call. When the call terminates, the phone

PLAINTIFF'S THIRD AMENDED COMPLAINT

6,000,608

**9**

card issuer hub **104** decrements the appropriate record in its phone card database **204** and instructs the processing hub **103** to do the same in the EGC database **205**. The record in the EGC database **205** is then unseized. When the card **101** is used to make a purchase, the processing hub **103** similarly instructs the phone card issuer hub **104** to seize the appropriate record in the phone card database **204** for the duration of the transaction. When the transaction is over, the records in the EGC database **205** and the phone card database **204** are decremented appropriately.

In the preferred embodiment of the invention, the retail issuer is also given the capability to award loyalty points to the bearer of the Electronic Gift Certificate™ card in recognition of purchases or recharges made. In such a case, the processing hub **103** maintains a separate loyalty card database **206**. When the Electronic Gift Certificate™ card bearer adds money to the card **101**, or makes a purchase using the card **101**, the system **108** may add a number of points proportional to the purchase price to the card's record in the loyalty card database **206**. Alternatively points could be awarded based upon the frequency of card usage rather than purchase amounts. In either case, when the card bearer reaches certain predefined point plateaus, he or she may be rewarded by the retail issuer with additional card value or with long-distance calling time.

III. Loyalty Card

Not unlike the loyalty feature add-on of the Electronic Gift Certificate™ card, the system **108** of the present invention may provide a separate loyalty card much like a frequent flier card that can have points added at virtually any POS device **105**.

A. Product/Manufacturer-Specific Loyalty Card

The card could be issued by a certain manufacturer to reward a customer with loyalty points for purchasing the manufacturer's product, regardless of the retail location of the purchase. This reward could be tied to the purchase of a single product type or to all of the manufacturer's products. The loyalty points awarded could be varied based upon any promotional campaigns being conducted by the manufacturer. Points are added to the card at participating retail locations which sell the manufacturer's product(s). The card **101** is swiped at any retail location, the purchase amount for the manufacturer's product is entered using the PIN pad of the POS device **105**, and the data is transmitted to the processing hub **103** using one of the methods described above. After receiving the data, the processing hub **103** credits the appropriate record in the loyalty card database **206** with a number of points proportional to the purchase price. The card is transportable to any participating retailer. The system **108** allows the manufacturer to connect to the processing hub **103** via an on-line connection to access the loyalty card database **206**. Again, the customer could be rewarded when certain point plateaus are reached.

B. Retailer-Specific Loyalty Card

Alternatively, the card could be issued by a particular retailer to reward customers for purchases made in the retailer's location(s). The retailer could award points for any purchase within the store, or could target special promotional items. The card would function in a manner similar to the product-specific card. Once again, the customer is rewarded when certain point plateaus are reached.

Alternatively, the loyalty data could be used to simultaneously credit other databases of the system **108**. For instance, instead of awarding loyalty points, the system could add value in real time to a record in the phone database **204** at the prepaid phone card issuer hub **104**, thus rewarding the customer with free phone time. Loyalty points might also

**10**

be converted into a dollar value for use at the retail location. Optionally, the system **108** can keep records of a consumer's purchasing habits for marketing purposes. As with the manufacturer-specific card, the system **108** allows the retailer to connect to the processing hub **103** via an on-line connection to access the loyalty card database **206**.

IV. Information Retrieval Card

Finally, the multifunction card system **108** of the present invention is capable of providing an information retrieval card. In an exemplary embodiment, a medical information card which allows access and retrieval of a patient's complete medical history from a multitude of remote locations is provided. Each participating patient's medical information is stored in a record in a medical information database **207** maintained at the processing hub **103**. The record contains the identification number encoded on the patient's card **101**.

When medical history information data is needed, it may be requested by swiping the card **101** through a POS device **105** at a participating doctor's office or hospital. Preferably, a PIN is entered into the POS device **105** to ensure that only an authorized person is able to request the information. The POS device **105** would then send the request to the processing hub **103** via one of the routes described above. When the processing hub **103** receives the request from the authorized requester, it then immediately sends the information to the requestor via means preselected by the participating doctor's office or hospital. Such means may include electronic mail, facsimile, voice response, and other similar means. The medical history information may be updated by the patient or his or her doctor or insurer by forwarding new information to the operator of the system **108** via an on-line connection, over the Internet, by telephone, by facsimile, or by mail.

As a backup, the request could instead be made using a computer, wherein the computer connects to the processing hub **103** via the Internet or by direct modem connection. The requestor might be allowed to view, print, or download the appropriate medical history information. Alternatively, the request could be made by facsimile or by calling an automated toll free number and entering the card number.

In order to allow a cardholder to keep track of medical savings accounts or various other means for paying for medical services (e.g., Medicare), the system **108** also allows access to a database which maintains the medical funds for the cardholder. As described above under the Electronic Gift Certificate™ section, the system **108** is able to authorize, reject, and cause money to be transferred based upon the cardholder's available medical funds.

V. Intelligent Card™

In the preferred embodiment of the invention, the multifunction card system **108** is capable of providing a single card **101** which is capable of performing all of the foregoing functions. Preferably, the system **108** also allows for the card **101** to be used as an on-line debit card after the cardholder registers with the system. In order to let the system **108** know which function or functions the card **101** is serving in any particular transaction, a code is entered into the PIN pad of the POS device from which the transaction is originating. Alternatively, the system **108** could prompt the user to indicate the proper card function and the databases that must be accessed. Based upon this input, the system **108** carries out the appropriate actions. The system **108** can access each of the databases discussed above and can simultaneously increase or decrease each database as needed by the type of transaction occurring.

VI. Processing Hub Technical Details

The processing hub **103** of the present invention provides front-end POS device management and message processing

PLAINTIFF'S THIRD AMENDED COMPLAINT

6,000,608

**11**

for card authorization and activations. The processing hub **103** can be implemented using any computer having acceptable processing and storage capacity. It preferably comprises a Stratus RADIO Cluster™, which is a scaleable system based upon the standard Intel Pentium processor. The Stratus RADIO Cluster™ provides the processing hub **103** with a high degree of reliability and fault-tolerance. Since the Stratus system is scaleable, an adequate degree of redundancy can be provided in order to reduce the impact of individual failures. In addition, as demand for the multifunction card system increases, the processing hub **103** can be scaled to meet increasing demands for processing power and storage availability. The modular design of such a hub is upgradable for long term capacity planning and expansion.

The software of the system is preferably written in the C, Force, and Foxpro programming languages. The C language programs are preferably written to interface with specialty external interface boards. Force is preferably used for all on-line transaction processing, while Foxpro preferably provides for database management and the user interface. Since Force and Foxpro share database file structures, on-line transactions may be viewed by the system operators using the Foxpro interface.

In order to provide further reliability, all applications and data are replicated and synchronized across the processing hub **103** by Isis Reliable software. Load distribution among the modules is automatically controlled by the software to improve the response time and throughput. External communications nodes provide the necessary interface requirements of physical connectivity, protocol, message transmission, message validation, and message processing.

While the multifunction card system herein described constitutes the preferred embodiment of the present invention, it is to be understood that the invention is not limited to this precise form of system, and that changes may be made therein without departing from the scope of the invention which is defined in the following claims.

I claim:

**1**. A multifunction card system, comprising:

a. at least one electronic gift certificate card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the multifunction card system;

b. means for receiving electronic gift certificate card activation data from an unmodified existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device, said electronic gift certificate card activation data comprising the unique identification number of the electronic gift certificate card and an electronic gift certificate activation amount;

c. means for activating an account corresponding to the electronic gift certificate card with a balance equal to the electronic gift certificate activation amount;

d. means for allowing a user of the electronic gift certificate card to purchase goods and services having a value up to the balance of the account corresponding to the electronic gift certificate card; and

e. means for decreasing the balance of the account corresponding to the electronic gift certificate card by the value of the goods and services purchased.

**2**. A multifunction card system as recited in claim **1**, further comprising:

**12**

a. means for receiving electronic gift certificate card recharge data from an existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device, said electronic gift certificate card recharge data comprising the unique identification number of the electronic gift certificate card and an electronic gift certificate recharge amount; and

b. means for increasing the balance of the account corresponding to the electronic gift certificate card by the electronic gift certificate recharge amount.

**3**. A multifunction card system as recited in claim **1**, wherein the first digit of said bank identification number is selected from the group consisting of four and five.

**4**. A multifunction card system as recited in claim **1**, further comprising means for allowing a user of the electronic gift certificate card to obtain long distance telephone calling time, wherein the total of the value of the goods and services purchased and the long distance telephone calling time obtained cannot exceed the balance of the account corresponding to the electronic gift certificate card.

**5**. A multifunction card system as recited in claim **4**, wherein said means for receiving electronic gift certificate activation data from an existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device employs the banking network.

**6**. A multifunction card system as recited in claim **4**, further comprising means for associating loyalty data with the electronic gift certificate card based upon usage of the electronic gift certificate card.

**7**. A multifunction card system as recited in claim **1**, further comprising means for associating loyalty data with the electronic gift certificate card based upon usage of the electronic gift certificate card.

**8**. A multifunction card system as recited in claim **1**, wherein said means for receiving electronic gift certificate activation data from an existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device employs the banking network.

**9**. A multifunction card system as recited in claim **1**, further comprising:

a. at least one phone card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the multifunction card system;

b. means for receiving phone card activation data from an unmodified existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device, said phone card activation data comprising the unique identification number of the phone card and a phone card activation amount;

c. means for activating an account corresponding to the phone card with a balance equal to the phone card activation amount;

d. means for allowing a user of the phone card to obtain long distance telephone calling time having a value up to the balance of the account corresponding to the phone card; and

e. means for decreasing the balance of the account corresponding to the phone card by the value of the long distance telephone calling time obtained.

**10**. A multifunction card system as recited in claim **9**, further comprising:

PLAINTIFF'S THIRD AMENDED COMPLAINT

6,000,608

**13**

a. means for receiving phone card recharge data from an existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device, said phone card recharge data comprising the unique identification number of the phone card and a phone card recharge amount; and

b. means for increasing the balance of the account corresponding to the phone card by the phone card recharge amount.

**11.** A multifunction card system as recited in claim 9, wherein a single card with a single identification number can function as an electronic gift certificate card and as a phone card.

**12.** A multifunction card system as recited in claim 1, further comprising:

a. at least one loyalty card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the multifunction card system;

b. means for receiving loyalty data from an existing standard retail point-of-sale device when said loyalty card is swiped through the point-of-sale device, said loyalty data comprising the unique identification number of the loyalty card and purchase data; and

c. means for crediting an account corresponding to the loyalty card with loyalty points based upon the purchase data.

**13.** A multifunction card system as recited in claim 12, wherein a single card with a single identification number can function as an electronic gift certificate card and as a loyalty card.

**14.** A multifunction card system as recited in claim 1, further comprising:

a. at least one medical information card having a unique identification number associated with it, said medical information card belonging to a patient;

b. a database comprising at least one record corresponding to said medical information card, said record containing medical history information about the patient; and

c. means for allowing an authorized requester to obtain the medical history information about the patient using the unique identification number associated with the medical information card.

**15.** A multifunction card system as recited in claim 14, wherein a single card with a single identification number can function as an electronic gift certificate card and as a medical information card.

**16.** A prepaid phone card system, comprising:

a. at least one phone card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the prepaid phone card system;

b. means for receiving phone card activation data from an unmodified existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device, said phone card activation data comprising the unique identification number of the phone card and a phone card activation amount;

c. means for activating an account corresponding to the phone card with a balance equal to the phone card activation amount;

**14**

d. means for allowing a user of the phone card to obtain long distance telephone calling time having a value up to the balance of the account corresponding to the phone card; and

e. means for decreasing the balance of the account corresponding to the phone card by the value of the long distance telephone calling time obtained.

**17.** A prepaid card system as recited in claim 16, further comprising:

a. means for receiving phone card recharge data from an existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device, said phone card recharge data comprising the unique identification number of the phone card and a phone card recharge amount; and

b. means for increasing the balance of the account corresponding to the phone card by the phone card recharge amount.

**18.** A prepaid card system as recited in claim 16, wherein the first digit of said bank identification number is selected from group of numbers consisting of the numbers four and five.

**19.** A prepaid card system as recited in claim 16, wherein said means for receiving phone card activation data from an existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device employs the banking network.

**20.** A loyalty card system, comprising:

a. at least one loyalty card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the loyalty card system;

b. means for receiving loyalty data from an unmodified existing standard retail point-of-sale device when said loyalty card is swiped through the point-of-sale device, said loyalty data comprising the unique identification number of the card and purchase data; and

c. means for crediting an account corresponding to the loyalty card with loyalty points based upon the purchase data.

**21.** A loyalty card system as recited in claim 20, wherein the first digit of said bank identification number is selected from a group of numbers consisting of the numbers four and five.

**22.** A loyalty card system as recited in claim 20, wherein said means for receiving loyalty data from an existing standard retail point-of-sale device when said loyalty card is swiped through the point-of-sale device employs the banking network.

**23.** A method of activating or recharging a prepaid card having a unique identification number encoded on it, the identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to a prepaid card system, comprising the steps of:

a. swiping the card through an unmodified existing standard retail point-of-sale device;

b. entering an amount into the point-of-sale device;

c. transmitting the identification number and the amount from the point-of-sale device to a processing hub;

d. crediting an account balance in a database with the amount;

e. allowing a user of the card to purchase goods and services using the card; and

6,000,608

15

f. allowing a user of the card to obtain long distance telephone calling time using the card;

g. wherein the total of the value of the goods and services purchased and the long distance telephone calling time obtained using the card cannot exceed the account balance.

**24.** A method according to claim **23**, further comprising the step of associating loyalty data with the card based upon usage of the card.

**25.** A method according to claim **24**, further comprising the step of transferring loyalty data to a phone card issuer.

**26.** A method according to claim **23**, wherein said step of transmitting the identification number and the amount from the point-of-sale device to a processing hub is carried out at least in part via the banking network.

**27.** A method of activating or recharging a prepaid phone card having a unique identification number encoded on it, the identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to a prepaid phone card system, comprising the steps of:

a. swiping the phone card through an unmodified existing standard retail point-of-sale device;

b. entering an amount into the point-of-sale device;

c. transmitting the identification number and the amount from the point-of-sale device to a processing hub;

d. transmitting the identification number and the amount from the processing hub to a prepaid phone card issuer hub;

e. crediting an account balance in a phone card database with the amount; and

f. allowing a user of the phone card to obtain long distance telephone calling time having a value up to the account balance.

**28.** A method according to claim **27**, wherein said step of transmitting the identification number and the amount from the point-of-sale device to a processing hub is carried out at least in part via the banking network.

**29.** A method of adding points to a loyalty card having a unique identification number encoded on it, the identification number comprising a bank identification number approved for use in a banking network, said identification number corresponding to a loyalty card system, comprising the steps of:

a. swiping the loyalty card through an unmodified existing standard retail point-of-sale device;

b. entering purchase data into the point-of-sale device;

c. transmitting the identification number and the purchase data from the point-of sale device to a processing hub; and

d. crediting an account in a database with loyalty points based upon the purchase data.

**30.** A method according to claim **29**, wherein said step of transmitting the identification number and the purchase amount from the point-of-sale device to a processing hub is carried out at least in part via the banking network.

**31.** A method according to claim **29**, further comprising the step of allowing the owner of the loyalty card to redeem loyalty points for an item selected from the group consisting of goods, services, discounts on goods and services, long distance telephone calling time value, and money value.

**32.** A multifunction card system comprising:

a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank

16

identification number approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;

c. a processing hub receiving directly or indirectly said card data from said transaction processor; and

d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.

**33.** The multifunction card system of claim **32**, wherein the unique identification number further comprises a medical identification number.

**34.** A system comprising:

a. at least one electronic gift certificate card having an electronic gift certificate card unique identification number encoded on it, said electronic gift certificate card unique identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving electronic gift card activation data from an unmodified existing standard retail point-of-sale device, said electronic gift certificate card activation data including said unique identification number and an electronic gift certificate card activation amount;

c. a processing hub receiving directly or indirectly said activation data from said transaction processor; and

d. said processing hub activating an account corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate activation amount.

**35.** The system of claim **34**, wherein the electronic gift certificate card activation amount is encoded in the unique identification number.

**36.** The system of claim **34**, wherein the electronic gift certificate card activation amount is entered at the point-of-sale device.

**37.** The system of claim **34**, wherein said processing hub allows a user of the electronic gift certificate card to purchase a value up to the balance corresponding to the electronic gift certificate activation amount.

**38.** The system of claim **34**, wherein:

a. said transaction processor receives electronic gift certificate card recharge data from the existing standard retail point-of-sale device, said electronic gift certificate card recharge data including said unique identification number and an electronic gift certificate card recharge amount; and

b. said processing hub increasing said amount corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate card recharge amount.

**39.** The system of claim **34**, wherein the first digit of the bank identification number is selected from a group of numbers consisting of the numbers four and five.

**40.** The system of claim **34**, wherein the processing hub allows the use of the electronic gift certificate card to obtain phone calling time.

**41.** The system of claim **34**, further comprising:

a. a prepaid phone card issuer hub receiving directly or indirectly the electronic gift card activation data from said processing hub; and

b. said prepaid phone card issuer hub activating a record in a phone card database corresponding to the electronic gift certificate card unique identification number.

6,000,608

**17**

**42**. The system of claim **41**, wherein the prepaid phone card issuer hub instructs the processing hub to seize the account corresponding to the electronic gift certificate card unique identification number where an electronic gift certificate card is used to make a call.

**43**. The system of claim **41**, wherein the processing hub instructs the phone card issuer hub to seize the record corresponding to the electronic gift certificate card unique identification number when the electronic gift certificate card is used to make a transaction.

**44**. The system of claim **34**, wherein the transaction processor is coupled to the banking network.

**45**. The system of claim **34**, wherein the processing hub associates loyalty data with the electronic gift certificate card based upon the usage of the electronic gift certificate card.

**46**. The system of claim **34**, wherein the activation data received at the processing hub is encrypted.

**47**. The system of claim **34**, wherein the processing hub includes a loyalty card database.

**48**. The system of claim **34**, wherein the processing hub includes a medical information card database.

**49**. The system of claim **34**, wherein the processing hub includes an electronic gift certificate card database, a loyalty card database, and a medical information database.

**50**. A multifunction card system comprising:

a. at least one electronic gift certificate card having an electronic gift certificate card unique identification number encoded on it, said electronic gift certificate card unique identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving electronic gift card activation data from an unmodified existing standard retail point-of-sale device, said electronic gift certificate card activation data including the electronic gift certificate card unique identification number and an electronic gift certificate card activation amount;

c. a processing hub receiving directly or indirectly said activation data from said transaction processor; and

d. said processing hub activating an account corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate activation amount.

**51**. The multifunction card system of claim **50**, wherein the electronic gift certificate card activation amount is encoded in the unique identification number.

**52**. The multifunction card system of claim **50**, wherein the electronic gift certificate card activation amount is entered at the point-of-sale device.

**53**. The multifunction card system of claim **50**, further comprising:

a. at least one phone card having a phone card unique identification number encoded on it, said phone card unique identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. said transaction processor receiving phone card activation data from said existing standard retail point-of-sale device, said phone card activation data including said phone card unique identification number and a phone card activation amount;

c. said processing hub receiving directly or indirectly said phone card activation data from said transaction processor and recognizing the phone card unique identification number of the phone card as being associated with a particular prepaid phone card issuer; and

**18**

d. said processing hub forwarding the phone card activation data to a particular prepaid phone card issuer hub.

**54**. The multifunction system of claim **53**, wherein the particular prepaid phone card issuer hub contains at least one phone card database which stores information about each said phone card and activates the stored information to permit debiting of a predetermined value of phone calling in response to the activation data.

**55**. The multifunction system of claim **50**, further comprising:

a. at least one loyalty card having a loyalty card unique identification number encoded on it, said loyalty card identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. said transaction processor receiving loyalty card activation data from said existing standard retail point-of-sale device, said loyalty card activation data including said loyalty card unique identification number and purchase data;

c. said processing hub receiving directly or indirectly said phone card activation data from said transaction processor; and

d. said processing hub crediting an account corresponding to the loyalty card with loyalty points based upon the purchase data.

**56**. The multifunction system of claim **50**, further comprising:

a. at least one medical information card having a medical card unique identification number associated with it, said medical information belonging to a patient; and

b. said processing hub including at least one record corresponding to said medical information card, said record containing medical history information about the patient.

**57**. A multifunction card system comprising:

a. at least one card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving card activation data from an unmodified existing standard retail point-of-sale device, said card activation data including said unique identification number;

c. a processing hub receiving directly or indirectly said activation data from said transaction processor; and

d. said processing hub activating an account corresponding to the unique identification number, thereby permitting later access to said account.

**58**. The multifunction card system of claim **57**, wherein said card is selected from the group consisting of an electronic gift certificate card, a phone card, a loyalty card, and a medical information card.

**59**. The multifunction card system of claim **57**, wherein said card performs the functions of an electronic gift certificate card, a phone card, a loyalty card, and a medical information card.

**60**. A method of activating a prepaid card having a unique identification number encoded on it, the identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, the method comprising the steps of:

a. swiping the card through an unmodified existing standard point-of-sale device;

b. transmitting the identification number and an activation amount from the point-of-sale device to a processing hub; and

6,000,608

**19**

c. activating an account in the processing hub correspond-
ing to the identification number.

**61**. The method of claim **60**, further comprising:

a. transmitting the identification number and a recharge
amount from the point-of-sale device to a processing
hub; and

b. recharging the account in the processing hub corre-
sponding to the identification number.

**62**. The method of claim **60**, further comprising entering
the activation amount into the point-of-sale device.

**63**. The method of claim **60**, wherein the step of trans-
mitting the identification number and the activation amount

**20**

from the point-of-sale device is carried out at least in part
over the banking network.

**64**. The method of claim **60**, further comprising allowing
a user of the card to obtain calling time using the card.

**65**. The method of claim **60**, further comprising allowing
a user of the card to purchase goods and services using the
card.

**66**. The method of claim **60**, further comprising associ-
ating loyalty data with the card based upon usage of the card.

\* \* \* \* \*

PLAINTIFF'S THIRD AMENDED COMPLAINT

US006000608C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (9123rd)

# United States Patent
### Dorf

(10) **Number:** US 6,000,608 C1

(45) **Certificate Issued:** Jul. 10, 2012

(54) **MULTIFUNCTION CARD SYSTEM**

(75) Inventor: **Robert E. Dorf**, Raleigh, NC (US)

(73) Assignee: **AlexSam, Inc.**

**Reexamination Request:**
No. 90/009,793, Aug. 2, 2010

**Reexamination Certificate for:**
Patent No.: **6,000,608**
Issued: **Dec. 14, 1999**
Appl. No.: **08/891,261**
Filed: **Jul. 10, 1997**

(51) **Int. Cl.**
*G07F 7/08* (2006.01)
*G07F 7/10* (2006.01)

(52) **U.S. Cl.** .......................... **235/380**; 235/375; 235/376

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/009,793, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—John M Hotaling

(57) **ABSTRACT**

Disclosed is a multifunction card system which provides a multifunction card capable of serving as a prepaid phone card, a debit card, a loyalty card, and a medical information card. Each card has an identification number comprising a bank identification number which assists in establishing communications links. The card system can be accessed from any existing point-of-sale (POS) device. The POS device treats the card as a credit or debit card and routes transaction data to a processing hub using the banking system. The processing hub coordinates the various databases corresponding to the various functions of the card.



PLAINTIFF'S THIRD AMENDED COMPLAINT

US 6,000,608 C1

**1**

## EX PARTE
## REEXAMINATION CERTIFICATE
## ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1**, **3-5**, **8-11**, **16-19**, **23**, **26-28**, **34**, **36**, **37**, **39-44**, **50**, **52-54**, **57**, **58**, **60**, **62**, **63** and **65** is confirmed.

Claims **2**, **6**, **7**, **12-15**, **20-22**, **24**, **25**, **29-33**, **35**, **38**, **45-49**, **51**, **55**, **56**, **59**, **61**, **64** and **66** were not reexamined.

\* \* \* \* \*

PLAINTIFF'S THIRD AMENDED COMPLAINT

**EXHIBIT B**

**Expert Declaration of Ivan Zatkovich**

# EXPERT DECLARATION OF IVAN ZATKOVICH

## REGARDING CLAIMS 34, 36, 37, 39, 44, 45, 60, 62, 63, 65 and 66 OF U.S. PATENT NO. 6,000,608

October 11, 2019

IVAN ZATKOVICH

PLAINTIFF'S THIRD AMENDED COMPLAINT

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................... 1

II. EXPERT QUALIFICATIONS AND EXPERIENCE ............................... 2

III. MATERIALS CONSIDERED ....................................................................... 5

IV. RELEVANT LEGAL STANDARDS .......................................................... 5

   A. 35 U.S.C. § 101. ....................................................................................... 6

   B. 35 U.S.C. § 102. ....................................................................................... 8

V. OVERVIEW OF THE '608 PATENT ........................................................ 9

   A. PRIOR SOLUTIONS BEFORE MULTIFUNCTION CARDS. ..................................... 11

   B. PURPOSE AND FEATURES OF THE '608 PATENT. ............................................. 12

      1. Processing Hub ................................................................................ 14

      2. Unique Identification Number Comprising A Bank Identification Number For Use In A Banking Network. ........................................... 16

      3. Transaction Processor And An Existing POS Device ..................... 17

VI. PATENT ELIGIBILITY UNDER 35 U.S.C. § 101 .................................. 19

   A. THE ASSERTED CLAIMS FALL WITHIN THE "MACHINE" CATEGORY UNDER 35 U.S.C. § 101 .................................................................................................... 19

   B. STEP 1 OF THE MAYO/ALICE TEST: THE CLAIMS ARE NOT DIRECTED TO AN ABSTRACT IDEA. ........................................................................................ 20

   C. STEP 2 OF THE MAYO/ALICE TEST: THE CLAIM ELEMENTS PROVIDE AN "INVENTIVE CONCEPT." ................................................................................ 21

      1. The "Processing Hub" Is Innovative ............................................... 21

      2. The Processing Hub, Individually And In Combination With A Transaction Processor And The Use A Standard ABA Banking Identification Number (BIN) Is Unconventional. ................................. 23

      3. Significant Benefit Over The Prior Art. ........................................... 24

      4. Other Improvements To The Technology – Enhancement Of A Banking Network Architecture. ........................................................ 25

         (a) Method A of the '608 Patent ............................................... 25

         (b) Method E of the '608 Patent ............................................... 26

         (c) Other Methods of the '608 Patent ....................................... 27

         (d) Architecture with Maximum Flexibility and Transparency ... 27

VII. PRIORITY DATE OF THE '608 PATENT TEACHINGS ...................... 27

VIII. CONCLUSION ............................................................................................. 38

## LIST OF FIGURES

Figure 1: Figure 2 from U.S. Patent No. 6,000,608.................................................................... 14

Figure 2: Example of a BIN on an electronic gift certificate card ................................................ 16

Figure 3: Flow Chart for Use of an Encrypted Card from Intelligent Card Services .................. 35

## I. INTRODUCTION

1. My name is Ivan Zatkovich. I have been retained by the law firm of Heninger Garrison Davis, LLC (hereinafter, "HGD") to provide an expert opinion concerning the nature of the inventions embodied in United States Patent No. 6,000,608 (hereinafter, the "'608 Patent" or "Patent-in-Suit") on behalf of their owner, AlexSam, Inc. (hereinafter, "AlexSam").

2. In particular, I will opine on the eligibility of claims 34, 36, 37, 39, 44, 45, 60, 62, 63, 65, and 66 of the '608 Patent (hereinafter, the "Asserted Claims") under 35 U.S.C. § 101.

3. In summary, it is my opinion that the inventions embodied in these Asserted Claims are patent eligible because the processing hub, defined further below (hereinafter, "Processing Hub"), uniquely conceived by these inventions, is both unconventional and innovative. It is "unconventional" because it goes counter to all teachings and standards at the time of a regulated banking network that only supports standardized debit and credit card (non-multifunction card) transactions. It is "innovative," because it established a technical model for processing any number of non-standard card transactions within a banking network. In addition, the flexible architecture of the combination of the transaction processor and Processing Hub is an innovative concept. The flexible placement and relationship of the transaction processor with the Processing Hub, allows it to control how, when, and where multifunction card transactions are processed in a combination of ways depending on what type of transactions are required. The details of my investigation and conclusions are set forth below.

4. In addition, I will opine on the conception and reduction to practice date for the '608 Patent.

5. In summary, it is my opinion there is ample corroborating evidence from multiple sources from which to conclude that the conception of the subject matter of the Asserted Claims occurred

by at least February 23, 1996, and certainly well prior to testing and reduction to practice conducted in August 1996 and completion of technical details of a working phone card activation system in October 1996. Reduction to practice of the electronic gift certificate card system occurred at least by the time of Mr. Dorf's patent application on July 10, 1997.

## II.      EXPERT QUALIFICATIONS AND EXPERIENCE

6.      I am a Principal Consultant of eComp Consultants, a position I have held for over 18 years.

7.      I bring over 30 years' experience in a diverse set of technologies including debit and/or credit card activation and payment processing, point-of-sale payment gateways, mobile payments, Loyalty cards, Mobile secure financial transactions including techniques for authorization & authentication. Companies consulted for include eTrade, Citicorp, Fifth Third Bank, Deutsche Telekom, PTT Netherlands, Apple, and Facebook.

8.      eComp Consultants provides professional consulting services relating to computer and technical matters in a wide range of industries including embedded internet systems, financial transactions, and cloud-based services. Such consulting services include working with clients on specific information technology projects, process improvement, project management and other technology issues as well as providing professional expert witness services.

9.      At eComp Consultants, I have been qualified as a technical expert in over 60 matters including patent litigation for credit card processing and secure financial transactions. This work has included providing expert reports, sitting for depositions, and providing trial testimony.

10.      I received a bachelor's degree in Computer Science, with a minor in Electrical Engineering Digital Circuit Design, from the University of Pittsburgh in 1980. I completed a

master's thesis in Computer Networks from the University of Pittsburgh, the results of which were published in Byte Magazine.

11.    In my professional career, I have worked for companies such as Digital Equipment Corp. and GTE/Verizon Telecomm on projects designing, developing and integrating software and hardware for computer networks and telecommunications systems. For example, relevant projects from my career include:

(a)    <u>ETrade Online Trading</u>: Securities trading system including the buying and selling of stocks and the use of settlement accounts for clearing and reconciling account transactions.

(b)    <u>Citicorp Residential Mortgage System</u>: Development of a Mortgage qualification and payment processing system.

(c)    <u>Wachovia Customer Banking System</u>: On-line banking application for viewing and maintaining balances, managing deposits, withdrawals, and transfers.

(d)    <u>Tanning Technology/IMR Global</u>: MedWrks – Designed and implemented Medical charges clearinghouse; Smith Barney - Designed and implemented PDA & Cell phone applications for Secure Digital Trading System.

(e)    <u>GTE/Verizon</u>: Pre-paid phone cards, Calling cards - Implemented provisioning and activation of pre-paid phone cards, and clearing house calling card accounts.

12.    From 1980 to 1987, I was a software engineer at Digital Equipment Corporation where I developed operating systems, database storage and retrieval systems. I specialized in developing CAD/CAM system, manufacturing automation processes, supply chain methodology based on the GM MAP standards, and programmed automated insertion machines.

13.    From 1996 to 1999, I was Director of Networks and Customer Support at Utility Partners Inc., where I designed and managed a system to automatically create and distribute service orders for Mobile Field units for various Utility companies.

14.    I have been frequently called upon to provide my expert opinion on matters concerning patent disputes for over 18 years. I have given testimony as an expert at trial and by deposition,

including in areas that relate to the technology described in the '608 Patent. For example, I was

qualified as an expert in card processing and secure financial transactions in the following cases:

(a) *3M Futures South Africa v. Standard Bank* (Patent Litigation)
- o Testifying expert for Mobile Credit Card activation and credit card payment authorization, use of cell phone apps for user
- o Authentication and secure transaction verification.
- o Testified at Trial in South Africa.

(b) *Ronald A. Katz v. Fifth Third Bank, Hunting National Bank* (Patent Litigation)
- o Provide expertise in automated processing of Bank account, credit cards transactions, and card Activation.
- o Prepared non-infringement and rebuttal reports.
- o Was deposed.

(c) *Paul Ware v Aldo Group, Inc, et al.* (Patent Litigation)
- o Provided expertise in Point-of-Sale Credit Card transactions and secure transaction processing.

(d) *TGIP v. AT&T, IDT, et al.* (Patent Litigation)
- o Prepaid phone card – Point-of-Sale activation
- o Provided Expertise in Point-of-sale card transactions, card activation and wireless transaction.
- o Provided report on non-infringement and Invalidity.
- o Was deposed.

(e) *Walker Digital v. Amazon.com* (Patent Litigation)
- o Loyalty / Rewards Card provisioning.
- o Provided Expertise eCommerce systems incentivizing buyers using gift cards, Loyalty, and Rewards cars.
- o Includes Card activation and purchase processing.

(f) *BuySafe v. Google Trusted Stores* (Patent Litigation)
- o Testifying expert for eCommerce buyer protection and loyalty programs, requiring capturing and tracking of in-store purchases.

(g) *AlexSam, Inc. v. Green Dot Corporation* (Patent License Dispute)
- o Prepaid cards and loyalty cards – point-of-sale activation.
- o Provided expertise in point-of-sale card transactions, card activation, and reload transactions.
- o Provided reports on breach of contract and validity.
- o Was deposed.

(h) *WEX Health, Inc. v. AlexSam, Inc.* (Patent License Dispute)
- o Prepaid medical cards.
- o Provided reports on breach of contract claim.

        o   Was deposed.

(i)    *Walker Digital, LLC v. Fandango, Inc. et al.* (Patent Litigation)
        o   Testifying Expert regarding e-commerce and the use of financial products such as credit and debit card promotion for retail discounts.

15. By virtue of the above experience, I have gained a detailed understanding of the technology that is at issue in this case. In addition, my experience with commercial and technical aspects of card processing and secure financial transactions is directly relevant to the subject matter of the '608 Patent.

16. I am familiar with the various networks and entities that processed debit and/or credit cards at the time of the inventions embodied in the Asserted Claims. I am also familiar with the systems and business operated by retailers to process various payment transactions and the industry standards that enable the various computer systems to communicate and work together.

## III.    MATERIALS CONSIDERED

17. In preparing this report, I considered the following documents:

(a)    '608 Patent and its file history.

(b)    Documents related to the conception and reduction to practice of the '608 Patent.

(c)    Prior art cited against the '608 Patent in prior litigation matters involving AlexSam.

(d)    My prior expert reports and supporting declarations from other litigation matters involving AlexSam, including supporting materials attached or referenced therein.

## IV.    RELEVANT LEGAL STANDARDS

18. I am not an attorney. I have been involved in other expert witness engagements involving patents. Prior to preparation of this document, AlexSam's attorneys explained to me the legal

principles applicable to my analysis. I applied these principles, to the best of my ability, in conducting my analysis and in forming the opinions memorialized here.

### A. 35 U.S.C. § 101.

19. I have been instructed by counsel that Section 101 of the Patent Act defines patent-eligible subject matter. It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101.

20. I have been instructed by counsel that to qualify as a "machine" under Section 101, the claimed invention must be a "concrete thing, consisting of parts, or of certain devices and combination of devices." *Burr v. Duryee*, 68 U.S. 531, 570, 1 Wall. 531, 17 L.Ed. 650 (1863); *see also Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1348-1349 (Fed. Cir. 2014).

21. I have been instructed by counsel that under the non-dispositive "machine-or-transformation" test, a "claimed process is surely patent-eligible under § 101 if: (1) tied to a particular machine or apparatus; or (2) it transforms a particular article into a different state or thing." *Bilski v. Kappos*, 561 U.S. 593, 600 (2010).

22. I have been instructed by counsel that there are three judicially-created exceptions to § 101's broad patent-eligibility principles: "laws of nature, physical phenomena, and abstract ideas." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980). Pertinent here is the third category of ineligibility, "abstract ideas," which "embodies the longstanding rule that an idea of itself is not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 218, 134 S.Ct. 2347, 2355, 189 L.Ed.2d 296, 305 (2014) (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972); internal quotation marks omitted).

23.   I have been instructed by counsel that eligibility under 35 U.S.C. § 101 is a question of law, which may be based on underlying facts.  *See Berkheimer v. HP Inc.,* 881 F.3d 1360, 1365 (Fed. Cir. 2018).

24.   I have been instructed by counsel that the Supreme Court has established a two-step analysis to determine whether a patent claim is ineligible for patenting under 35 U.S.C. § 101 because it is directed to one of the patent-ineligible concepts.  *See Alice Corp. Pty. Ltd.,* 573 U.S. at 217, 134 S.Ct. at 2355, 89 L.Ed.2d at 305 (citing *Mayo Collaborative Servs. v. Prometheus Laboratories, Inc.*, 566 U.S. 66, 77-80 (2012)) (hereinafter, the "*Mayo/Alice* Test").

25.   I have been instructed by counsel that the first step of the *Mayo/Alice* Test is to determine "whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice Corp. Pty. Ltd.,* 573 U.S. at 218, 134 S.Ct. at 2355, 89 L.Ed.2d at 305.

26.   I have been instructed by counsel that the goal of the *Mayo/Alice* Test is to determine the focus of each claim to determine its "character as a whole" to determine whether the claim is directed to an abstract idea.  *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018).

27.   I have been instructed by counsel that if it is determined that a claim is not directed to an abstract idea under Step 1 of the *Mayo/Alice Test*, the claim is eligible under 35 U.S.C. § 101 and the second step of the *Mayo/Alice* Test is not necessary.  *See Finjan, Inc. v. Blue Coat Sys.,* 879 F.3d 1299, 1306 (Fed. Cir. 2018).

28.   I have been instructed by counsel that the second step of the *Mayo/Alice* Test, if necessary, looks to the elements of the claim to determine whether the claims recite an element or combination of elements that is sufficient to ensure that the patent claims "significantly more" than

the ineligible concept itself. *See Alice Corp. Pty. Ltd.,* 573 U.S. at 218, 134 S.Ct. at 2355, 89 L.Ed.2d at 305; *Mayo Collaborative Servs.*, 566 U.S. at 72–73.

29.   I have been instructed by counsel that the second step of the *Mayo/Alice* Test looks to see whether there are any "additional features" that constitute an "inventive concept" that would render the claims eligible for patenting even if they were determined to be directed to an abstract idea. *Alice Corp. Pty. Ltd.,* 573 U.S. at 221, 134 S.Ct. at 2357, 89 L.Ed.2d at 307.

30.   I have been instructed by counsel that that no such "inventive concept" may be found if the "additional features" were merely "'well-understood, routine, conventional activit[ies]' previously known to the industry." *Alice Corp. Pty. Ltd.*, 573 U.S. at 225, 134 S.Ct. at 2359, 89 L.Ed.2d at 310 (quoting *Mayo Collaborative Servs.*, 566 U.S. at 73).

31.   I have been instructed by counsel that the underlying purpose of the *Mayo/Alice* Test is to prevent "pre-emption" of the "building blocks of human ingenuity." *Alice Corp. Pty. Ltd.,* 573 U.S. at 216, 134 S.Ct. at 2354, 89 L.Ed.2d at 304.

32.   I have been instructed by counsel that at Step 2 of the *Mayo/Alice* Test, underlying questions of fact inform the question of eligibility under 35 U.S.C. § 101. *See Aatrix Software, Inc. v. Green Shades Software, Inc*., 882 F.3d 1121, 1125 (Fed. Cir. 2018); *Berkheimer,* 881 F.3d at 1365.

 **B.   35 U.S.C. § 102.**

33.   I have been instructed that priority of invention goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice.

34.   I have been instructed that conception requires formation of a definite and permanent idea of the complete and operative invention in the mind of the inventor.

35. I have been instructed that to establish an actual reduction to practice, as opposed to the constructive reduction to practice that occurs when a patent application is filed, the inventor must prove that: (1) he constructed an embodiment or performed a process that met all the limitations of the claim; and (2) he determined that the invention would work for its intended purpose.

36. I have been instructed that an inventor's testimony alone is insufficient to prove conception; some corroborating evidence is required.

37. I have been instructed that an inventor's testimony on conception can be corroborated through several pieces of evidence, even though no one piece of evidence independently proves conception, and even circumstantial evidence, so long as the evidence supports that the "inventor's story is credible."

38. I have been instructed that "there is no particular formula" required for corroboration, and instead, a "rule of reason" analysis applies to the evaluation of all pertinent evidence.

39. I have been instructed that the same requirement for evidence that corroborates inventor testimony on conception also applies to the reduction to practice determination.

## V. OVERVIEW OF THE '608 PATENT

40. The '608 Patent discloses a Multifunction card system:

> Disclosed is a multifunction card system which provides a multifunction card capable of serving as a prepaid phone card, a debit card, a loyalty card, and a medical information card. Each card has an identification number comprising a bank identification number which assists in establishing communications links. The card system can be accessed from any existing point-of-sale (POS) device. The POS device treats the card as a credit or debit card and routes transaction data to a processing hub using the banking system. The processing hub coordinates the various databases corresponding to the various functions of the card.

'608 Patent, Abstract.

41.    Prior to the inventions disclosed in the '608 Patent, the available card systems at that time only supported either a "single" credit card or a "single" debit card transaction on a standard banking network.  The multifunction card system disclosed in the '608 Patent uses a Processing Hub to support a variety of card types, such as, among others, gift cards, phone cards, loyalty cards, medical cards, debit/medical cards, and/or gift/loyalty cards.

42.    One purpose of the '608 Patent is to expand the capability of then-available card systems, which were limited at that time to using debit and/or credit cards but not both, to be "capable of performing a plurality of functions, such as an electronic gift certificate card, a prepaid phone card, and a loyalty card, all in a real-time secure environment." '608 Patent, 1:26-29.

43.    The '608 Patent discloses a new multifunction card system that "solves the problems associated with prior art card systems by providing an improved multifunction card system...." '608 Patent, 3:9-27.  And specifically, regarding the Asserted Claims, which are claims directed to prepaid and gift certificate cards, the '608 Patent provide an innovative way to activate and process gift card transactions ('608 Patent, claim 34 and 60).  .

44.    Some of the benefits of the multifunction card system disclosed in the '608 Patent over the prior art include:

(a)    Initiating multifunction card system transactions from any standard point of sale device (i.e. a regular credit card reader).

(b)    Transmitting transactions utilizing a standard banking network (which does not normally allow non-standard transactions).

(c)    Allowing third parties (e.g. non-banks and non-financial institutions) to participate in, and in some cases control, card transactions to provide functionality beyond simple credit and debit card transactions.

45.    In particular, the specification of the '608 Patent teach that

The multifunction card system comprises at least one electronic gift certificate card having a unique identification number encoded on it, the identification

number comprising a bank identification number corresponding to the multifunction card system; means for receiving elec tronic gift certificate card activation data from an existing standard retail point-of-sale device when the electronic gift certificate card is swiped through the point-of-sale device, the electronic gift certificate card activation data comprising the unique identification number of the electronic gift certificate card and an electronic gift certificate activation amount; means for activating an account corresponding to the electronic gift certificate card with a value equal to the electronic gift certificate activation amount; and means for allowing a user of the electronic gift certificate card to purchase goods having a value up to the electronic gift certificate activation amount..

'608 Patent, 3:11-27.

## A. PRIOR SOLUTIONS BEFORE MULTIFUNCTION CARDS.

46. The multifunction card system disclosed and claimed in the '608 Patent covers a range of services, including pre-paid phone cards, gift certificate cards, loyalty cards, and medical services cards. Prior to this invention as a whole, a point-of-sale (POS) device and a banking network did not support the special transactions of a multifunction card system. In fact, some solutions were proposed by other inventors, vendors, and merchants that primarily fell into three categories:

(a) Pre-configured/pre-activated cards: Cards must be shipped in a configuration ready to be used by the card holder. For example, pre-paid debit cards already containing a dollar value were shipped as pre-activated so that specialized card transactions (e.g. activate card) were not required at the POS device. Special purpose cards (e.g. loyalty cards) would have be pre-assigned to a member or customer before they are shipped and could not be assigned at a POS device.

(b) Bypassing a banking network: By creating a modified POS device, or a separate activation device at the POS, merchants could swipe non-standard cards (e.g. loyalty cards) for in-store processing, or could activate prepaid cards by transmitting activation requests through a separate network.

(c) Initiating transactions through a non-POS device: By providing a separate process to initiate card transactions through a computer terminal, such as a special software station for sales agents, or online / dial in services, the gift cards could be activated without the need for a standard POS or banking network.

47.   All three of these prior solutions are technically easier to implement than the inventions disclosed in the '608 Patent. This is because all three of these solutions could be implemented as a standalone, self-contained process without the need to integrate with a banking network or conforming to existing standard POS devices, but these prior solutions had serious drawbacks, too.

48.   These prior, simpler solutions were not consumer friendly or merchant friendly. For example:

(a)   Pre-configured/pre-activated cards were not safe:  Phone cards used in this prior art systems could be stolen and used by someone other than the intended user without requiring activation or assignment by a system.

(b)   Bypassing a banking network: This prior art system required that merchants install modified POS devices, provide a separate POS device, or implement a separate network just to perform the specialized transactions such as activation, or tabulation of loyalty points.

(c)   Initiating transactions through a non-POS device:  Pre-paid cards used in this prior art system could be purchased at a retailer but could not be activated at the POS device.  This system required that a customer or vendor to perform a separate process to activate the card or purchase good and services.

49.   Each of the exemplary problems and limitations listed above existed, or would have to be solved, within a complex regulated transactional network.  Therefore, any solution to these problems would require a reasonably sophisticated technical solution.

50.   These problems are why none of these solutions ever became widely implemented in the marketplace as was the solution embodied in the Asserted Claims.

**B.   PURPOSE AND FEATURES OF THE '608 PATENT.**

51.   The '608 Patent's application (No. 08/891,261) was filed on July 10, 1997.  *See* '608 Patent.

52.   The 66 claims of the '608 Patent issued on December 14, 1999.  *See* '608 Patent.

53.    The multifunction card system disclosed in the '608 Patent provides an electronic gift certificate card or prepaid card can be activated "from an existing standard retail point-of-sale device" ['608 Patent, 3:16-17] with an activation amount that is applied to the balance of the card. Thus, "allowing a user of the electronic gift certificate card to purchase goods having a value up to the electronic gift certificate activation amount." '608 Patent, 3:25-27.

54.    This card system can also allow a prepaid card to be "recharged in any amount desired by the customer" ['608 Patent, 5:66-67], maintaining a balance on the card so the customer can continue making purchases.

55.    Another feature of the multifunction card system is a loyalty card where "the retail issuer is also given the capability to award loyalty points to the bearer of the Electronic Gift Certificate$^{TM}$ card in recognition of purchases or recharges made." '608 Patent, 9:11-14.

56.    The inventions disclosed and claimed in the '608 Patent solved the problems of processing non-standard card transactions within a standard banking system. These inventions specifically utilize the following components:

(a)    <u>Processing Hub</u> – The new and unconventional component of this invention that can intercept and process portions of the multifunction card transactions so that these transactions can flow from standard point of sale devices through a banking network. '608 Patent, Claim 34(c,d).

(b)    <u>BIN numbers</u>:  Multifunction cards conforming to the standard debit and credit cards numbering system by adopting the bank identification number [BIN] approved by the American Banking Association for the multifunction cards.  '608 Patent, Claim 34(a).

(c)    <u>Standard POS devices</u> – Existing debit/credit card devices requiring no special modifications for use in the multifunction card system. '608 Patent, Claim 34(b).

(d)    <u>Transaction processors</u> – Servers already utilized by retailers that will now transmit multifunction card transactions from point of sale devices to the Processing Hub in a banking network. '608 Patent, Claim 34(b,c).

57. A large portion of this system is illustrated in Figure 2 of the '608 Patent (reproduced below):



Figure 1: Figure 2 from U.S. Patent No. 6,000,608

58. The specific claimed features of the inventions embodied in the asserted claims of the '608 Patent include:

### 1. **Processing Hub**

59. The '608 Patent claim 34 describes a system that has as a component a "***processing hub*** receiving directly or indirectly said activation data from said transaction processor"['608 claim 34].

60. In the '608 Patent the "said ***processing hub*** activat[es] an account corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate activation amount." '608 Patent, claim 34.

61.   In a dependent claim of the '608 Patent the "***processing hub*** associates loyalty data with the electronic gift certificate card based upon the usage of the electronic gift certificate card." '608 Patent, claim 45.

62.   A primary component of the patented system is the Processing Hub (103 in Figure 2 from the '608 Patent).  In fact, Mr. Dorf had to build the Processing Hub because it is a special-purpose computer that did not exist at the time of the invention.

63.   One purpose of the Processing Hub within a banking network, was to allow the processing of transactions that required more than just the simple transfer of funds between banks. The Processing Hub, along with the American Banking Association ("ABA") approved BIN number on the card, allows the multifunction card transactions to be transmitted transparently from the POS device through a banking network (to the Processing Hub) in the same fashion as standard credit or debit card transactions.  '608 Patent, 4:36-5:14.

64.   In a prior case, the claim term "***Processing Hub***" has been construed to mean "a computer which provides front-end POS device management and message processing for card authorizations and activations."  *AlexSam, Inc. v. DataStream Card Services Limited, et al.*, Case 2:03-cv-337-TJW, Dkt. No. 199 (E.D. Tex. June 10, 2005).

65.   Prior to the inventions embodied in the claims of the '608 Patent, a card transaction would not be able to activate a Prepaid or Electronic Gift Certificate card or apply an activation amount to the card account from an existing Point of Sale device.  The insertion of the Processing Hub into a banking network is necessary in order to intercept and process these types of multifunction card transactions within the standardized banking system.

**2.** **Unique Identification Number Comprising A Bank Identification Number For Use In A Banking Network.**

66. The Asserted Claims recite that the prepaid and electronic gift certificate card includes a "unique identification number encoded on it". Said identification number "comprises a bank identification number approved by the American Banking Association for use in a banking network." Below is an example of a BIN on an electronic gift certificate card:



*Figure 2: Example of a BIN on an electronic gift certificate card*

67. The primary purpose of a card having a BIN approved by the ABA is so that card transactions are compatible with any other standard debit and/or credit card transactions that are processed at any existing standard POS device. Card issuers use a BIN to route "purchase" card transactions over a banking network. In the multifunction card system disclosed in the '608 Patent, the ABA approved BIN is needed to route any transaction generated by the card from the POS device, *via* a banking network, to the appropriate destination, such as, for example, the card's issuing bank and/or the Processing Hub if it is a multifunction card transaction. Without this

approved BIN, the system would not know how to route the transaction once the card is swiped at the POS device. *See* '608 Patent, 4:36-5:3.

68.     A banking network is an important element of the system since, not only do the card transactions have to be transmitted to the Processing Hub, but also to the other banks and financial institutions that may participate in these transactions, including the merchant bank, the issuing bank, and third-party transaction agents such as merchant acquirers, and card processors acting on behalf of the banks. All of these entities must operate and communicate on a banking network including conforming to all of the standards and regulations controlling a banking network including transmitting a BIN number and other ISO standards.[1]

69.     In a prior case, the claim term "banking network" has been construed to mean "a set of interconnected computers used by banks and financial institution for purposes of conducting and processing financial transactions." *AlexSam, Inc. v. DataStream Card Services Limited, et al.*, Case 2:03-cv-337-TJW, Dkt. No. 199 (E.D. Tex. June 10, 2005).

### 3.     Transaction Processor And An Existing POS Device

70.     Claim 34 of the '608 Patent recites that the system has the component "***transaction processor*** receiving electronic gift card activation data from an unmodified existing standard retail ***point-of-sale device***".

71.     Most POS devices (cash registers, credit card readers, etc.) cannot connect directly to a banking network. The transaction processor provides connectivity between the POS devices and

---

[1]    ISO Standards are issued by the International Organization for Standardization, an independent, non-governmental international organization with a membership of 164 national standards bodies. Source: https://www.iso.org/about-us.html (last visited April 12, 2019).

a banking network. The transaction processor also enables communications between the POS devices and the Processing Hub.

72. The '608 Patent describes the meaning of "existing standard retail" POS devices, such as any standard debit and/or credit card reader that reads standard magnetic strip encoding like the ones that exist at virtually every store in the United States. '608 Patent, 4:25-35.

73. All existing standard POS devices also support the ISO 8583 standard[2] that defines the transaction format (including the BIN number) and request/response protocol of bank card transactions from POS devices.

74. During prosecution of the application that resulted in the issuance of the '608 Patent, the word "unmodified" was coined by the inventor, Mr. Robert Dorf, and added to the claims for the purpose of distinguishing the *Stimson* prior art.[3] Before the consideration of the *Stimson* reference, all claims in the '608 Patent application referred to a POS device simply used the term "existing standard [retail] point-of-sale device." In the *Stimson* reference, there is no requirement for, or any indication of, the need for: (a) banking network; (b) an existing point-of-sale device that is compatible with industry standards, or (c) a BIN that is approved by the ABA. In fact, *Stimson* suggests that the system may use a proprietary network and that the security number requires a proprietary POS device or at least the modification of a standard POS device.

75. In a prior case, the claim term "transaction processor" has been construed to mean "a computer, other than a Processing Hub, that facilitates the card transaction and that is remote from

---

[2] ISO 8583-3:2003: Financial transaction card originated messages.
[3] U.S. Patent No. 5,577,109.

PLAINTIFF'S THIRD AMENDED COMPLAINT

the unmodified existing standard retail point-of-sale device." *AlexSam, Inc. v. DataStream Card Services Limited, et al.*, Case 2:03-cv-337-TJW, Dkt. No. 199 (E.D. Tex. June 10, 2005).

76. The "transaction processor" acts as a link to route and receive data between the POS device and the Processing Hub. The multifunction card system disclosed in the '608 Patent can include many transaction processors, such as MasterCard, Visa, Discover, and/or the retailer. Transaction processors are embodied as components 201, 202, 203, or 209 in Figure 2 or the '608 Patent. *See* '608 Patent, 6:32-34, 6:52-55, 6:34-40 respectively.

## VI. PATENT ELIGIBILITY UNDER 35 U.S.C. § 101

77. I have been asked to provide background facts about the nature of the art relevant to the '608 Patent and have done so below within the framework of a patent eligibility analysis. These facts establish that the Asserted Claims are patent-eligible under 35 U.S.C. § 101 and are not directed to an abstract idea and, even if they were, they contain inventive concepts sufficient to transform them into patent eligible applications of an abstract idea.

### A. THE ASSERTED CLAIMS FALL WITHIN THE "MACHINE" CATEGORY UNDER 35 U.S.C. § 101.

78. In my opinion, the inventions embodied in the Asserted Claims are patent-eligible subject matter because they describe a device made up of physical components and, therefore, fall within the "machine" category of inventions.

79. In my opinion, the system embodied in the Asserted Claims required the invention of specific components, functions, or algorithms to process multifunction card system transactions.

80. In my opinion, the inventions disclosed and claimed in the '608 Patent cannot be performed by a general purpose computer.

81.    Therefore, these claims fall within one of the statutory categories for patent-eligible subject matter under 35 U.S.C. § 101, in my opinion.

### B.    STEP 1 OF THE *MAYO/ALICE* TEST: THE CLAIMS ARE NOT DIRECTED TO AN ABSTRACT IDEA.

82.    A unique and novel concept of the Asserted Claims is the implementation of a new Processing Hub within a banking network for the use of prepaid, gift certificate and loyalty cards. This solution is technically more difficult to implement than the other proposed solutions available at the time. It requires the transmission and processing of non-standard multifunction card system transactions, initiated through an unmodified POS device that only supports standardized transactions, and still remain in compliance with a highly regulated banking network.

83.    The specification of the '608 Patent addresses specific technical problems and limitations with prior art card systems, including but not limited to the lack of "a processing center which can manage such a multifunction card system" (i.e. a specialized Processing Hub). '608 Patent, 1:33-35.

84.    Applying Step 1 of the *Mayo/Alice* Test, the Asserted Claims are not drawn to an abstract idea because they provide practical technological solutions to specific problems (including those listed above).  For example, the '608 Patent's specification identifies that for any multifunction card operation (e.g. activating a card, recharging a card, tabulating loyalty points, etc.) "regardless of the way in which the card is processed, the transaction data eventually makes its way to the processing hub 103." '608 Patent: 7:62-64.  In other words, the Processing Hub must always intervene, or participate in some fashion, in the processing of the multifunction card operation.

85.    More specifically, in the case of a card activation or recharge operation, "upon receipt of the transaction data, the [processing] hub 103 recognizes the card 101 as being an Electronic Gift

Certificate™ card of the retail issuer and activates or recharges the card 101 in the appropriate amount in an EGC database 205 maintained at the processing hub 103." '608 Patent: 7:65-8:2.

86. In the case of loyalty card functions "the processing hub 103 maintains a separate loyalty card database 206." '608 Patent: 9:14-16.

87. Therefore, the Processing Hub is a concrete and tangible component of the multifunction system, as depicted in Fig. 2 of the '608 Patent, that performs specific functions, has a specific network architecture, and identifies specific interfaces with existing and well-known components of a standard banking network.

## C. STEP 2 OF THE *MAYO/ALICE* TEST: THE CLAIM ELEMENTS PROVIDE AN "INVENTIVE CONCEPT."

88. The overall purpose of the '608 Patent is to implement a multifunction card system, such as a reloadable pre-paid card, a reloadable pre-paid phone card, a loyalty card, or a medical information card that will also perform as a debit card to purchase medical products and services. The problem to be solved, however, was that current technology infrastructure that supported standard bank cards and the existing POS devices did not support the special functions of a multifunction card.

### 1. The "Processing Hub" Is Innovative

89. The solutions taught by the Asserted Claims address specific technical problems that include the ability to have a separate entity (e.g. a 3rd party operating a Processing Hub or that is neither a bank nor a financial institution) that can intercept multifunction card transactions in order to perform processing on these non-standard transactions so that they can be transmitted on a banking network. Examples of transactions that could not be performed without the use of a Processing Hub are:

      a.   ***Activate a prepaid card or Gift Certificate card***  - allows a third party to intervene in a POS transaction, using a Processing Hub, to activate a prepaid card and/or activate a card account.  This allows prepaid cards to be displayed in a retail space without the risk of active cards being stolen.

      b.   ***Apply an activation amount or recharge amount to the card's account balance*** – allows a third party to add a balance to a prepaid card, from a POS device, that uses a transaction that is other than a standard debit, credit, or authorization transaction.

      c.   ***Accumulate loyalty points in that account based on the usage of the card*** – allows a third party to intercept a purchase transaction in order to evaluates the type of purchase in order to accumulate potential loyalty points associated with that card account.

90.   Prior to the inventions disclosed in the '608 Patent, the available systems did not permit such multifunction card transactions to be performed on a banking network.  And as described below, none of the prior art identified in previous litigations involving the '608 Patent discloses a Processing Hub that could perform such transactions on a banking network.

91.   The Processing Hub is an innovative concept because it establishes a new technical model for supporting and processing any number of specialized card functions, not just medical cards, phone cards, or gift cards, explicitly identified in the patent.  Almost any type of transaction that can be initiated through a standard POS device can be implemented using the teachings of the '608 Patent.

PLAINTIFF'S THIRD AMENDED COMPLAINT

**2. The Processing Hub, Individually And In Combination With A Transaction Processor And The Use A Standard ABA Banking Identification Number (BIN) Is Unconventional.**

92.  Although a Processing Hub is itself unconventional, the combination of a Processing Hub with a transaction processor and the use of a standard ABA banking identification number (BIN) initiating and transmitting non-standard multifunction card transactions is unconventional. A person of ordinary skill at the time of the invention (POSITA) would understand that a banking network is intended only for standard financial transactions between banks or financial institutions. A POSITA would not contemplate using a banking network for sending any transactions other than those transactions the network is standardized and regulated to send.

93.  Similarly, a **transaction processor in combination with a Processing Hub** is unconventional. The intended purpose of a transaction processor is to route standard debit and credit card transactions from the POS devices to/from merchant banks and issuing banks through a banking network, whereas the transaction processor of the '608 Patent routes transactions in any number of ways to a Processing Hub through a banking network in support of non-standard multifunction card transactions.

94.  Lastly, the **unique identification number** of the card is unconventional by itself in that, in addition to looking and behaving like a standard debit card number (following specific ISO standards and banking regulations), it must perform as part of a method to identify what multifunction card operation can be performed by that card (i.e. activation, recharge, loyalty data accumulation). That is because a standard POS device would not normally have the capability to transmit a card activation transaction to a transaction processor, and the transaction processor would not normally have the capability to transmit that on a banking network. The conventions

and standards of a regulated banking network allow for that type of information to be transmitted directly from information swiped from a POS device to a banking network.

95.    Needless to say, modifying the architecture of a standard banking network to allow the transmission and processing on non-standard multifunction card transactions, while affecting none of the existing standard transactions, is a technically difficult feat to perform.  This is especially difficult considering that this network, for many years, allowed only banks and certified financial institutions to participate in card transactions though a highly regulated and tightly standardized transaction process.

### 3.  Significant Benefit Over The Prior Art.

96.    Once the Processing Hub is in place, that enables the processing of these transactions through a banking network, Multifunction cards can be issued just like any debit or credit card with the BIN and account numbering.

97.    "Since VISA® and MasterCard® are the most universally accepted cards, the BIN of the multifunction card system 108 of the present invention preferably will begin with the same number used by either VISA® or MasterCard® (i.e., "4" or "5", respectively). By using one of these numbers, the [multifunction] card 101 will be recognized by almost all existing POS devices 105 as a debit or credit card, and its transactions will be automatically routed by a banking system to the correct destination."  '608 Patent: 4:57-65.

98.    This means, non-standard multifunction cards transactions (activate, recharge, loyalty, etc.) can then be initiated at any retail establishment, or any location, using an existing POS device. This is a significant benefit over the prior art where only credit/debit card purchase, and authorization transactions could be performed.

### 4. Other Improvements To The Technology – Enhancement Of A Banking Network Architecture.

99.    An important improvement to the technology of debit and credit card systems, is the enhancement of a banking network architecture. The invention of the Processing Hub, along with the design of the multifunction card system within a banking network, is what allows for the myriad of enhanced card functions to be performed through the existing POS and banking network infrastructure. Importantly, this new architecture implements these enhancements transparently to existing institutions, components, or transactions on a banking network.

100.    Figure 2 of the '608 Patent illustrates the architecture of the Processing Hub within the existing POS and banking network architecture. The components shown in Figure 2 represent previously existing components of a standard banking network except for the new Processing Hub (103) and new third party entities (104) (e.g. non-banks and non-financial institutions) who can now participate in, and control, multifunction card transactions on a banking network.

101.    This new system architecture supports the new non-standard card functions on the existing banking network, transparently from existing components on the network, the multifunction card transactions can be routed to or through the Processing Hub in numerous ways to allow for maximum flexibility for processing of new card functions. In other words, this new architecture allows the system to control how, when, and where the multifunction card transactions are processed. The following describes several ways in which this new architecture supports multifunction card transactions:

### (a)    Method A of the '608 Patent

102.    As disclosed in '608 Patent, in "Method A," the multifunction card transaction is first routed to the banks and then to the Processing Hub. This method allows the banks to authorize a transaction prior to any processing at the Processing Hub.

103.  In this method, the transaction (e.g. a purchase transaction using a debit card) starts with a card swipe at the merchant's POS device (first 105).  This is routed to transaction processor (201) which sends the transaction to the merchant bank's processor (208).  The merchant bank then routes the transaction to the issuing card's bank processor (102) to verify if the cardholder's debit card account is active and has sufficient funds for the purchase.  The transaction is then routed to the Processing Hub (103) for processing of the "non-standard" portion of the multifunction card transaction (for example, to activate a card, or recharge the card balance).  Only when both the issuing bank (102) and the Processing Hub (103) authorize the transaction will an approval be sent back to the POS device (105) to complete the purchase.

### (b)  Method E of the '608 Patent

104.  As disclosed in the '608 Patent, "Method E" routes the transaction very differently; first to the Processing Hub and then to the banks.  '608 Patent, 6:52-64.  This method can be used, for example, on a purchase transaction to verify if the cardholder and/or purchase is eligible to accumulating loyalty points before verifying if the funds are present in the card's bank account.

105.  In "Method E", the card is swiped at the POS device (the fifth 105) at a retailer for example.  The transaction is then routed through the transaction processor (203) which sends the transaction directly to the Processing Hub.  The Processing Hub examines the BIN and account number of the card which, to determine the account number. The account number is then used to identify if the retailer, product purchase, and/or account associated with this transaction will result in adding loyalty points to the account.  Once the Processing Hub verifies the transactions and cardholder's eligibility, it can then proceed add the loyalty points to the account.

### (c)  Other Methods of the '608 Patent

106.  There are other methods that this architecture supports that allows, for example, routing to the merchant bank and Processing Hub simultaneously ("Method C" and "Method D"; *see* '608 Patent, 6:32-51), or directly to the bank and then the Processing Hub, bypassing the transaction processor ("Method B"; *see* '608 Patent, 5:39-48), or directly to the Processing Hub, bypassing the transaction processor ("Method F"; *see* '608 Patent, 6:52-55).

### (d)  Architecture with Maximum Flexibility and Transparency

107.  This new combination of the transaction processor and the Processing Hub, and how they can be connected to a banking network in different ways, defines the flexible architecture of this new, novel and inventive multifunction card system.  This architecture allows the option of pre-processing, or post-processing, or co-processing of non-standard transactions by the Processing Hub in conjunction with, or separate from, the banking and financial institutions.  And this occurs on a regulated network that previously did not support, and would not allow, anything but the most limited type of standard debit and credit card transactions.  And most importantly, this new, novel and inventive architecture transmits and processes these non-standard transactions on that banking network in a manner that is transparent to existing institutions, components, or transactions on the network.

## VII.    PRIORITY DATE OF THE '608 PATENT TEACHINGS

108.  I have been asked to provide analysis about the conception and reduction to practice of the Asserted Claims.  Based on my analysis, facts establish that that the conception of the subject matter of the Asserted Claims occurred by at least February 23, 1996, and certainly well prior to testing and reduction to practice conducted in August 1996 and completion of technical details of a working phone card activation system in October 1996.  Reduction to practice of the electronic

gift certificate card system occurred at least by the time of Mr. Dorf's patent application on July 10, 1997.

109. I have reviewed Mr. Bob Baker's rebuttal expert report submitted in response to an invalidity opinion by Scott J. Loftesness in the *AlexSam v. Best Buy et al.*, E. D. Tex. Case No. 2:10-cv-0093. I have referenced specific portions of the Baker rebuttal report as incorporated below. I adopt these specific references as my own opinions. Additionally, I have spoken with Mr. Dorf, the inventor, and have considered additional facts and evidentiary support for my finding that there is reliable and credible evidence that corroborates Mr. Dorf's conception of the claimed inventions at least as early as February 23, 1996 and certainly well before October 1996. I also find that there is reliable and credible evidence that corroborates Mr. Dorf's reduction to practice at least as early as October 1996 and possibly earlier.

110. I have reviewed evidence that Mr. Dorf spent time beginning in 1995 acting as an independent salesman attempting to sell prepaid phone cards activated by WorldDial to retailers and distributors. Substantial correspondence reflects Mr. Dorf's attempts to sell the WorldDial system between April 1995 - January 1996.

111. In November 1995, Mr. Dorf began working under an NDA with Jim Russell in parallel while he was working with WorldDial. Eventually, TNPI would become the Processing Hub that he used with his prepaid card system as implemented with Meijer, MCI and MNB, as discussed below.

112. Much like *Stimson*, the WorldDial system was a typical closed system, relying upon a terminal that used a proprietary communication system to communicate directly with the WorldDial central hub computer, which could be connected to a phone company's computer. For example, a marketing letter dated December 14, 1995 letter from Dorf to Frontier

PLAINTIFF'S THIRD AMENDED COMPLAINT

Communications, specifically describe POS activation through a direct connection to a remote

Processing Hub:

> The card is simply swiped through any POS terminal on line with the EGC network. ***The appropriate information is transmitted to the Activating Hub from the POS terminal***. The HUB through a direct line to the phone company platform tells FRONTIER to 'Turn on' a specific pin number, while simultaneously telling the POS terminal that the card has been activated.

This approach of connecting directly from the POS device to the WorldDial central hub was also

contemplated for gift card activations.

113. Mr. Dorf's sales memos discussed using specialized software to reprogram POS

terminals.

114. I am aware, however, that Mr. Dorf later learned that WorldDial never installed any

software on any retailer's POS terminal or activated any cards using any such software on any

terminal.

115. Contemporaneous documents produced by AlexSam corroborate that, in addition to his

ongoing work with prepaid phone cards, Mr. Dorf was interested in developing a gift certificate

card system for retailers. Mr. Dorf first had ideas about creating an electronic gift card in 1995.

There is evidence that he began exploring an electronic gift card with JC Penney in early 1995, to

be activated using the WorldDial system. J.C. Penney expressed interest in POS activated gift

cards, but the approach of acquiring and deploying dedicated terminals at the many thousands of

POS terminals in its hundreds of stores was not acceptable. On or about June 22, 1995, Mr. Dorf

applied to the USPTO to register "Electronic Gift Certificate" as a federal trademark. Mr. Dorf

listed "promoting the sale of goods and services of others through the use of a debit card, and/or

through the administration of incentive awards programs" as the goods and services to be

associated with the mark. This further corroborates that Mr. Dorf was exploring solutions that

PLAINTIFF'S THIRD AMENDED COMPLAINT

would allow retailers to sell electronic gift cards by mid-1995, the same time period he was involved with the WorldDial closed loop prepaid phone cards.

116. For example, in an April 11, 1995 letter to JC Penney, Mr. Dorf described a "Penney Intelligent Card" as "A card which will be used by all Penney customers and served as a convenience and profit center for Penney's." This document describes a JC Penney debit card to be activated at the point-of-sale using the WorldDial system.

117. Correspondence dated June 19, 1995 from Mr. Dorf to WorldDial further documents his ideas for a POS activated internal debit card for retailers to replace paper gift certificates, which, like in his later patent claims, is referred to as "electronic gift certificate" card. The letter refers to installing software on POS terminals to connect the terminals to WorldDial's network for activating the cards. This corroborates Mr. Dorf's knowledge regarding activation of prepaid cards using a specialized POS terminal directly connected to the WorldDial Processing Hub.

118. A June 26, 1995 letter to JC Penney further corroborates Mr. Dorf's conception of an electronic retail gift card that is initially valued, activated and later rechargeable at the point-of-sale: The Electronic Gift Card may also have no specific value, whereupon the customer may choose exactly how much they wish to spend at the register.

> . . .
>
> CTC will allow existing POS terminal to activate electronic gift cards.
>
> . . .
>
> The Electronic Gift Certificate is inactive until paid for.
>
> . . .
>
> The customer may add value to the card at any time . . . .

PLAINTIFF'S THIRD AMENDED COMPLAINT

This further corroborates Mr. Dorf's idea to send an activation amount from the POS device to the Processing Hub to set the account balance to the value chosen by the customer when the card is initially activated.

119. Mr. Dorf testified that retailers like JC Penney expressed interest in POS activated phone and gift cards, but were not amenable to deploying dedicated terminals or reprogramming their existing terminals.

120. Mr. Dorf had difficulties selling systems using the specialized dedicated terminals of the WorldDial system.

121. The documents also corroborate that Mr. Dorf sought alternative approaches to the WorldDial system due to these difficulties he had selling WorldDial's system.

122. This led Mr. Dorf to conceive of the improved approach ultimately covered by the '608 Patent claims: encoding the cards with a BIN so that existing point-of-sale devices could be used without modifying them, as WorldDial had contemplated, to route activation transactions to a different computer than they send credit card transactions.

123. Seeking a solution, Mr. Dorf learned more about credit card processing and specifically about BINs and the American Bankers Association, which regulates BINs. He contacted the ABA to learn more about the use of BINs how he could obtain one. Mr. Dorf requested a BIN application and received an application for a BIN from the ABA on February 23, 1996. It was approved by ANSI on March 18, 1996 and ANSI assigned BIN 504389 to Mr. Dorf.

124. The BIN would act like "an electronic zip code" by enabling various electronic networks to identify cards that he issued and to direct activation transactions for those cards to computer designated to process the transactions. Using cards encoded with a BIN made it possible for any point-of-sale device to read the card and transmit card data as if it was a credit or debit card – thus

making it possible to use existing standard POS devices, and, in some implementations avoiding the need for modifications at the point-of-sale device, as recited in the asserted claims.

125. I am familiar with the various networks and entities that processed credit and debit cards at the time Mr. Dorf developed his invention. I am also familiar with the systems and business operated by retailers to process various payment transactions. Industry standards enable the various computer systems to communicate and work together. Examples of such standards include ISO 7812, which defines the system and procedures relating to Issuer Identification Numbers (also referred to as a "bank identification number," or "BIN"); ISO 7813, which defines contents of magnetic stripe cards; ISO 8583, which defines messaging formats, and several others that make it possible for any credit card to be accepted at virtually any retailer.

126. An important element of these systems is the use of a card number that contains a BIN. Standard retail point-of-sale devices and back-office systems can use the BIN to identify cards swiped through the devices. For credit card transactions, this information is passed, in turn, to the merchant acquirer that services the retailer and then to the card network and card issuer associated with the card.

127. The February 23, 1996 BIN application itself corroborates that Mr. Dorf conceived of using unmodified point of sale devices because the very purpose of using a BIN was to standardize the encoding of his cards like credit cards because any point-of-sale device, without modification, can read the card and transmit card data through existing networks as if the card were a credit or debit card. Mr. Dorf requested information from ANSI about how to obtain a BIN some time before February 23, 1996. His completed BIN application is dated February 26, 1996. Along with the documentary record of his activities relating to the WorldDial closed system, I consider the

PLAINTIFF'S THIRD AMENDED COMPLAINT

BIN application to be reliable corroborating evidence that Mr. Dorf had conceived of the inventions described in the claims by at least February 26, 1996.

128. Mr. Dorf's desire to own a BIN is consistent with the idea of activating phone cards and gift cards using the retailer's existing point-of-sale devices, instead of having to deploy dedicated terminals or reprogram the devices to send transactions outside of the POS network, as was the case with World Dial's system.

129. Mr. Dorf's marketing and business development letters also demonstrate his interest in POS activation at the time he sought to obtain a BIN. The idea of coupling POS activation with the use of BIN based card encoding corroborates that Mr. Dorf had conceived of using existing retailer point-of-sale networks, which connect to other networks and include transaction processors, to send card activation data to a card processing system. By creating an activation transaction that utilized a BIN, Mr. Dorf could take advantage of existing systems to transmit card activation data over a banking network. The use of a Processing Hub would have also been included in Mr. Dorf's initial conception to maintain the prepaid card account data and to manage requests for prepaid card activations. As Mr. Dorf learned and then applied in his own invention, a core function of a BIN is to permit intermediate card authorization networks to identify the remote Processing Hub that manages the accounts for an issuer's cards and provides response messaging to retail POS devices.

130. Further documentary evidence corroborates that Mr. Dorf conceived of using unmodified devices and reduced this to practice well before the end of 1996.

131. Further documentary evidence corroborated that Mr. Dorf conceived of using a Processing Hub and reduced the system to practice before the end of 1996.

132. I have also reviewed documents associated with Mr. Dorf's subsequent commercialization activities. I understand that Mr. Dorf became aware of an opportunity to sell MCI phone cards at Meijer, a large Midwest retailer.  A May 17, 1996 fax establishes that Mr. Dorf intended to meet with MCI in Grand Rapids, Michigan to discuss the Meijer opportunity. At the time, Michigan National Bank ("MNB") was the merchant acquirer for all of Meijer's credit card transactions. Mr. Dorf entered a confidentiality agreement with MNB dated May 31, 1996. The confidentiality agreement is corroborative of Mr. Dorf's system already having been conceived and ripe for reduction to practice.  This is consistent with his explanation that he desired to route prepaid card activation transactions from the existing credit card terminals, through a transaction processor of a merchant acquirer, which would then route the transaction to a Processing Hub associated with the BIN included in the activation message.  A subsequent June 12, 1996 fax suggests that testing of the system was supposed to commence in "two weeks." I understand from interviewing Mr. Dorf that this testing was delayed by WorldDial and/or MCI. Regardless of the delay, by June 1996, Mr. Dorf had assembled a team that included a retailer, acquiring bank and his company, ICS, was the card issuer and processor using its BIN.  Mr. Dorf's system was ready for testing, which was completed in the fall of 1996, as discussed below.

133.  Later documents describe testing that was performed beginning in August 1996. These testing documents confirm that a system was being developed to route prepaid card activations from Meijer retail stores to its merchant acquiring bank (MNB) to a Processing Hub (WorldDial) and then to the phone card system (MCI).

134.  Specifically, a fax transmission from Mr. Dorf to Mark Swienhart dated September 5, 1996, identifies a test using Mr. Dorf's BIN (504389) and a September 18, 1996 meeting at Meijer.

135. Correspondence shows that Mr. Dorf solicited bids for cards encoded with a BIN-based card number. The encoding is consistent with the standard ISO encoding required by Visa and other major networks. This further shows the intent to use the existing retailer POS systems and intermediate networks, such as credit and debit networks accessed through merchant acquiring banks, to route transactions to a Processing Hub.

136. On October 31, 1996, Mr. Dorf explained his system with the following depiction:



Figure 3: Flow Chart for Use of an Encrypted Card from Intelligent Card Services

PLAINTIFF'S THIRD AMENDED COMPLAINT

137. On October 31, 1996, Mr. Dorf also sent a letter to Steve Wolfco at MNB describing the Processing Hub and the use of a program where the "transaction [is] based through existing POS terminals." I understand that Mr. Dorf had originally contemplated using a WorldDial computer as the Processing Hub in the Meijer/MCI/MNB system. In addition to explaining his challenges with WorldDial in preparation for this report, Mr. Dorf has also testified that he had difficulty getting WorldDial to establish a data connection with MNB. In my opinion the system could be considered reduced to practice at that time, subject only to completing the data connection, which was a technical detail that could be handled by routine programming.

138. To that end, Mr. Dorf contracted with two entities for his Processing Hub shortly thereafter – SSTi for the software and TNPI to house the platform. A work order dated October 8, 1996 relates to phone card activation, and a work order dated October 21, 1996 relates to gift card activation. These documents provide additional reliable evidence that Mr. Dorf not only had fully conceived of the card activation systems and methods of the patent claims, and had reduced the concept to practice, but was also close to completing a commercially working system by at least October 7, 1996. Approximately two weeks later, the system will successfully activate a card using a pre-existing point-of-sale terminal at Meijer. The documentation explains how transactions were to be routed from an unmodified existing point-of-sale device ("The transaction will look much the same as a credit or debit card transaction") to a transaction processor ("data will be transmitted to MNB for their customer") to a Processing Hub (the "independent ICS hub [will] communicate between Michigan National Bank and MCI"). Mr. Dorf's correspondence to SSTi also contemplates many different retailers connecting to the system in different ways: "Some

PLAINTIFF'S THIRD AMENDED COMPLAINT

of these accounts may have one POS terminal others may have a direct connect from a central hub." It also mentions both gift certificate and loyalty card programs.

139. I have also reviewed testimony of Jay Levenson, the principal of SSTi, who did programming for Mr. Dorf's ICS hub. His testimony confirms that the system described in the Master Development Agreement was indeed created, and that it was functional within ten days after the agreement was created. The speed with which the programming was completed shows that it was a technical detail needed for commercialization, not an unfinished element of the invention. The Levenson testimony confirms that testing for the ICS hub involved running a transaction from a Meijer point-of-sale device, through the Processing Hub and out to MCI. Mr. Levenson also confirmed that Mr. Dorf had mentioned applying the Meijer/MCI system to gift cards during their first communications.

140. Other documents also confirm the development timeline from Mr. Dorf's conception and reduction to practice of the invention. A fax sent from Mr. Dorf to MCI on November 11, 1996 provides a description of the Meijer/MCI/MNB prepaid card activation system, along with a flow-chart that describes the system's components. This document also describes POS activated and valued electronic gift certificate card and phone card systems of the same type later described and claimed in the patents. Other documents that I have considered and relied on include SSTi invoices, subsequent faxes to MCI, program descriptions, and a contract between MCI and ICS. In addition, subsequent invoices indicate the continued technical and commercial success of the program.

141. On December 4, 1996, Meijer and MCI sent a letter to Dorf discussing the Meijer, MNB and MCI pre-paid phone card testing and which, in my opinion, confirms success of a prepaid card system that uses an unmodified point of sale device to activate a card:

"The card was swiped through our point of sale system with routing to ICS to activate a card for use. This testing produced an approval response [illegible word] to the point of sale."

…

"Robert – I guess this confirms encryption is o.k.?"

This December 4 letter corroborates Mr. Dorf's statements to me that the Meijer/MCI system was tested and worked shortly after SSTi completed its work the Processing Hub. Mr. Dorf stated that the December 4 letter was sent after the testing was conducted, which occurred approximately a month before this letter confirmation. On December 23, 1996, in a letter from MCI to ICS, it is confirmed that MCI could "connect" to the "POS terminals with no additional intervention."

142. Therefore, in my opinion there is ample corroborating evidence from multiple sources from which to conclude that the conception of the subject matter of the asserted gift card claims occurred by at least February 23, 1996, and certainly well prior to testing and reduction to practice conducted in August 1996 and completion of technical details of a working phone card activation system in October 1996. Reduction to practice of the electronic gift certificate card system occurred at least by the time of Mr. Dorf's patent application on July 10, 1997.

## VIII.    CONCLUSION

143. For the foregoing reasons, it is my opinion that Asserted Claims meet the criteria to be patent-eligible under 35 U.S.C. § 101. The Processing Hub of the '608 Patent was new, novel and inventive and did not exist previously. The combination of the transaction processor, Processing Hub, and the unique card identifier was also unconventional. It is technically more complex than previous solutions, yet more viable to merchants, more marketable, and more user acceptable in the marketplace.

144. Lastly, the enhancements to banking network architecture taught by the '608 Patent make a significant improvement to the technology of credit and debit card systems. As a result, any merchant or vendor, with their existing POS devices, can initiate any number of new multifunction card transactions (medical information, debit/medical services, pre-paid card activation, pre-paid phone cards, loyalty cards, etc.) through the same banking network, and without effecting any previous debit or credit card functions.

**EXHIBIT C**

**Order of Dismissal of AlexSam's Claims Against Simon and WildCard (E.D. Tex. No. 2:03-cv-00337) entered July 13, 2005**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ALEXSAM, INC. | § | |
| | § | |
| *Plaintiff,* | § | |
| vs. | § | Case No. 2-03CV-337 |
| | § | JURY        WARD |
| FSV PAYMENT SYSTEMS, LTD., | § | |
| MBC DIRECT, LLC, NEXT ESTATE | § | |
| COMMUNICATIONS, INC., | § | |
| SIMON PROPERTY GROUP, INC., | § | |
| TRANSCEND LLC, WILDCARD | § | |
| SYSTEMS, INC., INTERACTIVE | § | |
| COMMUNICATIONS INTERNATIONAL, | § | |
| INC., GLOBETEL COMMUNICATIONS | § | |
| CORP., ONE GLOBAL FINANCE, INC., | § | |
| GALILEO PROCESSING, INC., | § | |
| AMERICAN EXPRESS TRAVEL | § | |
| RELATED SERVICES COMPANY, INC., | § | |
| and ITC FINANCIAL SERVICES, LLC | § | |
| *Defendants*. | § | |

## ORDER OF DISMISSAL OF DEFENDANTS WILDCARD SYSTEMS, INC. AND SIMON PROPERTY GROUP, INC.

The Court has reviewed and considered Plaintiff Alexsam, Inc.'s ("Alexsam") and Defendants Wildcard Systems, Inc.'s ("Wildcard") and Simon Property Group, Inc.'s ("Simon") Stipulation and Order of Dismissal and it is of the opinion that it should be GRANTED.

It is, therefore, ORDERED that the Stipulation and Order of Dismissal is GRANTED and that each claim made or that could have been made by Alexsam against Wildcard and Simon and each counterclaim made or that could have been made by Wildcard and/or Simon against Alexsam in this action is hereby dismissed with prejudice.

It is further ORDERED that each party shall bear it owns costs and attorneys' fees.

SIGNED this 13th day of July, 2005.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE

**EXHIBIT D**

**August 2, 2018 Order in the Florida Litigation**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 15-cv-61736-BLOOM/Valle

ALEXSAM, INC.,

      Plaintiff/Counterclaim Defendant,

v.

WILDCARD SYSTEMS, INC.,
eFUNDS CORPORATION, and
FIDELITY NATIONAL INFORMATION
SERVICES, INC,

      Defendants/Counterclaim Plaintiffs.

_____/

## <u>ORDER ON MOTION FOR RECONSIDERATION</u>

**THIS CAUSE** is before the Court upon Plaintiff Alexsam, Inc.'s ("Plaintiff") Motion for Reconsideration, ECF No. [122] (the "Motion"). Plaintiff requests the Court reconsider its June 8, 2016 Order, ECF No. [106] (the "Order"), granting Defendants WildCard Systems, Inc., eFunds Corporation, and Fidelity National Information Services, Inc.'s (collectively, "Defendants") Motion for Partial Summary Judgment. In the Order, the Court determined that the operative Settlement and Licensing Agreement ("SLA") had been terminated in 2009 and entered summary judgment in Defendants' favor on Counts I and II of Plaintiff's Complaint, ECF No. [5-1]. Plaintiff moves for reconsideration of that Order or, in the alternative, for entry of either a final order under Rule 54(b) or certification permitting interlocutory appeal under 28 U.S.C. § 1292(b).

"The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1369 (S.D. Fla. 2002) (internal quotation and citation omitted). "[T]here are three

Case No. 15-cv-61736-BLOOM/Valle

major grounds which justify reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice." *Id.*

"[R]econsideration of a previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Wendy's Int'l, Inc. v. Nu-Cape Const., Inc.*, 169 F.R.D. 680, 685 (M.D. Fla. 1996); *see also Campero USA Corp. v. ADS Foodservice, LLC*, 916 F. Supp. 2d 1284, 1290 (S.D. Fla. 2012) ("A motion for reconsideration is an extraordinary remedy to be employed sparingly.") (citation omitted). "Motions for reconsideration are appropriate where, for example, the Court has patently misunderstood a party." *Compania de Elaborados de Cafe v. Cardinal Capital Mgmt., Inc.*, 401 F. Supp. 2d 1270, 1283 (S.D. Fla. 2003). But "[a] motion for reconsideration should not be used as a vehicle to present authorities available at the time of the first decision or to reiterate arguments previously made." *Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992). "[T]he movant must do more than simply restate his or her previous arguments, and any arguments the movant failed to raise in the earlier motion will be deemed waived." *Compania*, 401 F. Supp. 2d at 1283.

Plaintiff argues that reconsideration is warranted because it believes that the Court "misunderstood" Plaintiff's position on termination in this matter and that reconsideration is necessary to prevent manifest injustice. Plaintiff, however, merely reiterates the same arguments previously asserted in response to Defendants' motion for summary judgment and fails to explain how the Court misunderstood Plaintiff's position.

Plaintiff asserts that the Court had no new evidence between its ruling on Plaintiff's motion to dismiss—in which it held that whether the SLA was breached or terminated early was

Case No. 15-cv-61736-BLOOM/Valle

a question of fact that the Court cannot resolve at this stage of the pleadings—and its ruling on summary judgment. *See* ECF No. [51] at 7. Although the Court recognizes that much of the same evidence was available at the motion to dismiss stage, the two rulings were a result of the procedural posture of each motion. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) ("[D]ocument[s] attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed.") (internal citations omitted).

Plaintiff further argues that the Court disregarded Plaintiff's evidence submitted, such as a December 22, 2009 letter sent by Defendants, in which Defendants indicated that the Termination Notice letter had been received, but that Defendants had not breached the SLA and did not consider the SLA terminated. This letter, however, was specifically cited to in the Court's Order, *see* Order at 3-4, and addressed by the Court's determination that the post-termination conduct of the parties was irrelevant to whether a termination occurred. *See* Order at 11-13.

Plaintiff has failed to establish grounds for reconsideration and the Court, therefore, declines to grant this "extraordinary remedy." *See Wendy's*, 169 F.R.D. at 685. Because the Court has dismissed Defendants' counterclaim for patent invalidity, Plaintiff's request for alternative relief is denied as moot. The Court declines Defendants' request to impose sanctions against Plaintiff for filing of this Motion.

Accordingly, it is **ORDERED AND ADJUDGED** that The Court's prior Paperless Order denying Plaintiff's Motion as moot, ECF No. [157], is **VACATED**. After consideration of the Motion, Plaintiff's Motion for Reconsideration, ECF No. [122], is **DENIED**.

3

Case No. 15-cv-61736-BLOOM/Valle

**DONE AND ORDERED** in Miami, Florida, this 2nd day of August, 2016.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record

4

**EXHIBIT E**

*AlexSam, Inc. v. FSV Payment Sys., Ltd.,* E. D. Tex. No. 2:03-cv-00337, Order of Dismissal With Prejudice of Defendant American Express Travel Related Services Co., Inc., filed July 1, 2005 (Dkt. No. 221)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ALEXSAM INC. | § | |
| | § | |
| VS. | § | C. A. NO. 2:03-CV-337 (TJW) |
| | § | |
| DATASTREAM CARD SERVICES | § | |
| LIMITED, ET AL | § | |

## O R D E R

Came on to be considered the Stipulation of Dismissal With Prejudice regarding the suit by Plaintiff, Alexsam, Inc. ("Alexsam"), against Defendant, American Express Travel Related Services Company, Inc. ("American Express"). After considering the Stipulation, the Court is of the opinion that such Stipulation of Dismissal should be granted, as follows:

1.　This Court has personal jurisdiction over Alexsam and American Express, and also has jurisdiction over the subject matter of this action.

2.　Each claim made by Alexsam against American Express in this action is hereby dismissed with prejudice pursuant to Fed. R. Civ. P. 41.

3.　Each counterclaim made by American Express against Alexsam in this action is hereby dismissed without prejudice pursuant to Fed. R. Civ. P. 41.

4.　Alexsam's claims as to the remaining defendants in this action shall remain pending.

5.　Each party shall bear its own costs and attorneys fees.

SIGNED this 1st day of July, 2005.

_T. John Ward_
T. JOHN WARD
UNITED STATES DISTRICT JUDGE

RD152903

PLAINTIFF'S THIRD AMENDED COMPLAINT

**EXHIBIT F**

**August 11, 2015 Notice Letter to U.S. Bank**



HENINGER GARRISON DAVIS, LLC

JOSEPH J. GLEASON
ATTORNEY

3621 VININGS SLOPE
VININGS MAIN, SUITE 4320
ATLANTA, GEORGIA 30339

TELEPHONE: (404) 996-0862
FAX: (205) 547-5518

WEBSITE: WWW.HGDLAWFIRM.COM

EMAIL: JGLEASON@HGDLAWFIRM.COM

August 11, 2015

**VIA CERTIFIED MAIL/RETURN RECEIPT REQUESTED**

Richard K. Davis, Chairman, Chief Executive Officer, and President
U.S. Bank, N.A.
425 Walnut Street
Cincinnati, Ohio  45202

> **Re:** **U.S. Patent No. 6,000,608 (the "'608 Patent")**

Dear Mr. Davis:

Our firm represents Alexsam, Inc. ("Alexsam"), who is the owner of the above-referenced '608 Patent.

Based on publicly-available information, we believe that at least the following products require a license under at least claims 32 and 33 of the '608 Patent: Payment Cards associated with U.S. Bank Consumer Driven Healthcare programs. The '608 Patent covers multifunction card systems and methods such as, for example, health savings account and flexible spending account debit card systems. If you believe otherwise, please take the time to supplement our understanding of the publically available information.

For your information, two of Alexsam's patent infringement cases of particular interest to providers of HSA/FSA cards included:

> *Alexsam, Inc. v. United Health Group Incorporated et al.*, Civil Action No. 2:07-cv-00512 (E.D. Tex); and
> *Alexsam, Inc. v. Evolution Benefits, Inc. and Humana Inc.*, Civil Action No. 2:07-cv-00288 (E.D. Tex).

Both of the above-mentioned cases were settled by the defendants taking a license to the '608 Patent.

In spite of the fact that the '608 Patent has been involved in multiple patent infringement cases, the validity of claims 32 and 33 of the '608 Patent has never been successfully challenged.

PLAINTIFF'S THIRD AMENDED COMPLAINT

Richard K. Davis, Chairman, Chief Executive Officer, and President
U.S. Bank, N.A.
August 11, 2015
Page 2

Further, the U.S. Patent and Trademark Office has confirmed the patentability of the claims in the '608 Patent in a reexamination proceeding.

Alexsam wishes to enter into licensing negotiations with U.S. Bancorp and U.S. Bank, N.A. in order to quickly and amicably resolve this matter. The present licensees of the '608 Patent recognized the technological advancements embodied in the '608 Patent and negotiated terms for the continued use of Alexsam's patented technology in their day-to-day operations. We hope that U.S. Bancorp and U.S. Bank, N.A. will likewise recognize the technological advancements embodied in the '608 Patent and enter into a license prior to incurring the unnecessary expenses associated with patent infringement litigation.

Your prompt written response within 30 days of receipt of this correspondence is requested. We are also available to meet with you to discuss licensing arrangements. To this end, please contact me directly to arrange for either an in-person meeting or a teleconference.

Very truly yours,
HENINGER GARRISON DAVIS, LLC

Joseph J. Gleason

cc:    Jacqueline K. Burt, Esq.
       René A. Vazquez, Esq.
       Timothy C. Davis, Esq.
       Robert Dorf

Atlanta  •  Birmingham  •  D.C. Metro  •  Los Angeles  •  New Jersey  •  New York

PLAINTIFF'S THIRD AMENDED COMPLAINT

**EXHIBIT G**

**August 26, 2015 Letter Response from U.S. Bank**



*Received 31 Aug 2015*

**Daniel P. Sink**
Vice President
Senior Corporate Counsel

800 Nicollet Mall
BC-MN-H21N
Minneapolis, MN 55402
612.303.3627
612.303.7886 fax
daniel.sink@usbank.com

August 26, 2015

VIA FIRST CLASS MAIL

Mr. Joseph J. Gleason
3621 Vinings Slope
Vinings Main, Suite 4320
Atlanta, Georgia  30339

     Re:    U.S. Patent No. 6,000,608 ("the '608 Patent")

Mr. Gleason:

    I am in-house legal counsel for U.S. Bank National Association ("U.S. Bank").  This is a response to your letters dated August 11, 2015 to Mr. Richard Davis and Mr. James Chosy regarding the above-referenced patent.  If you believe further correspondence is required in the future, please direct it to my attention.

    After reviewing your letter and the '608 Patent, U.S. Bank is confident that a license is not necessary.  First, the cards issued by U.S. Bank do not function as "medical cards," as is required by claims 32 and 33 that you identified in your letter.  Second, U.S. Bank is a card issuer.  A third party processes all card transactions involving U.S. Bank issued cards.

    I trust that this information will resolve the matter.

                 Respectfully,

                 Daniel P. Sink

**usbank.com**

**EXHIBIT H**

**License Agreement Between AlexSam, Inc. and MasterCard International, Inc.**

## LICENSE AGREEMENT

This License Agreement ("Agreement") is made and entered into on the last date written below ("Effective Date") by and between Alexsam, Inc. ("Alexsam"), a Texas corporation, and MasterCard International Incorporated ("MasterCard"), a Delaware corporation.

WHEREAS Alexsam is the owner of U.S. Patent No. 6,000,608, issued on December 14, 1999 and entitled "Multifunction Card System" ("the '608 patent"), and U.S. Patent No. 6,189,787, issued on February 20, 2001 and entitled "Multifunctional Card System" ("the '787 patent"); and

WHEREAS Alexsam is desirous of granting and MasterCard is desirous of obtaining a non-exclusive license under the '608 and '787 patents, as more fully described below.

NOW, THEREFORE, in consideration of the mutual promises and covenants made herein, Alexsam and MasterCard agree to the following terms and conditions:

1.  <u>Definitions.</u> As used in this Agreement, the following terms and phrases shall have the following meanings:

1.1  <u>Licensed Patents.</u> The phrase "Licensed Patents" means the '608 patent, the '787 patent, and any reissues, continuations, continuations-in-part, or divisionals, reexaminations, renewals or term extensions thereof, and all foreign counterpart patents and applications, and any patented improvement on or relating to the inventions claimed in any of the foregoing which Alexsam has obtained or will obtain rights thereto in the future.

LICENSE AGREEMENT

**ATTORNEYS' EYES ONLY**

Page - 1 -

RD22352

1.2 <u>Point-Of-Interaction Device</u>. The phrases "Point-Of-Interaction Device" and "POI Device" mean a stand-alone POS terminal, a cash register with POS interfacing, a computer with POS interfacing, and other devices that can be used to activate or add value to an account or subaccount.

1.3 <u>Licensed Transaction</u>. The phrase "Licensed Transaction" means each process of activating or adding value to an account or subaccount which is associated with a transaction that utilizes MasterCard's network or brands wherein data is transmitted between a POI Device and MasterCard's financial network or reversing such process, provided that such process is covered by one of the Licensed Patents. Such Licensed Transaction includes the entire value chain and all parts of the transaction and may involve other parties including but not limited to: issuing banks, acquiring banks, processors, merchants, card vendors and third party marketing firms. To the extent that these other parties participate in a Licensed Transaction, they will also be licensed under this Agreement, but only to the extent of such parties' participation in a Licensed Transaction.

2. <u>License Grant and Covenant Not to Sue.</u>

2.1 <u>License.</u> In consideration of the respective covenants and promises contained herein, including the payments to be paid to Alexsam under Section 4 below, Alexsam hereby grants to MasterCard a worldwide, non-exclusive, non-transferable (except to the extent otherwise expressly provided for herein) license under the Licensed Patents to process and enable others to process Licensed Transactions. The license granted under this Section 2.1

**ATTORNEYS' EYES
ONLY**

LICENSE AGREEMENT                                                                Page - 2 -

RD22353

May-08-05 21:35 Robert                    9198462948              P.03

includes the right of MasterCard to grant sub-licenses under the Licensed Patents co-extensive in scope to the scope of the license granted under this Section 2.1, which sublicenses may be in writing or not, explicit or implied, at MasterCard's option. Unless otherwise sublicensed as permitted hereunder, all Licensed Transactions shall be deemed sublicensed under an implied sublicense granted hereunder to all participating parties.

2.2   Covenant Not To Sue.   Alexsam hereby agrees and covenants to not at any time initiate, assert, or bring any claim (in any court, administrative agency, or other tribunal, anywhere in the world) against MasterCard, for any claim or alleged liabilities of any kind and nature, at law, in equity, or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed, relating to Licensed Transactions arising or occurring before or during the term of this Agreement.

3.   Pilot Launch Period.   Alexsam will accept a reduced royalty (specified in Section 4.1 below) during the period beginning with the Effective Date and ending on December 31, 2005 (the "Pilot Launch Period"), in exchange for MasterCard's agreement to give reasonable consideration to the use of processors recommended by Alexsam for processing Licensed Transactions on a non-exclusive basis as part of the pilot launch, subject to approval by MasterCard's franchise management department.

4.   Consideration.   In exchange for the rights granted to MasterCard under Section 2, MasterCard shall make the following payments to Alexsam:

**ATTORNEYS' EYES
ONLY**

LICENSE AGREEMENT                    RD22354                    Page - 3 -

PLAINTIFF'S THIRD AMENDED COMPLAINT

4.1   <u>Royalties.</u>   MasterCard shall pay Alexsam a fee per Licensed Transaction as determined by the volume-discount fee schedule set forth on Exhibit A attached hereto, except that MasterCard shall pay Alexsam one-half of such fees during the Pilot Launch Period. If MasterCard changes its fee structure and collects more than $0.50 per Licensed Transaction (whether that fee is paid by an issuer, an acquiring processor, a retailer and/or any other entity, but not by a card holder), then Alexsam's royalty per Licensed Transaction (i.e., $0.05 during the Pilot Launch Period and $0.10 thereafter) shall be increased by an equivalent percentage. For example, if MasterCard raises its fee to $0.60, which is a 20% increase above $0.50, then Alexsam's royalty would be increased by 20% as well (e.g., to $0.06 during the Pilot Launch Period and $0.12 thereafter). If MasterCard changes its fee structure so that MasterCard charges a fee directly to the cardholder for each Licensed Transaction ("the Cardholder Fee"), and then MasterCard pays the other participants (e.g., issuer, acquiring processor, retailer, etc.) their respective shares for their involvement in the Licensed Transaction, then MasterCard shall pay Alexsam the greater of (i) a royalty equal to five percent (5%) of the Cardholder Fee, or (ii) the royalty fees specified in this Section 4.1 excluding this last sentence.

4.2   <u>Timing & Reports.</u>   Within 45 days after the end of each month, MasterCard shall (a) pay Alexsam all royalties accrued under Section 4.1 for the preceding month and (b) provide a written report to Alexsam identifying (i) the total number of completed Licensed Transactions for the month, (ii) the total

**ATTORNEYS' EYES ONLY**

LICENSE AGREEMENT       RD22355       Page - 4 -

PLAINTIFF'S THIRD AMENDED COMPLAINT

royalty due for the month, and (iii) a list of all new card issuers that became a sublicensee in each month.

    4.3    <u>Books, Records & Audit Rights.</u>  MasterCard shall keep complete, accurate and up-to-date books and records to enable the amount of royalty due to be determined according to sound accounting practices.  Alexsam shall have the right, through its representatives, to make inspections of such books and records of MasterCard at reasonable times and reasonable intervals upon reasonable prior written notice, said times and intervals at mutual agreement of the parties.  If the amount of royalty due Alexsam has been under-reported, MasterCard shall pay Alexsam the amount of any under-reported royalty, and if the royalty has been under-reported in an amount of 5% or greater, determined by an independent auditor, MasterCard shall also pay Alexsam the cost of inspecting the books of MasterCard.

    4.4    <u>Additional Fees.</u>  If MasterCard at its sole discretion chooses to charge sublicensees or parties in the value chain of a Licensed Transaction fees that are not directly tied to the number of Licensed Transactions ("Non-Transactional Fees"), MasterCard will pay Alexsam twenty-five percent (25%) of all such Non-Transactional fees paid to MasterCard.  The payments due under this Section 4.4 shall be made on a monthly basis along with the reports required under Section 4.2.  Examples of Non-Transactional Fees include a set-up fee, a yearly registration fee, etc.

<div align="center">ATTORNEYS' EYES<br>ONLY</div>

4.5   Method of Payment.  The payments specified in Sections 4.1 and 4.4 shall be made in U.S. dollars by wire transfer or Automated Clearing House (ACH) transfer to an account to be identified by Alexsam.

4.6   Payments Without Deductions.  All payments shall be made without deduction for taxes, assessments or other charges of any kind which may be imposed by any Government, or any political subdivision thereof with respect to any amount payable under this Agreement, and such taxes, assessments or other charges shall be assumed and solely borne by MasterCard.

5.   Promotion of Pilot and On-going Programs.  Unless a non-party makes an intellectual-property-based claim against MasterCard related to Licensed Transactions, MasterCard will exert commercially reasonable efforts to market the processing of Licensed Transactions and to educate retailers, processors and issuers in the use of Licensed Transactions.  MasterCard will exert commercially reasonable efforts to require that all Licensed Transactions made after the Effective Date will be made in association with MasterCard's "RePower" logo or another brand generally licensed by MasterCard or one of its affiliates.  Due to space constraints and the character of the Cards, MasterCard is unable to print relevant patent numbers on each of its Cards.  However, MasterCard will exert commercially reasonable efforts to cause the phrase "Licensed Under U.S. Patent Nos. 6,000,608 and 6,189,787" to be printed on the "Terms and Conditions" document for each Card and included on the pages of MasterCard's card issuers' web sites that directly and specifically relate to and discuss the Licensed Transactions, and shall include such phrase on the pages

LICENSE AGREEMENT                    RD22357                    Page - 6 -

**ATTORNEYS' EYES ONLY**

of MasterCard's web site that directly and specifically relate to and discuss the Licensed Transactions. MasterCard shall not be liable for the failure of any of its card issuers to comply with MasterCard's patent marking requests so long as MasterCard complies with its agreement to exert commercially reasonable efforts pursuant to the immediately preceding sentence. The exercise of "commercially reasonable efforts" shall not require MasterCard to sue any of its card issuers.

6.    <u>Most Favored Nations</u>.   Alexsam warrants and represents that as of the Effective Date, it has not granted explicitly or implicitly any license under the Licensed Patents to any other person to process transactions similar to Licensed Transactions on terms and conditions more favorable than those set forth in this Agreement and Exhibit A.   The terms and conditions in this Agreement and Exhibit A were negotiated based upon the value chain related to a particular type of card, i.e., a reloadable/reusable prepaid payment, debit and/or deposit-access cards ("Reusable Card"). To the extent Alexsam hereafter grants explicitly or implicitly any license under the Licensed Patents to any other person to process transactions similar to Licensed Transactions related to a Reusable Card on relevant terms and conditions more favorable than those set forth in this Agreement and Exhibit A, Alexsam will provide prompt written notice to MasterCard of the same, and, if MasterCard so elects within thirty (30) days following receipt of such notice, Alexsam shall offer MasterCard an amendment to this Agreement that includes such relevant more and less favorable terms and conditions in the same license, it being understood that the terms and conditions of this Agreement and Exhibit A without application of such amendment shall

ATTORNEYS' EYES
ONLY

LICENSE AGREEMENT                    RD22358                    Page - 7 -

continue to apply to cards other than Reusable Cards. If Alexsam hereafter grants explicitly or implicitly any license under the Licensed Patents to any other person to process transactions similar to Licensed Transactions related to a card other than a Reusable Card on relevant terms and conditions more favorable than those set forth in this Agreement and Exhibit A, Alexsam will provide prompt written notice to MasterCard of the same, and, if MasterCard so elects within thirty (30) days following receipt of such notice, Alexsam shall offer MasterCard an amendment to this Agreement that includes such relevant more and less favorable terms and conditions in the same license, as to the different card type, it being understood that the terms and conditions of this Agreement and Exhibit A without application of such amendment shall continue to apply to Reusable Cards. Such amended terms and conditions shall only apply to Licensed Transactions that occur after the date such terms and conditions became effective under such other license, and only for so long as such terms and conditions are in effect with such third party. Alexsam shall exert commercially reasonable efforts to enforce its patent rights against all potential infringers brought to its attention by MasterCard.

7. **Term and Termination.** Subject to Section 19 below and to the second sentence of this Section 7, this Agreement shall remain in full force and effect for the life of the Licensed Patents unless (i) all claims of the Licensed Patents applicable to Licensed Transactions are held invalid or unenforceable by a court of competent jurisdiction, in which case the term of this Agreement shall end upon the date of such holding, or (ii) a court of competent jurisdiction holds

**ATTORNEYS' EYES ONLY**

LICENSE AGREEMENT                    RD22359                    Page - 8 -

PLAINTIFF'S THIRD AMENDED COMPLAINT

the Licensed Patents are not applicable to Licensed Transactions similar to those actually being made, used or sold by or for MasterCard, in which case the term of this Agreement shall end upon the date of such holding, or (iii) MasterCard exercises any right to terminate this Agreement that it otherwise has under the applicable law, or (iv) either party breaches any material provision of this Agreement, including but not limited to Sections 4, 5 (last sentence only), 6, 8, 9, 11 and 18 and the other party gives written notice of such breach and the alleged breaching party fails to cure such breach within 30 days of its receipt of such notice, in which case the non-breaching party shall have the right to terminate the Agreement by giving a termination notice within sixty (60) days following the receipt of such written notice of breach. Notwithstanding the foregoing, MasterCard shall not exercise its right to terminate this Agreement, and this Agreement shall not terminate, under subclauses (i), (ii) and/or (iii) above of this Section 7 during the period starting six (6) months from the Effective Date and ending three (3) years from the Effective Date, it being understood and agreed that all sums to be paid during this period before any termination under subclause (iv) shall constitute irrevocable, guaranteed payment obligations, in lieu of a non-refundable up-front payment, in consideration of the other favorable terms stated herein to MasterCard, regardless of any rulings by any court of competent jurisdiction, provided that Alexsam timely appeals any holding under subclauses (i) or (ii) and exhausts all such appeals. Notwithstanding any other provision of this Agreement, at any time during which MasterCard would have the right to terminate this Agreement under subclauses (i), (ii) and/or (iii) of this

**ATTORNEYS' EYES ONLY**

LICENSE AGREEMENT RD22360 Page - 9 -

PLAINTIFF'S THIRD AMENDED COMPLAINT

Section 7 but for the operation of the immediately preceding sentence, MasterCard shall owe only the $0.075 per Licensed Transaction royalty fee no matter what number of Licensed Transactions is reported for the applicable month. The provisions of paragraphs 4 (but only as to activities prior to the termination date), 8-10, 12, 14 and 15 shall survive the termination of this Agreement.

8.     Warranties & Representations.

8.1 Alexsam warrants and represents that it owns all right, title and interest in and to the Licensed Patents, and has complete authority to enter into this Agreement and grant the rights granted herein. Each of the parties warrants and represents that its execution of this Agreement has been duly authorized by all necessary corporate action.

8.2 Alexsam warrants and represents that this Agreement provides MasterCard all necessary and sufficient rights for it and all other persons to perform Licensed Transactions without infringing any rights of any kind owned by Alexsam as of the Effective Date or which Alexsam currently has any reason to expect to acquire in any way.

8.3 Alexsam further warrants and represents that, to its knowledge, MasterCard has all necessary and sufficient rights for it and all other persons to perform Licensed Transactions and that, to its knowledge, the Licensed Transactions would not, when performed, infringe any intellectual property rights owned by others.

**ATTORNEYS' EYES ONLY**

RD22361

LICENSE AGREEMENT            Page - 10 -

8.4 Alexsam further warrants and represents that, to its knowledge, the Licensed Patents are enforceable and not invalid and that it is unaware of any published or unpublished ruling or agreement to the contrary or which would affect adversely or impair the enforceability or validity of the Licensed Patents, including but not limited to, any private, judicial or regulatory settlements, consents, actions, claims and/or holdings. Alexsam is further unaware of any prior art or other bases, or any investigation results, which it believes would affect adversely or impair the enforceability or validity of the Licensed Patents. Alexsam has never agreed not to enforce the Licensed Patents.

9. <u>Indemnity,</u>

9.1 <u>By MasterCard.</u> MasterCard shall defend, indemnify, and hold harmless Alexsam from and against any third-party claims or demands, liabilities to third parties, or expenses (including attorneys' fees and costs) arising from such claims or demands, for any injury or damage, including, but not limited to, any personal or bodily injury or property damage arising out of or resulting in any way from any defect in and/or the making, using, selling or offering to sell, and/or the processing of any Licensed Transaction.

9.2 <u>By Alexsam.</u> Alexsam shall defend, indemnify, and hold harmless MasterCard from and against any third-party claims or demands, liabilities to third parties, or expenses (including attorneys' fees and costs) arising from such claims or demands, to the extent arising from facts or legal claims that if proven would result in a breach of Alexsam's warranties in Section 8, except

ATTORNEYS' EYES
ONLY

PLAINTIFF'S THIRD AMENDED COMPLAINT

that Alexsam shall not have any obligations under this Section 9.2 with regard to Section 8.3 if MasterCard has knowledge, as of the Effective Date, that MasterCard lacks all necessary and sufficient rights from parties other than Alexsam for MasterCard and all other persons to perform Licensed Transactions or that the Licensed Transactions, when performed, would infringe any intellectual property rights owned by others.

10. Government Approvals. MasterCard shall be solely responsible at its expense for obtaining all necessary government approvals, licenses, permits and/or authorizations, if any, required from the United States and any other government related to this Agreement, any Licensed Transaction, and the export thereof, and for complying with all state, federal and international laws and regulations regarding the manufacture, use, offer for sale, sale, import and/or export of each Licensed Transaction.

11. Assignment. MasterCard may not assign, transfer or otherwise dispose of its rights and obligations under this Agreement, in whole or in part, without the prior written consent of Alexsam. This Agreement shall be binding upon, and shall inure to the benefit of, the undersigned parties and their representatives, officers, directors, shareholders, predecessors, successors, subsidiaries, parents, affiliates, agents, employees and assigns.

12. Entire Agreement. This Agreement constitutes the entire Agreement of the parties and supersedes all previous negotiations, agreements, understandings or commitments and shall not be released, discharged, changed or modified, except by instruments in writing signed by duly authorized officers or

LICENSE AGREEMENT                    RD22363                         Page - 12 -

**ATTORNEYS' EYES ONLY**

PLAINTIFF'S THIRD AMENDED COMPLAINT

representatives of the parties.   Both parties have participated equally in the drafting of this Agreement.

13.   Notices.  All notices shall be deemed to have been given when deposited in the mail properly addressed and with proper postage.  All notices to be given hereunder shall be in writing and sent by certified mail, return receipt requested to the addresses specified below:

Any notice to Alexsam shall be addressed to:

Alexsam, Inc.
2897 Seasons Blvd.
Sarasota, Florida 34240
Attn: President

With copy to:

C. Dale Quisenberry
Polasek, Quisenberry & Errington, L.L.P.
6750 West Loop South
Suite 920
Bellaire, Texas 77401

Any notice to MasterCard shall be addressed to:

MasterCard International Incorporated
2000 Purchase Street
Purchase, New York 10577
Attn: President

With copy to:

MasterCard International Incorporated
2000 Purchase Street
Purchase, New York 10577
Attn: General Counsel

14.   Severability.  In the event that any provision of this Agreement, or the application of such provision, is found to be contrary to law, the remaining provisions shall remain in full force and effect.

LICENSE AGREEMENT                                                      Page - 13 -

RD22364             **ATTORNEYS' EYES
ONLY**

PLAINTIFF'S THIRD AMENDED COMPLAINT

15. <u>Disclaimer of Warranties.</u> TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, EACH PARTY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THOSE RELATED TO THE USE OR SUITABILITY OF ANY MASTERCARD CARD AND/OR LICENSED TRANSACTION, AND IMPLIED WARRANTIES OF NONINFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

16. <u>Choice of Law.</u> This Agreement and the rights and obligations of the parties under this Agreement shall be governed by and construed in accordance with the Laws of the State of New York, without giving effect to the principles thereof relating to the conflicts of Laws.

17. <u>Sole and Exclusive Venue.</u> Each party irrevocably agrees that any legal action, suit or proceeding brought by it in any way arising out of this Agreement must be brought solely and exclusively in the United States District Court for the Southern or Eastern District of New York or in the state courts of the State of New York and irrevocably accepts and submits to the sole and exclusive jurisdiction of each of the aforesaid courts in personam, generally and unconditionally with respect to any action, suit or proceeding brought by it or against it by the other party; provided, however, that this Section shall not prevent a party against whom any legal action, suit or proceeding is brought by the other party in the state courts of the State of New York from seeking to remove such legal action, suit or proceeding, pursuant to applicable Federal Law, to the district court of the United States for the district and division embracing the

LICENSE AGREEMENT RD22365 Page - 14 -

ATTORNEYS' EYES
ONLY

place where the action is pending in the state courts of the State of New York, and in the event an action is so removed each party irrevocably accepts and submits to the jurisdiction of the aforesaid district court. Each party hereto further irrevocably consents to the service of process from any of the aforesaid courts by mailing copies thereof by registered or certified mail, postage prepaid, to such party at its address designated pursuant to this Agreement, with such service of process to become effective 30 days after such mailing.

18.     Confidentiality.  This Agreement and its terms, and all information provided under Sections 4.2 or 4.3 thereof, shall remain confidential and shall not be disclosed by either party to any non-party or used for any purpose not related to this Agreement, without consent of the other party except under a protective order entered by a court, under compulsion of a subpoena, or as otherwise required by law or a court, and further provided that the parties may advise others of the existence of this Agreement and that MasterCard is a licensee under the Licensed Patents.

19.     No Admission of Liability.  It is further understood and agreed that, by executing this Agreement, and by performing any obligations and exercising any rights under this Agreement, the parties do not admit any liability or indebtedness whatsoever to each other or any other party, and that the same may not be construed in any way as an admission that MasterCard is in need of a license, or as an admission of any liability for any claims or defenses asserted by any party against the other.  The same may not be used as an admission concerning either the applicability of the license (e.g., that the Licensed Patents

LICENSE AGREEMENT                          RD22366                       Page - 15 -

**ATTORNEYS' EYES ONLY**

May-08-05 21:38 Robert                          9198462948                    P.16

actually cover the License Transactions) or a determination regarding a monetary
recovery or for any other purpose. All claims, assertions, or alleged liabilities,
now or in the future, are expressly denied.

IN WITNESS WHEREOF, the parties hereby acknowledge their
agreement and consent to the terms and conditions set forth above through their
respective signatures as contained below.

| ALEXSAM, INC. | MASTERCARD INTERNATIONAL INCORPORATED |
|---|---|
| By: _Robert E. Dorf_ | By: _Scott Galit_ |
| Robert E. Dorf | Scott Galit |
| President | Senior Vice President, Global Prepaid |
| Date: May 8, 2005 | Date: May 5, 2005 |

> MasterCard Law Department
> Approved as to Legal Form
> Lawyers Initials: JHB
> Date: 5/5/05

**ATTORNEYS' EYES ONLY**

LICENSE AGREEMENT                      RD22367                        Page - 16 -

PLAINTIFF'S THIRD AMENDED COMPLAINT

## EXHIBIT A

### MONTHLY ROYALTY FEES PER LICENSED TRANSACTION[1]

| Royalty Fee | Number of Licensed Transactions Per Month |
|---|---|
| $0.10 | 0-999,999 |
| $0.095 | 1,000,000 - 2,499,999 |
| $0.085 | 2,500,000 - 4,999,999 |
| $0.075 | 5,000,000 and above |

**ATTORNEYS' EYES
ONLY**

---

[1]     The applicable fee is determined at the end of each calendar month, is based on the total number of Licensed Transactions for that month, and applies to all Licensed Transactions for that month.

LICENSE AGREEMENT                                                    Page - 17 -

RD22368

PLAINTIFF'S THIRD AMENDED COMPLAINT



April 2, 2006

Scott Galit
Senior Vice President, Global Prepaid
MASTERCARD INTERNATIONAL INCORPORATED
2000 Purchase Street
Purchase, New York 10577

Re:    Amendment to MasterCard/Alexsam License Agreement (Loyalty Cards)

Dear Scott:

    This is to memorialize our agreement to amend the License Agreement dated May 8, 2005 between Alexsam, Inc. ("Alexsam") and MasterCard International Incorporated ("MasterCard") as follows:  the Royalties payable to Alexsam under Section 4.1 for Licensed Transactions generated by a Loyalty Card shall be $0.05 per Licensed Transaction.  For purposes of this amendment, the phrase "Loyalty Card" means a card that only functions to track consumer usage or reward consumers with points for later redemption.  A card that has additional functions (e.g., prepaid debit/ATM, telecom, etc.) does not meet the definition of "Loyalty Card" for purposes of this amendment.

    If this letter accurately reflects our agreed amendment, kindly sign and date in the space below and return a signed copy to me.  Thank you.

Very truly yours,

ALEXSAM, INC.

Robert E. Dorf
President

MASTERCARD INTERNATIONAL INCORPORATED

By: _____
Scott Galit
Senior Vice President, Global Prepaid

RD48335

**10916 Grand Journey Ave.**
**Raleigh, N.C. 27614**
**919-793-0036**

PLAINTIFF'S THIRD AMENDED COMPLAINT



February 16, 2007

Scott Galit
Senior Vice President, Global Prepaid
MASTERCARD INTERNATIONAL INCORPORATED
2000 Purchase Street
Purchase, New York 10577

**Re: Second Amendment to MasterCard/Alexsam License Agreement**

Dear Scott:

     This is to memorialize our second amendment to the License Agreement dated May 8, 2005 ("License Agreement") between Alexsam, Inc. ("Alexsam") and MasterCard International Incorporated ("MasterCard"). This letter agreement supersedes and supplants the first amendment dated April 2, 2006.

**I.    CHANGES REGARDING ROYALTIES**

    **A.    Exhibit A is Applicable Only to Reusable Cards**

    The royalties in Exhibit A to the License Agreement shall be applicable only to Licensed Transactions involving the use of "Reusable Cards", where the phrase "Reusable Card" means a reloadable/reusable prepaid payment, debit and/or deposit-access card. No changes have been made to the royalties in Exhibit A, but the chart is reproduced here for completeness.

MONTHLY ROYALTY FEES PER LICENSED TRANSACTION

| Royalty Fee | Number of Licensed Transactions Per Month |
|---|---|
| $0.10 | 0-999,999 |
| $0.095 | 1,000,000 - 2,499,999 |
| $0.085 | 2,500,000 - 4,999,999 |
| $0.075 | 5,000,000 and above |

10916 Grand Journey Ave.
Raleigh, N.C. 27614
919-793-0036

RD48336

PLAINTIFF'S THIRD AMENDED COMPLAINT

AlexSam

**B.    Loyalty Cards**

The phrase "Loyalty Card" means a card that does not include a Reuseable Card and rewards consumers for purchasing goods or services. Some Loyalty Cards only track consumer usage or reward consumers with points for later redemption. Some Loyalty Cards grant discounts or rewards in the form of a rebate (e.g., 10% of the purchase amount). The royalties applicable to Licensed Transactions that involve the use of a Loyalty Card are as follows:

MONTHLY ROYALTY FEES PER LICENSED TRANSACTION

| Royalty Fee | Number of Licensed Transactions Per Month |
|---|---|
| $0.05 | 0-999,999 |
| $0.05 | 1,000,000 - 4,499,999 |
| $0.05 | 5,000,000 and above |

**C.    Other Cards**

The following are royalties for Licensed Transactions that involve card types other than a Reusable Card or a Loyalty Card (e.g., a prepaid phone card). In the event no redeemable value is activated or reloaded, only the fixed portion of the royalty fee shall apply. The royalties are as follows:

MONTHLY ROYALTY FEES PER LICENSED TRANSACTION

| Royalty Fee | Number of Licensed Transactions Per Month |
|---|---|
| $0.04 + (0.05% of reload over $5) | 0-999,999 |
| $0.03 + (0.05% of reload over $5) | 1,000,000 - 4,499,999 |
| $0.02 + (0.05% of reload over $5) | 5,000,000 and above |

\* \* \*

Consistent with footnote 1 of Exhibit A to the License Agreement, the applicable fee for each of the above categories of cards is determined at the end of each calendar month, is based on the total number of Licensed Transactions for that month, and applies to all Licensed Transactions for that month. For the avoidance of doubt, the royalties due for a Licensed Transaction shall be determined with respect to only one of the above tables. Further for the avoidance of doubt, the category definitions set forth above in no way modify the definition of Licensed Transaction, and a transaction must meet the requirements of a Licensed Transaction to subject MasterCard to a royalty obligation.

10916 Grand Journey Ave.
Raleigh, N.C. 27614
919-793-0036

RD48337

PLAINTIFF'S THIRD AMENDED COMPLAINT

**AlexSam**

**II.    EXTENSION OF ENDING DATE IN SECTION 7**

The ending date in the second sentence of Section 7 of the License Agreement is extended until December 31, 2009.

**III.    AMENDMENT OF "LICENSED TRANSACTION"**

The definition of Licensed Transaction in Section 1.3 of the License Agreement is hereby amended to further encompass each process of exchanging information related to an information card between a POI Device and MasterCard's financial network, provided that such process is covered by one of the Licensed Patents.

If this letter accurately reflects our agreed amendment, kindly sign and date in the space below and return a signed copy to me.  Thank you.

Very truly yours,

ALEXSAM, INC.

Robert E. Dorf
President

MASTERCARD INTERNATIONAL INCORPORATED

By: _____
Scott Galit
Senior Vice President, Global Prepaid

Dated:    February 28, 2007

10916 Grand Journey Ave.
Raleigh, N.C. 27614
919-793-0036

RD48338

PLAINTIFF'S THIRD AMENDED COMPLAINT

**EXHIBIT I**

**MasterCard's Answer to AlexSam's Complaint with Counterclaims**

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALEXSAM, INC., | ECF case |
|      Plaintiff/Counter-Defendant, | Civil Action No. 1:15-cv-2799-BMC |
| v. | **JURY TRIAL DEMANDED** |
| MASTERCARD INTERNATIONAL INCORPORATED, | |
|      Defendant/Counter-Plaintiff. | |

| |
|---|
| MASTERCARD INTERNATIONAL INCORPORATED, |
|      Third-Party Plaintiff, |
| v. |
| IDT CORPORATION and IDT FINANCIAL SERVICES LLC, |
|      Third-Party Defendants. |

**<u>MASTERCARD INTERNATIONAL INCORPORATED'S ANSWER,
COUNTERCLAIMS AND THIRD-PARTY COMPLAINT</u>**

**I.     ANSWER**

Defendant MasterCard International Incorporated hereby files its Answer, and as Counter-Plaintiff, hereby files Counterclaims, and as Third-Party Plaintiff, hereby files a Third-Party Complaint, each responsive to Plaintiff Alexsam, Inc.'s Complaint dated and filed May 14, 2015.

Answering each of the corresponding numbered paragraphs of Alexsam's Complaint, MasterCard answers and responds to the allegations therein, based on its current information and belief, as follows:

## NATURE OF THE ACTION

1.    MasterCard admits Alexsam purports to bring an action for breach of contract against MasterCard.  MasterCard admits Alexsam and MasterCard have entered into various agreements together, and Exhibit A to Alexsam's Complaint includes a copy of a document entitled "License Agreement" that purports to include one such agreement.  MasterCard denies the remaining allegations in paragraph 1 Alexsam's Complaint.

## PARTIES

2.    MasterCard admits Exhibits B and C to Alexsam's Complaint purport to be copies of U.S. Patent Nos. 6,000,608 and 6,189,787, respectively.  MasterCard lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 2 of Alexsam's Complaint, and therefore denies them.

3.    MasterCard admits MasterCard International Incorporated is a corporation organized under the laws of the State of Delaware, with its principal place of business in Purchase, New York, and maintains CT Corporation System as its registered agent located at 111 Eighth Avenue, New York, New York, 10011.  MasterCard denies the remaining allegations in paragraph 3 of Alexsam's Complaint.

## JURISDICTION AND VENUE

4.    MasterCard admits Alexsam purports to bring an action under the Laws of the State of New York.  MasterCard admits this Court has subject matter jurisdiction over the parties' dispute, but denies that this Court has jurisdiction under 28 U.S.C. § 1332.  MasterCard denies the remaining allegations in paragraph 4 of Alexsam's Complaint.

5.    MasterCard denies the allegations in paragraph 5 of Alexsam's Complaint.

6.    MasterCard denies the allegations in paragraph 6 of Alexsam's Complaint on the basis that MasterCard has not at any time performed acts in breach of any valid and enforceable

2

contract with Alexsam, except MasterCard admits MasterCard is subject to personal jurisdiction in this district for purposes of this action only.

7.      MasterCard admits the document entitled "License Agreement" attached as Exhibit A to Alexsam's Complaint states that "this Agreement shall be governed by and construed in accordance with the Laws of the State of New York."  MasterCard denies the remaining allegations in paragraph 7 of Alexsam's Complaint.

8.      MasterCard denies the allegations in paragraph 8 of Alexsam's Complaint on the basis that MasterCard has not at any time performed acts in breach of any valid and enforceable contract with Alexsam, except MasterCard does not contest that venue is proper in this district, but states that it is not convenient for the witnesses or parties, or in the interest of justice, under 28 U.S.C. § 1404(a).

9.      MasterCard admits the document entitled "License Agreement" attached as Exhibit A to Alexsam's Complaint lists this Court as a possible venue for "any legal action, suit or proceeding...arising out of this Agreement."  (Docket No. 1, Ex. A, ¶ 7).  MasterCard denies the remaining allegations in paragraph 9 of Alexsam's Complaint, except MasterCard does not contest that venue is proper in this district, but states that it is not convenient for the witnesses or parties, or in the interest of justice, under 28 U.S.C. § 1404(a).

## BACKGROUND INFORMATION

10.     MasterCard admits the document entitled "License Agreement" attached as Exhibit A to Alexsam's Complaint purports to have been signed by the parties to that agreement in May 2005.  (Docket No. 1, Ex. A, at 16).  MasterCard denies the remaining allegations in paragraph 10 of Alexsam's Complaint.

11.     MasterCard admits the document entitled "License Agreement" attached as Exhibit A to Alexsam's Complaint purports to list a number of obligations of the parties to that

<div align="center">3</div>

agreement. MasterCard denies the remaining allegations in paragraph 11 of Alexsam's Complaint.

12. MasterCard admits the document entitled "License Agreement" attached as Exhibit A to Alexsam's Complaint purports to specify that MasterCard shall "pay Alexsam all royalties accrued under Section 4.1 for the preceding month and (b) provide a written report to Alexsam identifying (i) the total number of completed Licensed Transactions for the month, (ii) the total royalty due for the month, and (iii) a list of all new card issuers that became a sublicensee in each month." (Docket No. 1, Ex. A, ¶ 4.2). MasterCard denies the remaining allegations in paragraph 12 of Alexsam's Complaint.

13. MasterCard admits a number of documents attached as Exhibit D to Alexsam's Complaint each purport to report a total number of completed Licensed Transactions for a certain month, a total royalty due for the month, and a list of all new card issuers that became a sublicensee in the month. MasterCard denies the remaining allegations in paragraph 13 of Alexsam's Complaint.

14. MasterCard admits a document attached as Exhibit E to Alexsam's Complaint purports to be a letter to MasterCard from then counsel for Alexsam and refers to certain allegedly "Licensed Transactions." MasterCard denies the remaining allegations in paragraph 14 of Alexsam's Complaint.

15. MasterCard admits a document attached as Exhibit E to Alexsam's Complaint purports to be a letter to MasterCard from then counsel for Alexsam and refers to certain allegedly "Licensed Transactions." MasterCard denies the remaining allegations in paragraph 15 of Alexsam's Complaint.

16. Admitted.

17.     Admitted.

18.     MasterCard admits the Eastern District of Texas determined that IDT Corporation could not be liable for infringement related to certain transactions, in part due to a license. MasterCard denies the remaining allegations in paragraph 18 of Alexsam's Complaint.

19.     Admitted.

20.     Admitted.

## COUNT I: BREACH OF CONTRACT

21.     MasterCard incorporates by reference its answers in paragraphs 1-20 above.

22.     Denied.

23.     Denied.

24.     Denied.

25.     Denied.

26.     Denied.

27.     Denied.

## JURY DEMAND

28.     MasterCard admits Alexsam purports to demand a trial by jury on all issues.

## DENIAL OF ANY REMAINING ALLEGATIONS

29.     Unless expressly admitted herein, MasterCard denies any remaining allegations in Alexsam's Complaint.

## II.     OTHER DEFENSES

In further answering the Complaint, MasterCard pleads the following defenses, without admitting, agreeing, or conceding that MasterCard bears the burden of proof or the burden of persuasion on any such defense, whether in whole or in part:

5

## FIRST DEFENSE

### (Laches)

30.     Alexsam admits in its Complaint that it informed MasterCard of its concerns regarding certain allegedly "Licensed Transactions" at least as early as June 13, 2007.  Alexsam then delayed for nearly eight (8) years the filing of this suit against MasterCard for breach of contract alleging non-payment for the allegedly "Licensed Transactions."

31.     Alexsam's delay from the date it knew or reasonably should have known of its claim against MasterCard to the filing of this suit was unreasonable and inexcusable.  Alexsam's delay has materially prejudiced MasterCard.  Accordingly, Alexsam's claims for relief during the period of Alexsam's delay are barred under the equitable doctrine of laches.

## SECOND DEFENSE

### (Equitable Estoppel)

32.     Alexsam asserted its claims with respect to certain allegedly "Licensed Transactions" against MasterCard as early as June 13, 2007.  MasterCard responded on July 2, 2007.  Upon information and belief, Alexsam remained silent and continued to accept royalty payments from MasterCard for nearly eight (8) years until the filing of this action.

33.     Following Alexsam's assertion of its claims in June 13, 2007, and MasterCard's subsequent reply, upon information and belief, Alexsam misled MasterCard by remaining silent for an unreasonably long time, up until the filing of the present suit, and/or by accepting royalty payments from MasterCard.  MasterCard thus reasonably believed that Alexsam did not intend to enforce any agreement against MasterCard with respect to the certain allegedly "Licensed Transactions."  In substantial reliance on Alexsam's misleading conduct and silence, MasterCard has suffered material harm, both in terms of its economic position (e.g., investment and

6

implementation of its products and services) and loss of access to evidence and sources of proof. Accordingly, Alexsam's claims for relief are barred under the doctrine of equitable estoppel.

## THIRD DEFENSE

### (Waiver)

34.     Alexsam asserted its claims with respect to certain allegedly "Licensed Transactions" against MasterCard as early as June 13, 2007.  Upon information and belief, Alexsam then abandoned any claim against MasterCard for nearly eight years.  Upon information and belief, Alexsam intended to relinquish any claim for breach of contract it may have had or may have against MasterCard.  The doctrine of waiver thus bars Alexsam's current suit.

## FOURTH DEFENSE

### (Failure to State a Claim)

35.     Alexsam's Complaint, on one or more claims for relief set forth therein, fails to state a proper claim upon which relief can be granted under the Laws of the State of New York and/or the United States Code.

## FIFTH DEFENSE

### (Failure to Perform)

36.     The claims alleged in Alexsam's Complaint are barred, in whole or in part, by Alexsam's failure to perform its obligations under one or more of its agreements with MasterCard.

## SIXTH DEFENSE

### (Actions of Others)

37.     The claims alleged in Alexsam's Complaint are barred, in whole or in part, because MasterCard is not liable for the acts of others over whom it has no control.

7

**SEVENTH DEFENSE**

**(Statute of Limitations)**

38.     The claims alleged in Alexsam's Complaint are barred, in whole or in part, by the applicable statute of limitations.

**EIGHTH DEFENSE**

**(Breach of Good Faith)**

39.     The claims alleged in Alexsam's Complaint are barred, in whole or in part, by Alexsam's breach of the implied covenant of good faith and fair dealing.

**NINTH DEFENSE**

**(Unjust Enrichment)**

40.     The claims alleged in Alexsam's Complaint are barred, in whole or in part, by the doctrine of unjust enrichment.

**TENTH DEFENSE**

**(Payment and Discharge)**

41.     Without admitting that Alexsam's Complaint states a claim, the claims alleged in Alexsam's Complaint are barred, in whole or in part, because MasterCard has already satisfied such claims through payment of money or discharge of obligation.

**ELEVENTH DEFENSE**

**(Damages and Costs Limitations)**

42.     Without admitting that Alexsam's Complaint states a claim, there has been no damage in any amount, manner or at all by reason of any act alleged against MasterCard, and the relief prayed for in Alexsam's Complaint therefore cannot be granted.

43.     Without admitting that Alexsam's Complaint states a claim, any remedies are limited to the extent that there is sought an overlapping or duplicative recovery pursuant to the various claims against MasterCard and others for any alleged single wrong.

### TWELFTH DEFENSE

### (Failure to Mitigate)

44.     Without admitting that Alexsam has suffered any harm, to the extent Alexsam has suffered harm, Alexsam has failed to mitigate that harm.

### ADDITIONAL DEFENSES

45.     MasterCard reserves the right to assert any other defenses based on information learned or obtained in the course of this action.

### DEMAND FOR JURY TRIAL

MasterCard demands a trial by jury on all claims of Alexsam's Complaint so triable.

### PRAYER FOR RELIEF

MasterCard denies that Alexsam is entitled to any of the relief sought in its prayer for relief against MasterCard and requests that the Court deny all such relief to Alexsam in its entirety and with prejudice and that Alexsam take nothing.

### III.     COUNTERCLAIMS

MasterCard hereby alleges the following Counterclaims against Alexsam:

### THE PARTIES

46.     Counterclaim Plaintiff MasterCard International Incorporated is a Delaware corporation, with its headquarters at 2000 Purchase Street, Purchase, New York 10577, and maintains The Corporation Trust Company as its registered agent located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

9

47.     Upon information and belief based on the allegation of Alexsam's Complaint in paragraph 1, Alexsam, Inc. is a corporation organized and existing under the laws of the State of Texas and has its principal place of business at 10509 Firestone Drive, Bradenton, Manatee County, Florida, 34202.

## JURISDICTION AND VENUE

48.     MasterCard's Counterclaims arise under the United States Patents Act, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. The Court has subject matter jurisdiction over MasterCard's Counterclaim pursuant to 28 U.S.C. §§ 1331, 1338 and 1367. This Court has personal jurisdiction over Alexsam at least by virtue of Alexsam's filing of its Complaint against MasterCard in this Court, and venue is proper in this District pursuant to 28 U.S.C. §§ 1391(c) and 1400(b).

## COUNT I: DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,000,608

49.     MasterCard incorporates by reference the allegations of paragraphs 46-48.

50.     On May 14, 2015, Alexsam filed a Complaint naming MasterCard as defendant.

51.     The Complaint alleges that MasterCard has performed acts in breach of contract with Alexsam due to non-payment of royalties arising from allegedly "Licensed Transactions" defined in a "License Agreement" between MasterCard and Alexsam attached as Exhibit A to Alexsam's Complaint.

52.     The License Agreement defines a Licensed Transaction to include certain processes "provided that such process is covered by one of the Licensed Patents." (Docket No. 1, Ex. A, ¶ 1.3).

53.     The License Agreement defines Licensed Patents to include U.S. Patent No. 6,000,608 ("the '608 Patent"). (*Id.* at ¶ 1.1).

54.     At least by virtue of its allegations in its Complaint of breach of contract due to non-payment of royalties arising from allegedly Licensed Transactions defined in the License Agreement, Alexsam alleges MasterCard has performed processes "covered by one of the Licensed Patents" as required by the License Agreement, and consequently, that MasterCard has practiced, is practicing, and/or has infringed and continues to infringe one or more claims of the '608 Patent.

55.     In its Complaint, Alexsam attaches a copy of the '608 Patent (as Exhibit B) and declares that it has "the right to license the Alexsam patents, and to sue for infringement and recover past damages."  (Docket No. 1, ¶ 2).  Alexsam (1) threatens MasterCard with liability for infringement of the '608 Patent and (2) effectively concedes that the '608 Patent is essential to its breach of contract claim.

56.     An actual controversy exists between MasterCard and Alexsam regarding Alexsam's allegations of breach of contract.

57.     MasterCard has not performed processes "covered by one of the Licensed Patents" and thus has not infringed any valid and enforceable claim of the '608 Patent, either directly or indirectly.

58.     To the extent it is found that more than one actor is involved in practicing any processes covered by the '608 Patent, the acts of others are not attributable to MasterCard, and thus MasterCard is not responsible for the infringement.  *See Akamai Technologies, Inc. v. Limelight Networks, Inc.*, No. 2009-1372, 2015 WL 4760450, at *1 (Fed. Cir. Aug. 13, 2015).

59.     The Federal Circuit affirmed judgment of no infringement of claims 57 and 58 of the '608 Patent by defendants in *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336 (Fed. Cir. 2013), ruling that, as a matter of law, "Alexsam failed to present substantial evidence that the terminals

11

PLAINTIFF'S THIRD AMENDED COMPLAINT

used in [defendants'] systems 'ha[d] not been reprogrammed, customized, or otherwise altered with respect to [their] software ... for use in the card system.'" *Id.* at 1342 (finding Alexsam failed to prove that defendants' systems included "an unmodified existing standard retail point-of-sale device" as claimed). Further, Alexsam is collaterally estopped from re-litigating this issue it has previously litigated and lost.

60.     MasterCard has not infringed claims 57 or 58 (or any claim in the '608 Patent at least because they all require "an unmodified existing standard retail point-of-sale device"), either directly or indirectly, at least because MasterCard does not utilize "an unmodified existing standard retail point-of-sale device" as that term has been construed in *Alexsam, Inc. v. IDT Corp.* and related cases. *Id.*

61.     Alexsam itself has admitted in its brief to the Federal Circuit that there is no evidence certain transactions accused in Alexsam's Complaint ("SafeNet transactions") are "different in any relevant way" from other transactions found not to infringe the '608 Patent. Brief of Alexsam, Inc., Plaintiff-Cross-Appellant at 70-71, *Alexsam, Inc. v. IDT Corp.*, Nos. 2012-1063, 2012-1064, 2012 WL 3105399 (Fed. Cir. May 21, 2012). As such, for at least the same reasons recognized by the Federal Circuit, the SafeNet transactions do not infringe the '608 Patent and cannot be considered "covered by one of the Licensed Patents" under the License Agreement.

62.     The Federal Circuit has found at least claims 1, 34, 36, 37, 57, 58, 60, 62 and 65 of the '608 Patent to be invalid. *Alexsam, Inc. v. Gap, Inc.*, No. 2014-1564, 2015 WL 3750121 (Fed. Cir. June 16, 2015). As such, at least because one cannot infringe invalid claims and/or invalid claims cover nothing, MasterCard cannot infringe at least these claims, and practicing these claims cannot be considered "covered by one of the Licensed Patents" under the License

PLAINTIFF'S THIRD AMENDED COMPLAINT

Agreement.   Further, Alexsam is collaterally estopped from re-litigating this issue it has previously litigated and lost.

63.     Pursuant to 28 U.S.C. §§ 2201 and 2202, MasterCard is entitled to a declaratory judgment that it has not infringed, and does not infringe, any valid and enforceable claim of the '608 Patent.

### COUNT II: DECLARATION OF INVALIDITY OF THE '608 PATENT

64.     MasterCard incorporates by reference the allegations of paragraphs 46-63.

65.     At least by virtue of its allegations in its Complaint of breach of contract due to non-payment of royalties arising from Licensed Transactions defined in the License Agreement, Alexsam contends that the '608 Patent is not invalid.

66.     An actual controversy exists between MasterCard and Alexsam regarding Alexsam's allegations of breach of contract.

67.     To the extent any claim of the '608 Patent is construed to cover MasterCard's products or services, that claim is invalid for failure to comply with 35 U.S.C. §§ 102 and/or 103 at least because the alleged claimed invention was (a) in public use, on sale, patented and/or described in a printed publication more than one year prior to the earliest filing date of the patent's application; and/or (b) obvious to a person of ordinary skill in the art at the time the alleged claimed invention was made.  In addition, to the extent any claim of the '608 Patent is construed to cover MasterCard's products or services, that claim is directed to an abstract idea and is therefore invalid under 35 U.S.C. § 101.

68.     To the extent any claim of the '608 Patent is construed to cover MasterCard's products or services, that claim scope is not properly described in the specification of the '608 Patent, and the claim is therefore invalid under 35 U.S.C. § 112.

13

69.     To the extent any claim of the '608 Patent is construed to cover MasterCard's products or services, the written description of the '608 Patent does not enable the full scope of the claim, and the claim is therefore invalid under 35 U.S.C. § 112.

70.     To the extent any claim of the '608 Patent is construed to cover MasterCard's products or services, the claim fails to particularly point out and/or distinctly claim the invention, and the claim is therefore invalid under 35 U.S.C. § 112.

71.     The Federal Circuit has found at least claims 1, 34, 36, 37, 57, 58, 60, 62 and 65 of the '608 Patent to be invalid under 35 U.S.C. § 102(g) as anticipated by Ceridian Stored Value Solutions's (SVS's) gift card processing system. *Alexsam, Inc. v. Gap, Inc.*, No. 2014-1564, 2015 WL 3750121 (Fed. Cir. June 16, 2015). Further, Alexsam is collaterally estopped from re-litigating this issue it has previously litigated and lost. The remaining claims of the '608 Patent are invalid under 35 U.S.C. § 102(g) as anticipated by, or alternatively under 35 U.S.C. § 103(a) as unpatentable over, Ceridian Stored Value Solutions's (SVS's) gift card processing system.

72.     Pursuant to 28 U.S.C. §§ 2201 and 2202, MasterCard is entitled to a declaratory judgment that the claims of the '608 Patent are invalid in part or in whole.

## COUNT III: DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,189,787

73.     MasterCard incorporates by reference the allegations of paragraphs 46-48.

74.     On May 14, 2015, Alexsam filed a Complaint naming MasterCard as defendant.

75.     The Complaint alleges that MasterCard has performed acts in breach of contract with Alexsam due to non-payment of royalties arising from allegedly "Licensed Transactions" defined in a "License Agreement" between MasterCard and Alexsam attached as Exhibit A to Alexsam's Complaint.

14

76.     The License Agreement defines a Licensed Transaction to include certain processes "provided that such process is covered by one of the Licensed Patents." (Alexsam's Complaint, Ex. A, ¶ 1.3).

77.     The License Agreement defines Licensed Patents to include U.S. Patent No. 6,189,787 ("the '787 Patent"). (*Id.* at ¶ 1.1).

78.     At least by virtue of its allegations in its Complaint of breach of contract due to non-payment of royalties arising from allegedly Licensed Transactions defined in the License Agreement, Alexsam alleges MasterCard has performed processes "covered by one of the Licensed Patents" as required by the License Agreement, and consequently, that MasterCard has practiced, is practicing, and/or has infringed and continues to infringe one or more valid claims of the '787 Patent.

79.     In its Complaint, Alexsam attaches a copy of the '787 Patent (as Exhibit C) and declares that it has "the right to license the Alexsam patents, and to sue for infringement and recover past damages." (Docket No. 1, ¶ 2). Alexsam (1) threatens MasterCard with liability for infringement of the '787 Patent and (2) effectively concedes that the '787 Patent is essential to its breach of contract claim.

80.     An actual controversy exists between MasterCard and Alexsam regarding Alexsam's allegations of breach of contract.

81.     MasterCard has not performed processes "covered by one of the Licensed Patents" as required by the License Agreement and thus has not infringed any valid and enforceable claim of the '787 Patent, either directly or indirectly.

82.     To the extent it is found that more than one actor is involved in practicing any processes covered by the '787 Patent, the acts of others are not attributable to MasterCard, and

thus MasterCard is not responsible for the infringement. *See Akamai Technologies, Inc. v. Limelight Networks, Inc.*, No. 2009-1372, 2015 WL 4760450, at *1 (Fed. Cir. Aug. 13, 2015).

83.     Alexsam itself has admitted in its brief to the Federal Circuit that there is no evidence certain transactions accused in Alexsam's Complaint ("SafeNet transactions") are "different in any relevant way" from other transactions found not to infringe the '787 Patent. Brief of Alexsam, Inc., Plaintiff-Cross-Appellant at 70-71, *Alexsam, Inc. v. IDT Corp.*, Nos. 2012-1063, 2012-1064, 2012 WL 3105399 (Fed. Cir. May 21, 2012); *see also id.* at 23 (it "has also been determined that none of the remaining products infringe…Claims 1 or 14 of the '787 patent") (quoting jury instructions).  As such, for at least the same reasons, the SafeNet transactions do not infringe the '787 Patent and cannot be considered "covered by one of the Licensed Patents" under the License Agreement.

84.     The Federal Circuit has found at least claims 1, 2 and 19 of the '787 Patent to be invalid.  *Alexsam, Inc. v. Gap, Inc.*, No. 2014-1564, 2015 WL 3750121 (Fed. Cir. June 16, 2015).  Further, Alexsam is collaterally estopped from re-litigating this issue it has previously litigated and lost.  As such, at least because one cannot infringe invalid claims and/or invalid claims cover nothing, MasterCard cannot infringe at least these claims, and practicing these claims cannot be considered "covered by one of the Licensed Patents" under the License Agreement.

85.     Pursuant to 28 U.S.C. §§ 2201 and 2202, MasterCard is entitled to a declaratory judgment that it has not infringed, and does not infringe, any valid and enforceable claim of the '787 Patent.

### COUNT IV: DECLARATION OF INVALIDITY OF THE '787 PATENT

86.     MasterCard incorporates by reference the allegations of paragraphs 46-48 and 73-85.

<div align="center">16</div>

87.     At least by virtue of its allegations in its Complaint of breach of contract due to non-payment of royalties arising from Licensed Transactions defined in the License Agreement, Alexsam contends that the '787 Patent is not invalid.

88.     An actual controversy exists between MasterCard and Alexsam regarding Alexsam's allegations of breach of contract.

89.     To the extent any claim of the '787 Patent is construed to cover MasterCard's products or services, that claim is invalid for failure to comply with 35 U.S.C. §§ 102 and/or 103 at least because the alleged claimed invention was (a) in public use, on sale, patented and/or described in a printed publication more than one year prior to the earliest filing date of the patent's application; and/or (b) obvious to a person of ordinary skill in the art at the time the alleged claimed invention was made.  In addition, to the extent any claim of the '787 Patent is construed to cover MasterCard's products or services, that claim is directed to an abstract idea and is therefore invalid under 35 U.S.C. § 101.

90.     To the extent any claim of the '787 Patent is construed to cover MasterCard's products or services, that claim scope is not properly described in the specification of the '787 Patent, and the claim is therefore invalid under 35 U.S.C. § 112.

91.     To the extent any claim of the '787 Patent is construed to cover MasterCard's products or services, the written description of the '787 Patent does not enable the full scope of the claim, and the claim is therefore invalid under 35 U.S.C. § 112.

92.     To the extent any claim of the '787 Patent is construed to cover MasterCard's products or services, the claim fails to particularly point out and/or distinctly claim the invention, and the claim is therefore invalid under 35 U.S.C. § 112.

93.     The Federal Circuit has found at least claims 1, 2, and 19 of the '787 Patent to be invalid under 35 U.S.C. § 102(g) as anticipated by Ceridian Stored Value Solutions's (SVS's) gift card processing system. *Alexsam, Inc. v. Gap, Inc.*, No. 2014-1564, 2015 WL 3750121 (Fed. Cir. June 16, 2015).  Further, Alexsam is collaterally estopped from re-litigating this issue it has previously litigated and lost.  The remaining claims of the '787 Patent are invalid under 35 U.S.C. § 102(g) as anticipated by, or alternatively under 35 U.S.C. § 103(a) as unpatentable over, Ceridian Stored Value Solutions's (SVS's) gift card processing system.

94.     Pursuant to 28 U.S.C. §§ 2201 and 2202, MasterCard is entitled to a declaratory judgment that the claims of the '787 Patent are invalid in part or in whole.

### COUNT V: DECLARATION OF NO BREACH OF CONTRACT BY MASTERCARD

95.     MasterCard incorporates by reference the allegations of paragraphs 46-94.

96.     The Complaint alleges that MasterCard has performed acts in breach of contract with Alexsam due to non-payment of royalties arising from allegedly "Licensed Transactions" defined in a "License Agreement" between MasterCard and Alexsam attached as Exhibit A to Alexsam's Complaint.

97.     The License Agreement defines a Licensed Transaction to include certain processes "provided that such process is covered by one of the Licensed Patents."  (Docket No. 1, Ex. A, ¶ 1.3).

98.     The License Agreement defines Licensed Patents to include the '608 Patent and the '787 Patent.  (*Id.* at ¶ 1.1).

99.     At least by virtue of its allegations in its Complaint of breach of contract due to non-payment of royalties arising from allegedly Licensed Transactions defined in the License Agreement, Alexsam alleges MasterCard has performed processes "covered by one of the Licensed Patents" as required by the License Agreement.

PLAINTIFF'S THIRD AMENDED COMPLAINT

100.    An actual controversy exists between MasterCard and Alexsam regarding Alexsam's allegations of breach of contract.

101.    The Federal Circuit affirmed judgment of no infringement of claims 57 and 58 of the '608 Patent by defendants in *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336 (Fed. Cir. 2013), ruling that, as a matter of law, "Alexsam failed to present substantial evidence that the terminals used in [defendants'] systems 'ha[d] not been reprogrammed, customized, or otherwise altered with respect to [their] software ... for use in the card system.'"  *Id.* at 1342 (finding Alexsam failed to prove that defendants' systems included "an unmodified existing standard retail point-of-sale device" as claimed).

102.    MasterCard has not performed processes "covered by one of the Licensed Patents" at least because MasterCard does not utilize "an unmodified existing standard retail point-of-sale device" as that term has been construed in *Alexsam, Inc. v. IDT Corp.* and related cases. *Id.*

103.    Alexsam itself has admitted in its brief to the Federal Circuit that there is no evidence certain transactions accused in Alexsam's Complaint ("SafeNet transactions") are "different in any relevant way" from other transactions found not to infringe the '608 Patent. Brief of Alexsam, Inc., Plaintiff-Cross-Appellant at 70-71, *Alexsam, Inc. v. IDT Corp.*, Nos. 2012-1063, 2012-1064, 2012 WL 3105399 (Fed. Cir. May 21, 2012).  As such, for at least the same reasons recognized by the Federal Circuit, the SafeNet transactions cannot be considered "covered by one of the Licensed Patents" under the License Agreement.

104.    The Federal Circuit has found at least claims 1, 34, 36, 37, 57, 58, 60, 62 and 65 of the '608 Patent to be invalid.  *Alexsam, Inc. v. Gap, Inc.*, No. 2014-1564, 2015 WL 3750121 (Fed. Cir. June 16, 2015).  Any claim of the '608 Patent that Alexsam alleges covers a

19

transaction or process performed by MasterCard is similarly invalid. As such, at least because one cannot infringe invalid claims and/or invalid claims cover nothing, practicing these claims cannot be considered "covered by one of the Licensed Patents" under the License Agreement.

105. Alexsam itself has admitted in its brief to the Federal Circuit that there is no evidence certain transactions accused in Alexsam's Complaint ("SafeNet transactions") are "different in any relevant way" from other transactions found not to infringe the '787 Patent. Brief of Alexsam, Inc., Plaintiff-Cross-Appellant at 70-71, *Alexsam, Inc. v. IDT Corp.*, Nos. 2012-1063, 2012-1064, 2012 WL 3105399 (Fed. Cir. May 21, 2012); *see also id.* at 23 (it "has also been determined that none of the remaining products infringe...Claims 1 or 14 of the '787 patent") (quoting jury instructions). As such, for at least the same reasons, the SafeNet transactions cannot be considered "covered by one of the Licensed Patents" under the License Agreement.

106. The Federal Circuit has found at least claims 1, 2 and 19 of the '787 Patent to be invalid. *Alexsam, Inc. v. Gap, Inc.*, No. 2014-1564, 2015 WL 3750121 (Fed. Cir. June 16, 2015). Any claim of the '787 Patent that Alexsam alleges covers a transaction or process performed by MasterCard is similarly invalid. As such, at least because one cannot infringe invalid claims and/or invalid claims cover nothing, practicing these claims cannot be considered "covered by one of the Licensed Patents" under the License Agreement.

107. Moreover, without admitting that MasterCard has performed processes "covered by one of the Licensed Patents," since August 2007 until after the filing of this lawsuit by Alexsam, MasterCard has provided monthly statements to Alexsam listing transactions alleged to be licensed under the License Agreement.

PLAINTIFF'S THIRD AMENDED COMPLAINT

108. Without admitting that MasterCard has performed processes "covered by one of the Licensed Patents," MasterCard has paid or offered to pay to Alexsam amounts specified by the License Agreement for such transactions listed in MasterCard's monthly statements to Alexsam.

109. The License Agreement specifies that "by performing any obligations and exercising any rights under this Agreement, the parties do not admit any liability or indebtedness whatsoever to each other or any other party" and that "[t]he same may not be used as an admission concerning either the applicability of the license (e.g., that the Licensed Patents actually cover the License Transactions) or a determination regarding a monetary recovery or for any other purpose." (Docket No. 1, Ex. 1, ¶ 19).

110. Without admitting that MasterCard has performed processes "covered by one of the Licensed Patents," to the extent MasterCard has performed processes "covered by one of the Licensed Patents," MasterCard has fulfilled its obligations under the License Agreement.

111. Pursuant to 28 U.S.C. §§ 2201 and 2202, MasterCard is entitled to a declaratory judgment that it has not breached the License Agreement with Alexsam and has no further liability to Alexsam related to the License Agreement.

**COUNT VI: DECLARATION OF TERMINATION OF THE LICENSE AGREEMENT**

112. MasterCard incorporates by reference the allegations of paragraphs 95-111.

113. The Complaint alleges that MasterCard has performed acts in breach of contract with Alexsam due to non-payment of royalties arising from allegedly "Licensed Transactions" defined in a "License Agreement" between MasterCard and Alexsam attached as Exhibit A to Alexsam's Complaint.

21

114.    The License Agreement defines a Licensed Transaction to include certain processes "provided that such process is covered by one of the Licensed Patents." (Alexsam's Complaint, Ex. A, ¶ 1.3).

115.    The License Agreement defines Licensed Patents to include the '608 Patent and the '787 Patent. (*Id.* at ¶ 1.1).

116.    With respect to termination, the License Agreement specifies as follows:

> this Agreement shall remain in full force and effect for the life of the Licensed Patents unless…(ii) a court of competent jurisdiction holds the Licensed Patents are not applicable to Licensed Transactions similar to those actually being made, used or sold by or for MasterCard, in which case the term of this Agreement shall end upon the date of such holding....

(Docket No. 1, Ex. A, ¶ 7).

117.    An actual controversy exists between MasterCard and Alexsam regarding Alexsam's allegations of breach of contract.

118.    The Federal Circuit affirmed judgment of no infringement of claims 57 and 58 of the '608 Patent by defendants in *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336 (Fed. Cir. 2013), ruling that, as a matter of law, "Alexsam failed to present substantial evidence that the terminals used in [defendants'] systems 'ha[d] not been reprogrammed, customized, or otherwise altered with respect to [their] software ... for use in the card system.'" *Id.* at 1342 (finding Alexsam failed to prove that defendants' systems included "an unmodified existing standard retail point-of-sale device" as claimed).

119.    Any alleged Licensed Transactions made, used or sold by or for MasterCard are similar to those transactions found not to infringe the claims 57 or 58 (or any claim in the '608 Patent at least because they all require "an unmodified existing standard retail point-of-sale device"), either directly or indirectly, at least because MasterCard does not utilize "an

22

PLAINTIFF'S THIRD AMENDED COMPLAINT

unmodified existing standard retail point-of-sale device" as that term has been construed in *Alexsam, Inc. v. IDT Corp.* and related cases. *Id.*

120. Alexsam itself has admitted in its brief to the Federal Circuit that there is no evidence certain transactions accused in Alexsam's Complaint ("SafeNet transactions") are "different in any relevant way" from other transactions found not to infringe the '787 Patent. Brief of Alexsam, Inc., Plaintiff-Cross-Appellant at 70-71, *Alexsam, Inc. v. IDT Corp.*, Nos. 2012-1063, 2012-1064, 2012 WL 3105399 (Fed. Cir. May 21, 2012); *see also id.* at 23 (it "has also been determined that none of the remaining products infringe…Claims 1 or 14 of the '787 patent") (quoting jury instructions).

121. Any alleged Licensed Transactions made, used or sold by or for MasterCard are similar to those transactions found not to infringe the '787 Patent in *Alexsam, Inc. v. IDT Corp.* and related cases. *Id.*

122. Thus, at least as early as May 23, 2013, a court of competent jurisdiction held the Licensed Patents are not applicable to Licensed Transactions similar to those actually being made, used or sold by or for MasterCard.

123. As such, at least as early as May 23, 2013, the term of the License Agreement ended.

124. Pursuant to 28 U.S.C. §§ 2201 and 2202, MasterCard is entitled to a declaratory judgment that the License Agreement with Alexsam terminated at least as early as May 23, 2013.

**COUNT VII: DECLARATION OF TERMINATION OF THE LICENSE AGREEMENT**

125. MasterCard incorporates by reference the allegations of paragraphs 112-124.

126. The Complaint alleges that MasterCard has performed acts in breach of contract with Alexsam due to non-payment of royalties arising from allegedly "Licensed Transactions"

defined in a "License Agreement" between MasterCard and Alexsam attached as Exhibit A to Alexsam's Complaint.

127. The License Agreement defines a Licensed Transaction to include certain processes "provided that such process is covered by one of the Licensed Patents." (Alexsam's Complaint, Ex. A, ¶ 1.3).

128. The License Agreement defines Licensed Patents to include the '608 Patent and the '787 Patent. (*Id.* at ¶ 1.1).

129. With respect to termination, the License Agreement specifies as follows:

> this Agreement shall remain in full force and effect for the life of the Licensed Patents unless (i) all claims of the Licensed Patents applicable to Licensed Transactions are held invalid or unenforceable by a court of competent jurisdiction, in which case the term of this Agreement shall end upon the date of such holding....

(Docket No. 1, Ex. A, ¶ 7).

130. An actual controversy exists between MasterCard and Alexsam regarding Alexsam's allegations of breach of contract.

131. The Federal Circuit has found at least claims 1, 34, 36, 37, 57, 58, 60, 62 and 65 of the '608 Patent to be invalid under 35 U.S.C. § 102(g) as anticipated by Ceridian Stored Value Solutions's (SVS's) gift card processing system. *Alexsam, Inc. v. Gap, Inc.*, No. 2014-1564, 2015 WL 3750121 (Fed. Cir. June 16, 2015).

132. As such, all claims of the '608 Patent applicable to the Licensed Transactions have been held invalid by a court of competent jurisdiction.

133. The Federal Circuit has found at least claims 1, 2, and 19 of the '787 Patent to be invalid under 35 U.S.C. § 102(g) as anticipated by Ceridian Stored Value Solutions's (SVS's)

PLAINTIFF'S THIRD AMENDED COMPLAINT

gift card processing system. *Alexsam, Inc. v. Gap, Inc.*, No. 2014-1564, 2015 WL 3750121 (Fed. Cir. June 16, 2015).

134.    As such, all claims of the '787 Patent applicable to the Licensed Transactions have been held invalid by a court of competent jurisdiction.

135.    Thus, at least as early as June 16, 2015, a court of competent jurisdiction held all claims of the Licensed Patents applicable to Licensed Transactions are invalid.

136.    Accordingly, at least as early as June 16, 2015, the term of the License Agreement ended.

137.    Pursuant to 28 U.S.C. §§ 2201 and 2202, MasterCard is entitled to a declaratory judgment that the License Agreement with Alexsam terminated at least as early as June 16, 2015.

**COUNT VIII: DECLARATION OF DAMAGES**

138.    MasterCard incorporates by reference the allegations of paragraphs 46-48.

139.    The Complaint alleges that MasterCard has performed acts in breach of contract with Alexsam due to non-payment of royalties arising from allegedly "Licensed Transactions" defined in a "License Agreement" between MasterCard and Alexsam attached as Exhibit A to Alexsam's Complaint.

140.    The License Agreement defines a Licensed Transaction to include certain processes "provided that such process is covered by one of the Licensed Patents."  (Alexsam's Complaint, Ex. A, ¶ 1.3).

141.    The License Agreement defines Licensed Patents to include the '608 Patent and the '787 Patent.  (*Id.* at ¶ 1.1).

142.    An actual controversy exists between MasterCard and Alexsam regarding Alexsam's allegations of breach of contract.

143.   With respect to royalties for prepaid phone cards, the License Agreement specifies as follows:

### MONTHLY ROYALTY FEES PER LICENSED TRANSACTION

| Royalty Fee | Number of Licensed Transactions Per Month |
|---|---|
| $0.04 + (0.05% of reload over $5) | 0-999,999 |
| $0.03 + (0.05% of reload over $5) | 1,000,000 - 4,499,999 |
| $0.02 + (0.05% of reload over $5) | 5,000,000 and above |

(Docket No. 1, Ex. A, Second Amendment, Section C).

144.   With respect to royalties for "Reusable Cards," the License Agreement specifies as follows:

### MONTHLY ROYALTY FEES PER LICENSED TRANSACTION

| Royalty Fee | Number of Licensed Transactions Per Month |
|---|---|
| $0.10 | 0-999,999 |
| $0.095 | 1,000,000 - 2,499,999 |
| $0.085 | 2,500,000 - 4,999,999 |
| $0.075 | 5,000,000 and above |

(*Id.*)

145.   Alexsam admits in its Complaint that "in the IDT Case the Court determined that the 'highest number of transactions that the evidence supports were processed over the SafeNet system are 470,009 phone card transactions and 1,351 gift card transactions.'" (Docket No. 1, ¶ 18) (citations omitted).

146.   Assuming the SafeNet transactions are "covered by one of the Licensed Patents," and that the Licensed Patents are valid (each of which MasterCard denies), the royalty due for such SafeNet transactions under the License Agreement would be no more than $25,000.

147.   Pursuant to 28 U.S.C. §§ 2201 and 2202, MasterCard is entitled to a declaratory judgment that, if the SafeNet transactions are "covered by one of the Licensed Patents," and the

26

Licensed Patents are valid, the royalty due for such SafeNet transactions under the License Agreement is no more than $25,000.

## PRAYER FOR RELIEF AS TO ALEXSAM

For these reasons, MasterCard respectfully prays for the following relief:

a.      Judgment against Alexsam denying with prejudice all relief requested in Alexsam's Complaint and prayer therein, and that Alexsam take nothing;

b.      Declaratory judgment that MasterCard has not infringed, and does not infringe, any valid and enforceable claim of the '608 Patent or the '787 Patent and that the claims of the '608 Patent and the '787 Patent are invalid;

c.      Declaratory judgment that MasterCard has not breached the License Agreement with Alexsam;

d.      Declaratory judgment that the License Agreement with Alexsam terminated at least as early as May 23, 2013, or alternatively, June 16, 2015;

e.      Declaratory judgment that, if the SafeNet transactions are "covered by one of the Licensed Patents," and the Licensed Patents are valid, the royalty due for such SafeNet transactions under the License Agreement is no more than $25,000; and

f.      Judgment awarding MasterCard such other relief the Court deems just, equitable, and proper.

## JURY DEMAND

MasterCard demands a trial by jury on all issues so triable.

## IV.    THIRD-PARTY COMPLAINT AGAINST IDT

MasterCard hereby alleges the following Third-Party Complaint pursuant to Fed. R. Civ. P. 14 against Third-Party Defendants IDT Corporation and IDT Financial Services, LLC

27

(collectively, "IDT") in the above-captioned action brought by Alexsam.  MasterCard, as for its cause of action against IDT, hereby states and alleges as follows:

## THE PARTIES

148.    Third-Party Plaintiff MasterCard International Incorporated is a Delaware corporation, with its headquarters at 2000 Purchase Street, Purchase, New York 10577, and maintains The Corporation Trust Company as its registered agent located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

149.    Upon information and belief, Third-Party Defendant IDT Corporation is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 520 Broad Street, Newark, New Jersey, 07102.

150.    Upon information and belief, Third-Party Defendant IDT Financial Services LLC is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 520 Broad Street, Newark, New Jersey, 07102.

## JURISDICTION AND VENUE

151.    MasterCard's third-party complaint arises directly out of and as a result of Alexsam's institution of the above-captioned action against MasterCard and as a result of certain transactions forming the subject matter of the above-captioned litigation.

152.    Upon information and belief, IDT conducts business in the State of New York and has introduced products into the stream of commerce in the United States knowing that such products would be sold in New York.  Additionally, IDT consents to jurisdiction in the State of New York under one or more agreements with MasterCard.

153.    Counts I-III arise under New York law and are substantially based upon the same operative facts as Plaintiff's cause of action.  Subject matter jurisdiction in this Court over these

28

causes of action is proper at least on the basis of supplemental jurisdiction under 28 U.S.C. § 1367. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(c) and 1400(b).

## NATURE OF THE ACTION

154. This is an action by MasterCard against IDT for indemnification and/or misuse arising out of claims of breach of contract directed at MasterCard arising from transactions allegedly covered by a License Agreement between MasterCard and Alexsam, and/or for any infringement of any valid, enforceable claims of the '608 Patent or the '787 Patent (collectively, the "patents in-suit") found against MasterCard in its declaratory judgment action against Alexsam, asserted above. Together, or alternatively, this action arises out of, and to the extent of, IDT's operation or sponsorship of, and/or involvement in any prepaid card program that utilized or utilizes in any way the MasterCard financial network and which Alexsam contends are Licensed Transactions.

155. On May 14, 2015, Alexsam filed a Complaint (Docket No. 1) against MasterCard for breach of contract. In its complaint, Alexsam alleges that MasterCard has performed acts in breach of contract with Alexsam due to non-payment of royalties arising from allegedly "Licensed Transactions" defined in a "License Agreement" between MasterCard and Alexsam.

156. The License Agreement defines a Licensed Transaction to include certain processes "provided that such process is covered by one of the Licensed Patents." (Docket No. 1, Ex. A, ¶ 1.3). The License Agreement defines Licensed Patents to include the patents-in-suit. (*Id.* at ¶ 1.1).

157. Certain transactions performed by IDT as a Third Party Processor Member Service Provider ("TPP MSP") of MasterCard, including, but not limited to, services provided by IDT in connection with its SafeNet system, are accused by Alexsam as being Licensed Transactions, and thus are accused of being covered by one of the patents-in-suit. Such IDT

29

sponsored transactions thus form the basis for at least a portion of Alexsam's breach of contract claims and MasterCard's claims for declaratory judgment of noninfringement of the patents-in-suit.

158.    In accordance with a TPP MSP Agreement between MasterCard and IDT, IDT is obligated to defend, indemnify and hold MasterCard harmless from and against any and all claims arising out of any acts by IDT in connection with or arising from its provision of Services as defined in the TPP MSP Agreement.  These Services include, but are not limited to, services provided by IDT in connection with its SafeNet system referred to in Alexsam's Complaint. (Docket No. 1, ¶¶ 18, 27).

159.    IDT has an obligation to defend, indemnify, and hold harmless MasterCard from and against any and all claims arising out of any acts by IDT in connection with or arising from its provision of Services (including all costs and expenses, including but not limited to attorney's fees, associated with or arising out of defending against any such claim).

160.    MasterCard has provided IDT with adequate, timely, and proper written notice of Alexsam's claims, but IDT has refused to satisfy its indemnification obligations under its TPP MSP Agreement with MasterCard.   IDT has thus not complied with its indemnification obligations to MasterCard.

161.    Additionally, certain transactions performed by IDT as a Sponsored User ("User") of MasterCard, including, but not limited to, services provided by IDT in connection with its SafeNet system, are accused by Alexsam as being Licensed Transactions, and thus are accused of being covered by one of the patents-in-suit.  Such IDT sponsored transactions thus form the basis for at least a portion of Alexsam's breach of contract claims and MasterCard's claims for declaratory judgment of noninfringement of the patents-in-suit.

162. In accordance with a User Agreement between MasterCard and IDT, IDT is obligated to defend, indemnify and hold MasterCard harmless from and against any and all claims arising out of any acts by IDT in connection with or arising from its use of MIP Hardware and Software provided by MasterCard to use the MasterCard financial network as defined in the User Agreement. This use includes, but is not limited to, services provided by IDT in connection with its SafeNet system referred to in Alexsam's Complaint. (Docket No. 1, ¶¶ 18, 27).

163. IDT has an obligation to defend, indemnify, and hold MasterCard harmless from any and all claims, expenses, damages, and liabilities arising from or relating to IDT's acceptance, possession, or use of the MIP Hardware or Software, any act or omission of IDT or IDT's breach of the User Agreement in connection with or arising from services provided by IDT in connection with its SafeNet system (including all costs and expenses, including but not limited to attorney's fees, associated with or arising out of defending against any such claim).

164. Further, to the extent IDT asserts any and all of Alexsam's claims arising out of IDT sponsored transactions are not covered by any of its agreements with MasterCard, and thus not subject to any contractual indemnification obligation, IDT has been unjustly enriched by performing such IDT sponsored transactions at MasterCard's expense, and equity and good conscience permit MasterCard to recover damages from IDT to the extent of its use of the MasterCard financial network to perform the IDT sponsored transactions accused by Alexsam.

### COUNT I: BREACH OF CONTRACT

165. MasterCard incorporates by reference the allegations of paragraphs 148-164.

166. MasterCard and IDT are parties to a MasterCard Member Service Provider Third Party Processor Agreement (the "TPP MSP Agreement") (attached hereto as Exhibit A). IDT Financial Services LLC (as "Processor") executed the TPP MSP Agreement on June 11, 2003. MasterCard executed the TPP MSP Agreement on June 19, 2003.

31

167.    IDT Financial Services LLC operates as a subsidiary of IDT Corporation.

168.    On June 1, 2015, MasterCard, by and through its representatives, notified IDT of the above-captioned action by Alexsam, and MasterCard requested defense and indemnity in connection with the above-captioned action pursuant to Paragraph 4 of the TPP MSP Agreement.

169.    On July 2, 2015, IDT, by and through its representatives, declined to comply with its indemnification obligations to MasterCard.

170.    The language of the TPP MSP Agreement is as follows:

> Processor hereby agrees to defend, indemnify and hold harmless MasterCard, at no cost to MasterCard, from and against any and all claims, demands, liabilities, losses, costs and/or expenses, including reasonable attorney's fees, arising out of any breach of Processor's obligations hereunder, under the Standards and/or any act by or omissions of Processor in connection with or arising from its provision of Services.

171.    Upon information and belief, services provided by IDT in connection with its SafeNet system fall within the meaning of "Services" under the TPP MSP Agreement.

172.    IDT is liable to MasterCard for Alexsam's claims against MasterCard pursuant to the TPP MSP Agreement.

173.    MasterCard's damages for this breach of contract claim include MasterCard's costs for defending this lawsuit arising from services provided by IDT, including its attorneys' fees and related litigation costs, and any monies that may eventually be paid by MasterCard in resolution of this lawsuit, whether by settlement, or by judgment to the extent MasterCard is found liable.

174.    An actual controversy has arisen and now exists between MasterCard and IDT with respect to: (i) whether, as between MasterCard and IDT, responsibility for the damages, if any, claimed by Alexsam in its Complaint rests entirely, or in part, on IDT; and (ii) whether, as a result, IDT is obligated to defend and partially or fully indemnify MasterCard for any sums that

PLAINTIFF'S THIRD AMENDED COMPLAINT

MasterCard may be compelled to pay as a result of any damages, by judgment or other recovery by Alexsam against MasterCard, and for reasonable attorneys' fees incurred by MasterCard in defending against Alexsam's allegations of breach of contract or any declaratory judgment of infringement of the patents-in-suit in connection with or arising from services provided by IDT.

175.    Pursuant to the TPP MSP Agreement, IDT is liable to MasterCard for any and all of Alexsam's claims against MasterCard in connection with or arising from services provided by IDT.  Because IDT has not complied with its indemnification obligations under the TPP MSP Agreement, IDT is in breach.

## COUNT II: BREACH OF CONTRACT

176.    MasterCard incorporates by reference the allegations of paragraphs 148-164.

177.    MasterCard and IDT are parties to a Member-Sponsored User Agreement (the "User Agreement") (attached hereto as Exhibit B).  IDT Financial Services LLC  (as "User") executed the User Agreement on April 26, 2004.  MasterCard executed the User Agreement on May 9, 2004.

178.    IDT Financial Services LLC operates as a subsidiary of IDT Corporation.

179.    On June 1, 2015, MasterCard, by and through its representatives, notified IDT of the above-captioned action by Alexsam, and MasterCard requested defense and indemnity in connection with the above-captioned action.

180.    On July 2, 2015, IDT, by and through its representatives, declined to comply with its indemnification obligations to MasterCard.

181.    The language of the User Agreement is as follows:

> User agrees to indemnify MasterCard against and hold MasterCard harmless from any and all claims, expenses, damages, and liabilities arising from or relating to User's acceptance, possession, or use of the MIP Hardware or Software, any act or omission of User or User's breach of this Agreement.

33

182. Upon information and belief, services provided by IDT in connection with its SafeNet system use the MIP Hardware or Software defined in the User Agreement.

183. IDT is liable to MasterCard for Alexsam's claims against MasterCard pursuant to the User Agreement.

184. MasterCard's damages for this breach of contract claim include MasterCard's costs for defending this lawsuit arising from services provided by IDT, including its attorneys' fees and related litigation costs, and any monies that may eventually be paid by MasterCard in resolution of this lawsuit, whether by settlement, or by judgment to the extent MasterCard is found liable.

185. An actual controversy has arisen and now exists between MasterCard and IDT with respect to: (i) whether, as between MasterCard and IDT, responsibility for the damages, if any, claimed by Alexsam in its Complaint rests entirely, or in part, on IDT; and (ii) whether, as a result, IDT is obligated to defend and partially or fully indemnify MasterCard for any sums that MasterCard may be compelled to pay as a result of any damages, by judgment or other recovery by Alexsam against MasterCard, and for reasonable attorneys' fees incurred by MasterCard in defending against Alexsam's allegations of breach of contract or any declaratory judgment of infringement of the patents-in-suit in connection with or arising from services provided by IDT.

186. Pursuant to the User Agreement, IDT is liable to MasterCard for any and all of Alexsam's claims against MasterCard in connection with or arising from services provided by IDT in connection with its SafeNet system. Because IDT has not complied with its indemnification obligations under the User Agreement, IDT is in breach.

## COUNT III: UNJUST ENRICHMENT

187. MasterCard incorporates by reference the allegations of paragraphs 148-164.

34

188.    IDT performs or has performed certain IDT sponsored transactions in connection with its SafeNet system using the MasterCard financial network.

189.    IDT has been enriched by monetary gain as a result of the IDT sponsored transactions using the MasterCard financial network at MasterCard's expense.

190.    To the extent IDT asserts that any and all of Alexsam's claims arising out of IDT sponsored transactions are not covered by agreement, IDT has been unjustly enriched by such IDT sponsored transactions at MasterCard's expense, and equity and good conscience permit MasterCard to recover damages from IDT to the extent of its use of the MasterCard financial network to perform the IDT sponsored transactions accused by Alexsam.

## PRAYER FOR RELIEF AS TO IDT

For these reasons, MasterCard respectfully prays for the following relief:

a.    Judgment that IDT is responsible and liable for damages alleged by Alexsam in connection with or arising from services provided by IDT, if any such damages found to exist;

b.    Judgment that IDT shall defend MasterCard, and that IDT is liable to indemnify MasterCard, in whole or in part, for any sums paid to Alexsam resulting from settlement, judgment, and/or other awards in connection with or arising from services provided by IDT;

c.    Judgment awarding damages in connection with or arising from IDT's wrongful actions in connection with its services, including any sums paid to Alexsam resulting from settlement, judgment, and/or other award, arising from any of the causes of action above, including breach of contract and declaratory judgment of noninfringement of the patents-in-suit;

d.    Judgment awarding costs of suit and reasonable attorneys' fees incurred in defending against Alexsam's lawsuit alleging breach of contract in connection with or arising from services provided by IDT and MasterCard's declaratory judgment of noninfringement and invalidity of the patents-in-suit;

PLAINTIFF'S THIRD AMENDED COMPLAINT

e.　　　Judgment awarding costs of suit, including reasonable attorneys' fees incurred in bringing this Third-Party Action against IDT; and

f.　　　Judgment awarding MasterCard such other relief the Court deems just, equitable, and proper.

## JURY DEMAND

MasterCard demands a trial by jury on all issues so triable.


Date:  September 25, 2015　　　　　　　　Respectfully submitted,


_/s/ Robert C. Scheinfeld_
Robert C. Scheinfeld
Christopher R. Patrick
BAKER BOTTS L.L.P.
30 Rockefeller Plaza, 44th Floor
New York, New York 10112-4498
(212) 408-2500
(212) 408-2501 (Facsimile)

Eliot D. Williams
BAKER BOTTS L.L.P.
1001 Page Mill Road
Building One, Suite 200
Palo Alto, California 94304-1007
(650) 739-7500
(650) 739-7699 (Facsimile)

_Attorneys for Defendant MasterCard
International Incorporated_

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2015, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on September 25, 2015, the attached document was Electronically Mailed to the following person(s):

Maureen V. Abbey
**HENINGER GARRISON DAVIS, LLC**
NY Bar No. MA-1562
5 Penn Plaza, 23rd Floor
New York, New York 10001
Telephone: (212) 896-3876
Facsimile: (908) 301-9008
Email: maureen@hgdlawfirm.com

*/s/ Robert C. Scheinfeld*
Robert C. Scheinfeld
BAKER BOTTS L.L.P.
30 Rockefeller Plaza, 44th Floor
New York, New York 10112-4498
(212) 408-2500
(212) 408-2501 (Facsimile)

*Attorney for Defendant MasterCard*
*International Incorporated*

37

**EXHIBIT J**

**Evidence of Infringement of Claims of U.S. Patent No.**

**6,000,608 by the Simon Visa Gift Card, The Simon Amex Gift**

**Card, And Simon Loyalty Card**

# Part 1 of 2

# INFRINGEMENT CLAIM CHART FOR

## U.S. Patent 6,000,608 ("'608 Patent")

*ALEXSAM, INC. v. SIMON PROPERTY GROUP, L.P.*

U.S. Patent No. 6,000,608

| U.S. Patent 6,000,608 ("'608 Patent") Claims | | Evidence From Simon Property Group, L.P. |
|---|---|---|
| | | Simon Property Group, L.P. ("Simon") makes, uses, sells, and offers for sale multifunction cards and/or brand for use with a multifunction card system. Plaintiff's research into these is ongoing. It should be understood that other products not discussed directly may also infringe, and AlexSam may assert additional infringement claims related to any claim, product, and/or service at a later date. |
| 34 | A system comprising: | The preamble is not limiting. See, e.g., Alexsam v. Datastream, et al, Civil Action No. 2:03-cv-337, June 10, 2005 Order, p. 11 ("With respect to those claims which use the term [multifunction card system] in the preamble, the court holds that it is not a limitation.") |
| 34[a] | at least one electronic gift certificate card having an electronic gift certificate card unique identification number encoded on it, said electronic gift certificate card unique identification number comprising a bank identification number approved by the American Banking Association for use in a banking network; | Simon, under the product names "Simon branded Visa variable denomination Gift Card ("Simon Visa Gift Card")", "Simon branded 5% Back Visa Gift Card ("Simon Visa Loyalty Card")", "Simon branded American Express variable denomination Gift Card ("Simon AmEx Gift Card")", and possibly others, sells, advertises, offers for sale, uses, or otherwise provides an electronic gift certificate card. An electronic gift card is pre-paid card that operates through an exchange of electronic signals and that can be used in lieu of cash. See Figures 1-11 below.

Each electronic gift certificate card contains a unique identification number encoded on it. All Simon cards have an account number embossed into the card. This account number is also encoded in the magnetic strip on the back of the card. This magnetic stripe can be swiped by or at a point of sale device when the card is used for transactions. The 16 digit Personal Account Number ("PAN") is embossed on the front of the card or encoded in the mag stripe. The PAN is used to determine which customer belongs to that card. The first six-digits of the PAN are referred to as the Bank Identification Number ("BIN"). The BIN is basically a zip code, signaling the issuing bank. Every Simon card requires a PAN including the BIN embossed on the front or encoded in the mag stripe in order to function. A 16 digit PAN is required by every processing system to process a card transaction in the United States. |

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|
| | Within this unique identification number is a "bank identification number." A "bank identification number" is the first six digits of a user's card that facilitates making of each electronic transaction. See Figure 6, below. As shown in Figure 7 below, Bank identification numbers (BINs) "carry critical information related to card programs and program benefits and tell processors how to route the payment – to what issuer for authorization and what card and what card network for clearing and settlement." On information and belief, Simon uses bank identification numbers to enable transactions to be properly routed. |
| | See Figure 8, below, showing the Simon Visa Gift Card's PAN and "bank identification number" as "455172." |
| | In this case, the BIN (455172), below, is registered to Visa, as shown in Figure 9 below. |
| | Upon information and belief, the Simon 5% Back Visa Gift Card has a PAN and "bank identification number." See Figures, 3-5. |
| | See Figure 10, below, showing the Simon AmEx Gift Card's PAN and "bank identification number" as "372300." |
| | In this case, the BIN (372300), below, is registered to American Express, as shown in Figure 11 below. |

U.S. Patent No. 6,000,608

PLAINTIFF'S THIRD AMENDED COMPLAINT

Page 4

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|
| | 

Figures 1 and 2 – Attached hereto as Exhibits 1 and 2. |

U.S. Patent No. 6,000,608

Page 5

U.S. Patent 6,000,608 ("'608 Patent") Claims

Evidence From Simon Property Group, L.P.



Figure 3 – Attached hereto as Exhibit 3 – Simon 5Back Packaging, available at https://www.pointchaser.com/buy-visa-gift-cards-credit-card/5-percent-back-visa-gift-cards-from-simon-mall/

U.S. Patent No. 6,000,608

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|
| |  Figure 4 – Attached hereto as Exhibit 4 – Simon Card, available at https://frequentmiler.boardingarea.com/cvs-leaving-5-back-visa-program-january-20th/ |

Page 6

U.S. Patent No. 6,000,608

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|
| | 

Figure 5 – Attached hereto as Exhibit 5 – Simon 5% Back Cards, available at https://renespoints.boardingarea.com/2017/01/01/earn-2017-delta-medallion-mqd-exempt-status-via-amex-card-spending-just-qualifies-works/ |

Page 7

U.S. Patent No. 6,000,608

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|
| | Bank Identification Number or BIN represents the first six digits of the user's credit, debit, or prepaid card numbers that facilitate making of each electronic transaction. The first six digits are also called issuer identification numbers (IIN). The Bank Identification Numbers (BIN) or IIN database and its membership are managed by the American Bankers Association and are updated monthly. Online merchants use BIN database to validate transactions. |
| | **Figure 6 – Excerpt from https://www.bindb.com/verify-card-details.html as page 1; attached hereto as Exhibit 6.** |
| | The Bank Identification Number (aka BIN) – the analog to the internet protocol that tells the worldwide web how to route traffic – is facing its own shortage of numbers. |
| | BINs are the numerical sequence that serve as unique cardholder account identifiers that support the authorization process when a card is presented for payment. BINs carry critical information related to card programs and program benefits and tells processors how to route the payment – to what issuer for authorization and what card network for clearing and settlement. BINs are also the first line of defense in identifying fraud online – matching the geographic location of the cardholder with the individual presenting it for payment. |
| | **Figure 7 – Excerpt from http://www.pymnts.com/news/payment-methods/2016/mastercard-october-bin-upgrade/ as page 2; attached hereto as Exhibit 7.** |

U.S. Patent No. 6,000,608

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
| --- | --- |

Page 9



**Figure 8 – Attached hereto as Exhibit 8.**

U.S. Patent No. 6,000,608

Page 10

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|

Bin: 455172
Card Brand: VISA
Issuing Bank: SIMON CARD ISSUED BY METABANK
Card Type: DEBIT
Card Level: PREPAID

Figure 9 – Excerpt from www.bindb.com as page 1; attached hereto as Exhibit 9.



Figure 10 – Attached hereto as Exhibit 10.

U.S. Patent No. 6,000,608

PLAINTIFF'S THIRD AMENDED COMPLAINT

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|
| | Bin: 372300<br><br>Card Brand: AMEX<br><br>Issuing Bank: AMERICAN EXPRESS<br><br>Card Type: DEBIT<br><br>Card Level: PREPAID<br><br>**Figure 11 – Excerpt from www.bindb.com as page 1; attached hereto as Exhibit 11.** |
| 34[b] a transaction processor receiving electronic gift card activation data from an unmodified existing standard retail point-of-sale device, said electronic gift certificate card activation data including said unique identification number and an electronic gift certificate card activation amount; | Upon information and belief, the transaction processors (See *DataStream* Claim Construction Order) may be Simon Mall's central processing computer, which receives electronic gift card activation data from an unmodified existing standard retail point-of-sale device, said electronic gift certificate card activation data including said unique identification number and an electronic gift certificate card activation amount.<br><br>On information and belief, the electronic gift certificate card activation data comprises at least the unique identification number of the card and an electronic gift certificate activation amount. See, e.g. Figures 1-5, 12 and 14. The activation amount is the total value of goods or services that the user may obtain upon the prepaid account being made functional for use. *DataStream* Order, p. 9. However, the "activation data comprises" indicates non-limiting language within the claims. This "activation data" may include but is not limited to the point-of-sale device terminal information, and any other information concerning the transaction, such as the time of day, location of the retailer, etc.<br><br>Upon information and belief, in order for the retailer to route the activation data to Simon's processing hub, the transactions processor must first receive the activation data containing the unique identification, which comprises the BIN, and the activation amount from the unmodified existing standard retail point-of-sale device. Upon information and belief, Simon employs an unmodified existing standard retail point-of-sale device within its card system. An unmodified existing standard retail point-of-sale device has been previously |

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|
| | construed as a terminal for making purchases at a retail location of the type in use as of July 10, 1997 that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system. *DataStream Order*, p. 9. Upon information and belief, Simon does not perform any modifications on the POS device for its use in the card system. Claim 34 of the '608 patent does not require swiping an electronic gift certificate card through a POS device. It recites the broader term "card" and does not require card activation data to be entered by swiping. Thus, the unmodified existing standard retail point-of-sale device collects the activation data, which is then routed to a transaction processor.

A transaction processor is a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point of sale device. *DataStream Order*, p. 7. Any computer that is remote from Simon's POS terminal used for activation and that processes activation data would constitute a transaction processor. Examples of transaction processors may include routers, switches, store servers, or other computers in communications path between the POS terminal and Simon's processing hub, as each such computer may facilitate card transactions and is separate from a POS device and processing hub. See Figure 2, '608 Patent.

For activation, Simon may transmit an "encoded" or "encrypted" BIN during activation, instead of "said unique identification number." The Simon Visa Gift Card is sold as a plastic Visa card encapsulated within cardboard packaging. Upon information and belief, the Simon Visa Loyalty Card is sold in a similar manner. The PAN is not exposed within this packaging. The PAN is obscured for security purposes to prevent the PAN from being exposed, limiting the potential for fraudulent use of the card. During the activation transaction, the customer takes the Simon Visa Gift Card or Simon Visa Loyalty Card package to the register, and the store clerk scans the UPC code/bar code on the packaging to prompt the point of sale device. As illustrated below in Figures 12 and 13, the UPC in the upper right-hand corner of the packaging "0 76750 29849" matches the PAN on the back of the Visa Simon gift Card "07675029849". Likewise, the second number on the Visa Simon Gift Card's UPC "603953914155547684" matches the receipt.

Upon information and belief, this number is correlated with the card's PAN and the activation amount $20.00 is transmitted to Simon's processing hub for activation. Upon information and belief, the same matching scheme applies to the Simon 5% Back Visa Gift Card. There it is used to identify the 16 digit PAN, so that the activation amount can be deposited into the account. This external identification number directly |

U.S. Patent No. 6,000,608

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|
| | corresponds to the BIN encoded in the magstripe and embossed on the front of the Simon Visa Gift Card or Simon Visa Loyalty Card. See Figures 12 and 13. Thus, serving as an encrypted version of the unique identification number, containing the BIN. This concept of encryption for security purposes at the retail level is discussed within the specification. '608 Patent, 6:8-14. |
| | The Simon AmEx Gift Card is sold as a plastic AmEx card behind the clerk's counter. When the customer wishes to purchase one, he or she takes a cardboard token to the clerk. The clerk then proceeds with activation transaction. As illustrated in Figure 10 and 14, the PAN on the AmEx card (372300170489375) matches the receipt (372300170489375). Upon information and belief, this card's PAN and the activation amount $20.00 is transmitted to Simon's processing hub for activation. |
| | If the trier of fact determines that Simon's transmission of "said unique identification number"[1] during activation does not literally meet the claims limitation, AlexSam contends that such usage would still be considered infringing under the doctrine of equivalents. These instrumentalities perform substantially the same function (transmitting activation data comprising the external identification number correlating to the PAN on the card within the packaging and an activation amount), in substantially the same way (transmitting a unique number relevant to the card, such as a BIN, and an activation amount) to achieve the same result (activation data transmitted from the POS device to the processing hub for activation of an account). |

---

[1] "Said unique identification number" in Claim 34(b) refers to the unique identification number, comprising a bank identification number approved by the American Banking Association for use in a banking network, encoded on the electronic gift certificate card in Claim 34(a).

U.S. Patent No. 6,000,608

PLAINTIFF'S THIRD AMENDED COMPLAINT

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|
| | J Hook Personal      20.00<br>60395391415554 7684<br>Purch. Fee      3.95<br>================================<br>ACTIVATE $20.00<br>*************7684 SimonBHVisaGift SWIPED<br>NAME:<br>AUTH#: 906598 Approved<br>CARD BALANCE: $20.00<br>================================<br><br>**Figure 12 – Attached hereto as Exhibit 12.** |

Page 14

U.S. Patent No. 6,000,608

PLAINTIFF'S THIRD AMENDED COMPLAINT

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
| --- | --- |



**Figure 13 – Attached hereto as Exhibit 13.**

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|
| | AmEx Personal                    20.00 <br> 372300170489375 <br>   Purch. Fee                     3.95 <br> ================================= <br> ACTIVATE $20.00 <br> xxxxxxxxxxx9375 SimonAmexGift SWIPED <br> NAME: <br> AUTH#:  APPROVED <br> CARD BALANCE: $20.00 <br> ================================= <br><br> **Figure 14 – Attached hereto as Exhibit 12.** |
| 34[c] a processing hub receiving directly or indirectly said activation data from said transaction processor; and | Upon information and belief, Simon, or a third party acting on Simon's behalf, receives directly or indirectly said activation data from said transaction processor. <br><br> Upon information and belief, Simon's processing hub may receive said activation data from the transaction processor via a banking network. A banking network is a set of interconnected computer used by banks and financial institutions for purposes of conducting and processing financial transactions. *DataStream* Order, p. 11. Upon information and belief, the activation transaction is transmitted to Simon direct through a "private line," or it may be transmitted over the Visa, BlackHawk or AmEx network. There could be a processor in between a Simon mall and the processing hub. See Figure 2, '608 Patent. |

U.S. Patent No. 6,000,608

Page 16

| U.S. Patent 6,000,608 ("'608 Patent") Claims | | Evidence From Simon Property Group, L.P. |
|---|---|---|
| | | A transaction processor is a computer, other than a processing hub, that facilitates the card transaction and that is remote from Simon's POS terminal used for activation and that processes activation data would constitute a transaction processor. Examples of transaction processors may include routers, switches, store servers, or other computers in communications path between the POS terminal and Simon's processing hub, as each such computer may facilitate card transactions and is separate from a POS device and processing hub. See Figure 2, '608 Patent. |
| 34[d] | said processing hub activating an account corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate activation amount | On information and belief, the Simon's processing hub activates an account corresponding to the electronic gift certificate card's unique identification number with a balance corresponding to the electronic gift certificate activation amount. See Figures 1-14 above. Activating an account means making an account functional for use. *DataStream* Order, p. 10. In order to make the account functional for use, the unique identification number and the activation amount are transmitted from the POS device to the processing hub. Upon information and belief, this information may transmitted to Simon directly through a "private line," or via over the over the Visa, BlackHawk or AmEx network. Upon information, Simon may be fulfilling the processing hub function, based on the network used and type of transaction. Upon information and belief, there is a series of services Simon's processing hub performs to validate to make sure that the card can be sold, load limits are appropriate, etc. The structures for activating an account in the processing hub corresponding to the identification number may include, but is not limited to, the transaction processors, retail processors, bank processors, a debit network, the Visa, BlackHawk or AmEx Network, and/or Simon's processing hub. |
| 36 | The system of claim 34, wherein the electronic gift certificate card | During the activation of a Simon Visa Gift Card, Simon Visa Loyalty Card, and Simon AmEx Gift Card the activation amount is entered at the point-of-sale device. During the transaction, after the store clerk scans the bar code to begin the transaction and prompt the register, the store clerk asks the amount the customer desires to load onto the card, subject to store minimums and maximum amounts. Then, the store clerk enters the |

U.S. Patent No. 6,000,608

Page 17

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|
| activation amount is entered at the point-of-sale device. | activation amount into the POS device. The activation amount is the total value of goods or services that the user may obtain upon the prepaid account being made functional for use. *DataStream* Order, p. 9. As indicated in Figures 1-3 above, the cardholder may choose between $20 and $500 to load unto the card at activation, and the card holder's purchases will be limited to this amount of value, unless additional funds are loaded onto the card. |
| 37 The system of claim 34, wherein said processing hub allows a user of the electronic gift certificate card to purchase a value up to the balance corresponding to the electronic gift certificate activation amount. | The Simon processing hub allows a user of the Simon Visa Gift Card, Simon Visa Loyalty Card, and Simon AmEx Gift Card to purchase a value up to the balance corresponding to the activation amount. |
| 39 The system of claim 34, wherein the first digit of the bank identification number is selected from a group of numbers consisting of the numbers four and five. | The first digit of the bank identification number used by the Simon Visa Gift Card and Simon Visa Loyalty Card are selected from the group consisting of four. <u>See</u> Figure 1-5 and 8 above. |

U.S. Patent No. 6,000,608

Page 18

| | U.S. Patent 6,000,608 (''608 Patent'') Claims | Evidence From Simon Property Group, L.P. |
|---|---|---|
| 44 | The system of claim 34, wherein the transaction processor is coupled to the banking network. | On information and belief, the Simon Visa Gift Cards, Simon Visa Loyalty Cards, and Simon AmEx Gift Cards are processed in a manner where the transaction processor is coupled to the banking network, as described in Claim 34.<br><br>A transaction processor is a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point of sale device. *DataStream* Order, p. 7. Any computer that is remote from Simon's POS terminal used for activation and that processes activation data would constitute a transaction processor. Examples of transaction processors may include routers, switches, store servers, or other computers in communications path between the POS terminal and Simon's processing hub, as each such computer may facilitate card transactions and is separate from a POS device and processing hub. See Figure 2, '608 Patent. |
| 45 | The system of claim 34, wherein the processing hub associates loyalty data with the electronic gift certificate card based upon the usage of the electronic gift certificate card. | Upon information and belief, the processing hub associated loyalty data with the Simon Visa Loyalty Card, based upon usage of the card. See Figures 16 (''If they are used at selected merchants, 5% of the spend is automatically redeposited on the card…The Simon Mall version of this card has different branding, but it works the same way.''); Figure 15-22 (further detailing the loyalty card component). Here, the consumer's loyalty data is associated with the Simon Visa Loyalty Card, based upon usage (''qualifying purchases'') with the card. See Figures 15-22 below. |

U.S. Patent No. 6,000,608

**Evidence From Simon Property Group, L.P.**

**U.S. Patent 6,000,608 ("'608 Patent") Claims**

Page 20



**Figure 15 – attached hereto as Exhibit 13**

U.S. Patent No. 6,000,608

PLAINTIFF'S THIRD AMENDED COMPLAINT

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|
| | The 5 Back Visa Gift card can be purchased at Simon Mall, GiftCardMall.com, and a number of retail locations. These gift cards can be used as regular debit or credit gift cards anywhere that Visa is accepted. However, if they are used at selected merchants, 5% of the spend is automatically redeposited to the card. For example, if you spend $500 with a 5 Back Visa card at a participating merchant, $25 will be re-deposited to the card within a couple of days. I previously wrote about this card here: Five Back Visa Gift Card. A new way to earn 5X and save money? |
| | The Simon Mall version of this card has different branding, but it works the same way. |
| | **Figure 16 – attached hereto as Exhibit 14** |

Page 21

U.S. Patent No. 6,000,608

PLAINTIFF'S THIRD AMENDED COMPLAINT




**Evidence From Simon Property Group, L.P.**

**U.S. Patent 6,000,608 ("'608 Patent") Claims**

A growing list of leading merchants will add up to 5% back to your card with every purchase when you use your Five Back Visa gift card.

**Figure 17 – available at https://www.fivebackgift.com/**

Page 22

U.S. Patent No. 6,000,608

PLAINTIFF'S THIRD AMENDED COMPLAINT

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|

Page 23

### Register Card | Check Balance/Transactions | Personalize PIN

Please enter your card information below to register your card for online, mail or telephone purchases. Please note that enrollment in the Five Back program is **automatic** and you do not need to register your card to participate.

Enter Gift Card Number

[ Card number ]

Enter Expiration Date

[ MM ] / [ YY ]

Enter 3-Digit Code (CVV2)

[ Enter code ] ⓘ

Cancel    **Register Card**

Visit www.fivebackgift.com for a list of participating merchants and the

**Terms and Conditions***

When you shop at participating merchants, the Award Sponsor will add a certain percentage (up to 5%) of your purchase amount (including sales tax) to your Card balance. Visit www.fivebackgift.com for a list of participating merchants and the money back percentage award offered by each merchant. The Award Sponsor will calculate earnings on a purchase by purchase basis and will round earnings amounts to the nearest whole cent (with amounts below half a cent being rounded down and amounts of half a cent or more being rounded up). Earnings generally will be added to your Card balance within 48 hours of the purchase.

You can continue to earn money back until the balance on your Card is less than 10 cents. At that point, you will stop earning money back (because 5% of an amount less than half a cent, and the Award Sponsor rounds earnings to the nearest whole cent).

If you return an item on which you earned money back, the Award Sponsor reserves the right to deduct the money you earned from your Card balance.

* The 5% Back Bonus offer is provided by the Award Sponsor and is not provided or endorsed by MetaBank®.

**Figure 18 – available at https://www.fivebackgift.com/**

U.S. Patent No. 6,000,608

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
| --- | --- |

Page 24



**Figure 19 – available at https://www.fivebackgift.com/**

U.S. Patent No. 6,000,608

PLAINTIFF'S THIRD AMENDED COMPLAINT

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|

▸ **How can I earn money back by using my Card?**

When you shop at participating merchants, the Award Sponsor (Blackhawk Network California, Inc.) will add a certain percentage (up to 5%) of your purchase amount (including sales tax) to your Card balance. Visit participating merchants and the money back percentage award offered by each merchant. The Award Sponsor (Blackhawk Network California, Inc.) will round earnings amounts to the nearest whole cent (with amounts below half a cent being rounded down and amounts of half a cent or more being rounded up). If you return an item on which you earned money back, the Award Sponsor (Blackhawk Network California, Inc.) reserves the right to deduct the money you earned from your Card balance. *

**Figure 20 – available at https://www.fivebackgift.com/**

▸ **When will my earnings be added to my Card balance?**

When you make a purchase at a participating merchant, your earnings will be added to your Card balance within 48 hours. If your earnings have not been added to your card within 48 hours, please call 1 (844) 201-8796. Do not reach out directly to merchant partners.

▸ **Will I earn more money back when I spend the money that has been added to the Card?**

Yes. You can continue to earn money back until the balance on your Card is less than 10 cents. At that point, you will stop earning money back (because 5% of an amount less than 10 cents is less than half a cent, and the Award Sponsor rounds earnings to the nearest whole cent).

**Figure 21 and Figure 22 – available at https://www.fivebackgift.com/**

Page 25

U.S. Patent No. 6,000,608

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|
| 60 | |
| A method of activating a prepaid card having a unique identification number encoded on it, the identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, the method comprising the steps of: | Simon utilizes a method of activating the Simon AmEx Gift Card, Simon Visa Gift Card, and Simon Visa Loyalty having a unique identification number encoded on it, the identification number comprising a bank identification number approved by the American Banking Association for use in a banking network. See Figures 1 – 14 above. |
| | A prepaid card is a card that requires a prepaid amount before it can be used. *DataStream* Order, p. 13. Each prepaid card has a unique identification number encoded on it. Within this unique identification number is a "a bank identification number approved by the American Banking Association for use in a banking network," which is a numeric code that identifies a card-issuing financial institution and that is sanctioned by the American Bankers Association. *DataStream* Order, p. 6. |
| | All Simon cards have an account number embossed into the card. This account number is also encoded in the magnetic strip on the back of the card. This magnetic stripe can be swiped by or at a point of sale device when the card is used for purchase transactions. The 16 digit Personal Account Number ("PAN") is embossed on the front of the card or encoded in the mag stripe. The PAN is used to determine which customer belongs to that card. The first six-digits of the PAN are referred to as the Bank Identification Number ("BIN"). The BIN is basically a zip code, signaling the issuing bank. Every Simon card requires a PAN including the BIN embossed on the front or encoded in the mag stripe in order to function. A 16 digit PAN is required by every processing system to process a card transaction in the United States. |
| | Within this unique identification number is a "bank identification number." A "bank identification number" is the first six digits of a user's card that facilitates making of each electronic transaction. See Figure 6, below. As shown in Figure 7 below, Bank identification numbers (BINs) "carry critical information related to card programs and program benefits and tell processors how to route the payment – to what issuer for authorization and what card and what card network for clearing and settlement." On information and belief, Simon uses bank identification numbers to enable transactions to be properly routed. |
| | If the trier of fact determines that Simon's transmission of a unique identification number during activation does not literally meet the limitation of activation, AlexSam contends that such usage would still be covered under the doctrine of equivalents. These instrumentalities perform substantially the same function (transmitting activation data comprising the external identification number relating to the PAN on the card |

U.S. Patent No. 6,000,608

Page 26

PLAINTIFF'S THIRD AMENDED COMPLAINT

| U.S. Patent 6,000,608 ("'608 Patent") Claims | | Evidence From Simon Property Group, L.P. |
|---|---|---|
| | | within the packaging and an activation amount), in substantially the same way (transmitting a unique identification number, such as a BIN, and an activation amount) to achieve the same result (activation data transmitted from the POS device to the processing hub for activation of an account). |
| 60[a] | swiping the card through an unmodified existing standard point-of-sale device; | On information and belief, the Simon AmEx Gift Card, Simon Visa Gift Card, and Simon Visa Loyalty Card incorporates "swiping" or "passing or sliding [the] card through an electronic card reader" as part of the activation process. *DataStream* Order, p. 13. See, e.g., Figures 8 – 14 above. For cards purchased at Simon mall locations, a customer cannot activate a card without having swiped it at the register as part of a purchase transaction. Swiping also encompasses passing a barcode (i.e. carrier Universal Product Code or magnetic stripe) over or through a barcode scanner.<br><br>Simon employs an unmodified existing standard retail point-of-sale device within its card system. An unmodified existing standard retail point-of-sale device has been previously construed as a terminal for making purchases at a retail location of the type in use as of July 10, 1997 that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system. *DataStream* Order, p. 9. Upon information and belief, Simon does not perform any modifications on the POS device for its use in the card system. |
| 60[b] | transmitting the identification number and an activation amount from the point-of-sale device to a processing hub; and; | Upon information and belief, the Simon AmEx Gift Card, Simon Visa Gift Card, and Simon Visa Loyalty Card's identification number and activation amount are transmitted from the Simon's point-of-sale device to its processing hub. See, e.g. Exhibit 10. The structures that perform the function of transmitting the identification number and an activation amount from the point-of-sale device to a processing hub may include, but is not limited to, the transaction processors, retail processors, bank processors, a debit network, the Visa, BlackHawk or AmEx network, and/or Simon's processing hub. |

U.S. Patent No. 6,000,608

PLAINTIFF'S THIRD AMENDED COMPLAINT

| U.S. Patent 6,000,608 ("'608 Patent") Claims | | Evidence From Simon Property Group, L.P. |
|---|---|---|
| 60[c] | activating an account in the processing hub corresponding to the identification number | On information and belief, the Simon processing hub performs the step of activating an account corresponding to the unique identification number, thereby permitting later access to said account. See Figures 1-14. The structures for activating an account in the processing hub corresponding to the identification number may include, but is not limited to, the transaction processors, retail processors, bank processors, a debit network, the Visa, BlackHawk or AmEx Network, and/or Simon's processing hub.<br><br>Activating an account means making an account functional for use. *DataStream* Order, p. 10. In order to make the account functional for use, the unique identification number and the activation amount have to transmitted from the POS device to the processing hub. "Corresponding to" is defined as "agreeing to, conforming to, consistent to, or analogous to." *DataStream* Order, p. 10. Thus, the PAN does not have to be exactly the same as the Simon account number tied to the card or vice versa. See Figures 8-14. Under this claim limitation, the BIN doesn't have to be transmitted, it just has to "correspond to" the unique identification number on the card.<br><br>A processing hub is a computer which provides front-end POS device management and message processing for card authorizations and activations. *DataStream* Order, p. 10. This information is transmitted to Simon directly through a "lease line," or over the Visa, BlackHawk or AmEx network. There is a series of services Simon performs to validate to make sure that the card can be sold, load limits are appropriate, etc. |
| 62 | The method of claim 60, further comprising entering the activation amount into the point-of-sale device. | Upon information and belief, the activation amount for the Simon AmEx Gift Card, Simon Visa Gift Card, and Simon Visa Loyalty Card is entered into said point-of-sale device. See Exhibit 10. |
| 63 | The method of claim 60, wherein the step of transmitting the | On information and belief, the step of transmitting the identification number and the activation amount from the point-of-sale device at the Simon Mall kiosk to Simon's processing hub is carried out at least in part over the banking network. See Exhibit 10. |

U.S. Patent No. 6,000,608

Page 28

PLAINTIFF'S THIRD AMENDED COMPLAINT

| U.S. Patent 6,000,608 ("'608 Patent") Claims | Evidence From Simon Property Group, L.P. |
|---|---|
| | identification number and the activation amount from the point-of-sale device is carried out at least in part over the banking network. | |
| 65 | The method of claim 60, further comprising allowing a user of the card to purchase goods and services using the card. | The Simon AmEx Gift Card, Simon Visa Gift Card, and Simon Visa Loyalty Card allow a user of the card to purchase goods and services using the card. See Figures 1-5 above. |
| 66 | The method of claim 60, further comprising associating loyalty data with the card based upon usage of the card. | Upon information and belief, loyalty data is associated with the Simon Visa Loyalty Card, based upon usage of the card. See Figures 16 ("If they are used at selected merchants, 5% of the spend is automatically redeposited on the card…The Simon Mall version of this card has different branding, but it works the same way."); Figure 15-22 (further detailing the loyalty card component). Here, the consumer's loyalty data is associated with the Simon Visa Loyalty Card, based upon usage ("qualifying purchases") with the card. See Figures 15-22 below. |

Page 29

U.S. Patent No. 6,000,608

**EXHIBIT J**
**Evidence of Infringement of Claims of U.S. Patent No.**
**6,000,608 by the Simon Visa Gift Card, The Simon Amex Gift**
**Card, And Simon Loyalty Card**

# Part 2 of 2

# EXHIBIT 1



# EXHIBIT 2

CARD IS NOT REFUNDABLE



0 76750 29849 3

**GIFTCARD VALUE: $_____**

Use your Visa® Simon Giftcard® in the U.S. anywhere
Visa debit cards are accepted, including online.

No fees after purchase. No expiration of funds. No value until
purchased and activated. Funds available after activation. Card
may be used until "VALID THRU" date on the front of the card.
If available funds remain on your card after the "VALID THRU" date,
call customer service to obtain a replacement card at no additional
cost. Registration may be required for online purchases. Additional
terms and conditions apply to Giftcard use. See enclosed
Cardholder Agreement for details or visit simon.com/giftcard
and select the Terms and Conditions link. Be sure to provide
the Cardholder Agreement to gift recipient.

**VISIT SIMON.COM/GIFTCARD OR CALL 1-866-325-6238
FOR CUSTOMER SERVICE AND TO CHECK YOUR BALANCE.
TO OBTAIN OR PERSONALIZE YOUR PIN FOR PIN DEBIT
PURCHASES, VISIT GIFTCARDMALL.COM/MYGIFT OR
CALL 1-866-325-6238. NO CASH OR ATM ACCESS.**



FDIC, purs
apply.
Netw

103371350

This card is issued by MetaBank, Member FDIC,
pursuant to a license from Visa U.S.A. Inc.

94647

08/18

103371350

PLAINTIFF'S THIRD AMENDED COMPLAINT

# EXHIBIT 3

5-percent-back-visa-gift-cards-from-simon-mall -



HOME    BEGINNER'S GUIDE    CREDIT CARDS    TRIP REPORTS    ABOUT

# 5-Percent-Back-Visa-Gift-Cards-From-Simon-Mall

Written by Ariana Arghandewal  /  on November 5, 2016



5% Back Visa Gift Cards can be a real money maker



Sorry! We couldn't find it
404



Barclaycard Arrival™ Plus
Earn 60,000 bonus miles

## SUBSCRIBE

Enter your email address to subscribe and receive notifications of new posts

Email Address

Subscribe



E.D. Tex. No. 2:19-cv-00331-JRG                                                      Page | J-36

PLAINTIFF'S THIRD AMENDED COMPLAINT

5-percent-back-visa-gift-cards-from-simon-mall -

**How to Redeem an American Airlines Travel Voucher**

**Where to Buy Visa Gift Cards With a Credit Card**

**A Visit to Real Life Stars Hollow (aka Unionville, Ontario)**

HOME    BEGINNER'S GUIDE    CREDIT CARDS    TRIP REPORTS    ABOUT

    

Cards

**New Money Order Purchase Policy at Walmart?**

**7 Rideshare Apps You Should Be Using in New York City**

**Post Office Stops Accepting Gift Cards for Money Orders: Now What?**

Enter your keywords...

Search

**FOLLOW ME ON TWITTER**

E.D. Tex. No. 2:19-cv-00331-JRG                                                    Page | J-37

PLAINTIFF'S THIRD AMENDED COMPLAINT

5-percent-back-visa-gift-cards-from-simon-mall -

My Tweets



# EXHIBIT 4



| Start Here | 💳 Best Offers | Earn Miles Without Flying | Travel Cheaper and Better | ✉ Subscribe |

# CVS leaving 5 Back Visa program as of January 20th

📅 January 10, 2017 by 👤 Greg The Frequent Miler



The 5 Back Visa Gift card can be purchased at <u>Simon Mall</u>, GiftCardMall.com, and a number of retail locations. These gift cards can be used as regular debit or credit gift cards anywhere that Visa is accepted. However, if they are used at selected merchants, 5% of the spend is automatically redeposited to the card. For example, if you spend $500 with a 5 Back Visa card at a participating merchant, $25 will be re-deposited to the card within a couple of days. I previously wrote about this card here: <u>Five Back Visa Gift Card. A new way to earn 5X and save money?</u>

The Simon Mall version of this card has different branding, but it works the same way.

CVS leaving 5 Back Visa program as of January 20th



One of the most lucrative uses of these cards has been to use them to buy certain items at CVS. Unfortunately, CVS is withdrawing from the program as of January 20th.  Several blogs reported this in the past few days, but details were murky.  A reader named Carol, who writes "Chicago on the Cheap" got the scoop directly from Simon Customer Service:

> *Thank you for contacting Simon Customer Service,*
>
> *Yes, CVS will be exiting the 5% Back program. They will officially be off the program on Jan 20th.*
>
> *Thank you,*
> *Simon Customer Service*

A full list of participating merchants can be found on the Simon website.  Here are the current retail participants:

E.D. Tex. No. 2:19-cv-00331-JRG                                                    Page | J-41

PLAINTIFF'S THIRD AMENDED COMPLAINT

CVS leaving 5 Back Visa program as of January 20th

**Retail**

- Aerie®
- Aéropostale
- P.S. by Aéropostale
- American Eagle Outfitters®
- Athleta
- babyGap
- Banana Republic
- Bass Pro Shops®
- Bath & Body Works®
- Bed Bath & Beyond®

- Christmas Tree Shops andThat!
- Crutchfield
- CVS Pharmacy®
- Express
- Gap
- GapKids
- JCPenney
- Journeys
- Journeys Kidz
- Kmart

- Nike
- Old Navy
- PBteen®
- Pottery Barn®
- Pottery Barn Kids®
- Sally Beauty Supply
- Sears®
- Sephora
- Shi by Journeys
- Staples


**BoardingArea** ☰

- buybuyBaby®
- Cabela's®
- Catherine's®

- Lowe's®
- Macy's
- Neiman Marcus®

- Williams-Sonoma®
- Yankee Candle®



Earn Miles Without Flying: START HERE

« Previous Article                Next Article »

**About Greg The Frequent Miler**

Greg is the owner, founder, and primary author of the Frequent Miler. He earns millions of points and miles each year, mostly without flying, and dedicates this blog to teaching others how to do the same.

**More articles by Greg The Frequent Miler »**

17  Leave a Reply

https://frequentmiler.boardingarea.com/cvs-leaving-5-back-visa-program-january-20th/                3/10

Join the discussion...

13 4 0 12

This site uses Akismet to reduce spam. Learn how your comment data is processed.

Subscribe

JohnnieD

Guest

So would it be safe to assume that the participating merchant was responsible for the 5% back? If so, I get their reason for jumping ship on the program.

BoardingArea

voyager10

Guest

I think so. Why would Blackhawk want to pay cash back? From what kind of budget? Besides, if they did, they wouldn't have preference of merchants, say CVS over Walgreens. This is the program that pretty much gives 5% back coupon to shops that want to increase number of sales and customers. Unfortunately, CVS didn't think that "certain items" they sell will be used to take advantage of them. Either way, let's blame the bloggers again : )

0 Reply 1 year ago

Confirmed: CVS to Exit the Five-Back Program - Doctor Of Credit

[…] There were lots of reports that CVS will no longer be part of the 5-Back program starting January 20 as we wrote yesterday. This has now been confirmed in writing by Simom Mall customer service, as reported by Frequentmiler. […]

0 Reply 1 year ago

SDO

Guest

Something had to give, eventually. I was wondering when they would stop giving MSers $80.20 per visit.

0 Reply 1 year ago

will

Guest

I still have $1000 in them. Will CVS let me buy visa or mastercards with them and will I get the extra 5% ?

0 Reply 1 year ago

Papas

Guest

Sub

0 Reply 1 year ago



CVS leaving 5 Back Visa program as of January 20th

**Jeff** I think the obvious question is: Are there any other retailers remaining on the list that will allow you to convert your 5-Back the way CVS did? I see 2 strong candidates, but unsure if one carries a $500 VGC and unsure if the other will let you use the 5-Back to buy it...

Guest

👍 0 👎 | Reply                                    🕐 1 year ago

**5 Back Visa Change, Delta Flash Sale 37% Off to Mexico & eBay 10% off Select Categories - Miles to Memories**

[...] Simon Mall and some stores sell 5 Back Visa gift cards. These prepaid Visa cards offer 5% back at select merchants. Due to overwhelming popularity (my guess), CVS will be leaving this program as of January 20th and thus won't be eligible for 5% back. This was a popular option for many, so make sure to use your 5 Back cards before its too late. HT: Frequent Miler [...]

👍 0 👎 | Reply                                    🕐 1 year ago

**Credit**

Guest

everytime you bought more than $300 worth of vgc

👍 0 👎 | Reply                                    🕐 1 year ago

**Credit**

People had no problem giving their driver license to be stored in the system at cvs? You have to give it everytime you bought more than $300 worth of vgc

Guest

👍 0 👎 | Reply                                    🕐 1 year ago

**Alaska Welcomes Elevate Members, Uganda Tourism, Income Tax Scams, Better Avios - TravelBloggerBuzz**

[...] goes down another one, no more 5 Back giftcarding them at CVS. We'll not blame The Points Guy for this one [...]

👍 0 👎 | Reply                                    🕐 1 year ago

**Sam**

January 20th! As if the liberals needed another thing to blame on trump!

Guest

👍 0 👎 | Reply                                    🕐 1 year ago ▲

**ace**

when your pal turns out to be adolf hitler or worse come back and say hi

Guest

👍 0 👎 | Reply                                    🕐 1 year ago ▲

**SumOfAll**

nothing says loser like crying about your gal losing an election

Guest

👍 0 👎 | Reply                                    🕐 1 year ago

PLAINTIFF'S THIRD AMENDED COMPLAINT



Phil Bought Amazon gift cards from CVS using the 5% back in early Jan… never received rebate.

Guest

0 Reply 1 year ago

calwatch

Guest

Five backs at CVS were always inconsistent to use. Some CVS's allowed you to swipe multiple times to get to $500, handy for the $200 five backs ubiquitous at office stores. If you could get that to work that was perfect.

0 Reply 1 year ago

will

BoardingArea

I did have to show my drivers license for the $1000 buy.

0 Reply 1 year ago

## Greg's Picks:

1.5X Ultimate Rewards everywhere and no annual fee

5X categories, 50K signup bonus, and no annual fee

Great choice to pair with Freedom & Ink Cash

$500 signup bonus. Up to 2.62% everywhere for spend

CVS leaving 5 Back Visa program as of January 20th

## Recent Posts

Better than expected: Earn 5x & get loyalty credit w/ FHR prepaid bookings

Marriott Platinum Premier: Into the home stretch

My thoughts about the big Capital One news

Almost messing up with promo Avios (& don't forget to use yours!)

Capital One Transfer Partners

Take the stress out of credit card bonus hunting:


BoardingArea

Wow! Capital One miles now transfer & a huge bonus

Is 4X worth $295 per year? Evaluating the new Amex Business Gold Card.


WHEN YOU REALIZE YOU'VE FOUND THE ONE,

### Start Here

Start Here

Best credit card offers

Laboratory

Frequent Miler Resources

CVS leaving 5 Back Visa program as of January 20th



## Must Read Posts

The game we play

Easy wins

Big Wins

Extreme Stacking

Increase credit card spend (and get most of it back)

The earn and burn fallacy

## Blog Sort Order

Display oldest posts first

Display most recent posts first

Frequent Miler
11,275 likes

Like Page
Learn More

Be the first of your friends to like this

Frequent Miler
48 minutes ago

Staples and Lowe's deals might be useful for Black Friday shopping. 10% off on Southwest and Hotels.com never hurts.
https://frequentmiler.boardingarea.com/ebay-gift-card-deal…/

BoardingArea

FREQUENTMILER.BOARDINGAREA.COM
**10% off Southwest, Lowe's, Hotels.com…**

**Advertiser Disclosure:** FrequentMiler is an independent, advertising-supported web site. Frequent Miler has financial relationships with many of the cards mentioned here, and is compensated through the credit card issuer Affiliate Program. This compensation does not impact how or where products appear on this site. Frequent Miler has not reviewed all available credit card offers in the marketplace. Advertiser partners include American Express, Barclays, Capital One, and CreditCards.com.

**Editorial Note:** The editorial content on this site is not provided by the credit card issuer. Any opinions, analyses, reviews or recommendations expressed here are the author's alone, not those of the credit card issuer, and have not been reviewed, approved or otherwise endorsed by the credit card issuer.

**Regarding comments:** Comments posted at the bottom of Frequent Miler pages and posts are not provided or commissioned by the bank advertiser. Responses have not been reviewed, approved or otherwise endorsed by the bank advertiser. It is not the bank advertiser's responsibility to ensure all posts and/or questions are answered.

**Privacy Policy**: Please click here to view our Privacy Policy

**Click here to contact Frequent Miler**

© 2018 · Frequent Miler RSS

BoardingArea



CVS leaving 5 Back Visa program as of January 20th



About Us          Become a Blogger
Contact

A Frequent Flyer Network site. ©2018. All rights reserved

BoardingArea

E.D. Tex. No. 2:19-cv-00331-JRG                                                   Page | J-49

PLAINTIFF'S THIRD AMENDED COMPLAINT

# EXHIBIT 5



# EXHIBIT 6

10/8/2019       Credit and Debit Cards Verification

Sales Line: US +1 302-703-7976 & UK +44 20-8133-7772

Contact

Home Why BinDB Products Bin Search Pricing Developers Company

# Your Business Needs a Dependable Anti-Fraud System

If you are an entrepreneur whose business is exclusively dependent on internet transactions, you might be haunted by the possibility of internet fraud wreaking havoc on your business dealings. The threat of fraud is real; the risks are not overstated, and understandably fraud prevention must be on the top of your business agenda.

What are the possible scenarios that you can be confronted with in your day-to-day business?

Here are some typical examples:

- You have launched your website and now you are busy building up traffic to boost your business. But do you know who your customers are? Are they legitimate?
- You receive a barrage of orders for your product, a great feel-good factor indeed, but are you sure about the credentials of the credit card you are going to charge?
- You have received payment for a sold product, and now you have shipped the product. What is the risk that the card is stolen and the genuine card holder disputes the transaction?
- All your sales are online and your first payments are coming in. Are you sure about each customer's identity?
- Now your business is moving like a breeze, apparently no issues, high volumes, and everything looks sunny. What do you do if organized hooligans with the help of stolen cards have boosted your sales?
- You have managed to succeed in this cut-throat trade, but now a jealous competitor is keen to put you out of business. The dubious competitor fakes a lot of orders; you have shipped them and now the competitor disputes all the charges. How do you wriggle out of the situation?

The above constitute only the tip of the iceberg of a potentially massive scale of fraudulent activities that are either already devised, waiting to be stealthily executed, notwithstanding addition to the new ingenious ones on the anvil in a latent phase ready to strike unsuspecting businesspersons. Internet marketing is replete with deceitful players. You need to put in place a mechanism that not only is 100 percent foolproof but also capable of plugging newer and more devious fraudulent methods that are concocted every day.

Bin Database System

Bank Identification Number database or BIN database is the most effective strategy to tackle the scourge of internet fraud.

What is a BIN?

E.D. Tex. No. 2:19-cv-00331-JRG        Page | J-53

PLAINTIFF'S THIRD AMENDED COMPLAINT

Bank Identification Number or BIN represents the first six digits of the user's credit, debit, or prepaid card numbers that facilitate making of each electronic transaction. The first six digits are also called issuer identification numbers (IIN). The Bank Identification Numbers (BIN) or IIN database and its membership are managed by the American Bankers Association and are updated monthly. Online merchants use BIN database to validate transactions.

Nevertheless, for the BIN database or IIN database to be effectual, it must fulfil the following conditions.

- It must be user-friendly: Professional database preferably is the best choice. Yet, there is no reason why you cannot create your own.
- It must be accurate: Fortunately, these days most trusted databases are 99 percent accurate, more so because these databases are monitored and updated regularly. Users look for databases that provide comprehensive information of the country of residence and the BIN numbers. Verification cannot be complete without all these relevant details. The obvious source to get these details is from online merchants, financial institutions, and banks.
- It must conform to the highest quality: Dependability is a must-have. It should be free from spelling errors to enable accurate automatic filtering. A BIN databases has to ensure conformity to acceptable standards, and therefore naturally instil confidence among users. Reputable databases willingly offer assistance to provide updates on a regular basis as well as provide assistance in BIN correction and also in locating unidentified BINs.
- It must be cost-effective: Typically there are different rates for bulk usages and single rates. Choose one after a careful consideration of quality and ease of use.

So what is the call? Making your own anti-fraud system could be one of the workable solutions. For that you need to collect data on internet card processing behaviour and build up a database with a large number of different fraud models. Once you are able to do that, checking bank identification numbers will save you money. Alternatively, you can buy professionally made BIN database that has a good record of verifying credit card details, reducing chargebacks and preventing fraud attempts.

Try our online BIN database

Here is how bin databases help you

- The first six digits of the BIN provide the most vital identification of the user that helps you validate an order. Most importantly, it provides the name of the issuer bank and the country of its origin. It provides information whether the card is a credit, debit, or a prepaid card.

- The database prevents you from getting trapped by fraudulent transactions. When you run a BIN through an online validation service, you have a chance to cross-check suspicious transactions and if necessary put a hold on them. In effect you can pre-empt fraudulent transactions before they get the better of you. Another great advantage is you can use the BIN in a customized way to suit your business needs. You can seamlessly integrate the credit card BIN checker with your business requirements and weed out banks having a history of shady bank transactions. Additionally, if there is restriction to export to a particular country, you can exclude cards issued from that country's billing address automatically.

E.D. Tex. No. 2:19-cv-00331-JRG                                    Page | J-54

PLAINTIFF'S THIRD AMENDED COMPLAINT

- BIN identification numbers help you charge variable fees applicable for debit and credit cards. This is especially true for cards issued from outside the USA that need to be charged extra. Even a business card has a higher charge than a personal card. With a proper merchant account, you can set an automated arrangement whereby with a BIN database lookup you can assess the exact fees that needs to be charged with credit cards.

Internet card fraud is on the rise. It would be an unpardonable act to run an internet business without the help of Bank Identification Number database. Even optimistically assuming a very low-risk scenario, the potential damage to businesses can be huge.

- Why BinDB
-
- Solutions
-
- Verify Card Details
- Fraud Prevention
- Recurring Payments
- Investigation
-

- Why BinDB
- Verify Card Details
- Fraud Prevention
- Recurring Payments
- Fraud Investigation

- Products
- Web Portal
- Premium License
- Ultimate License
- Priority Updates
- FAQ

- Structure
- Identify Prepaid Cards
- Bank Card Brands
- Visa Class Levels
- MasterCard Levels
- Amex Levels

- BIN Search
- Euro KartenSysteme
- Nets Visa Dankort
- Nets Dankort
- Teller
- Bank Card Company
- PayLife
- Euro6000

PLAINTIFF'S THIRD AMENDED COMPLAINT

- Developers
- Premium License
- Premium Samples
- Ultimate License
- Ultimate Samples

- About Us
- Customers
- News
- Contact Us

© 2009-2019 BinDB LLC. All rights reserved.

- Privacy Policy
- Sitemap

E.D. Tex. No. 2:19-cv-00331-JRG                                        Page | J-56

PLAINTIFF'S THIRD AMENDED COMPLAINT

# EXHIBIT 7

# PYMNTS.com

PAYMENT METHODS

# MasterCard Questions Need For 8-Digit BIN

By **PYMNTS**

Posted on June 13, 2016



There's a shortage of BINs — Bank Identification Numbers — thanks to the growing demand for accounts and digital use cases tied to tokenization. But MasterCard SVP Andrea Gilman says that the ISO 8-digit BIN standard that will be released this week is too heavy a lift for too little gain, especially when there are other alternatives available. She gives Karen Webster the scoop.

      

It happened to the internet in 2011.

PLAINTIFF'S THIRD AMENDED COMPLAINT

In February of 2011, it was announced that the internet protocol most commonly used to route traffic over the web, IPv4, had all but exhausted its supply of numbers for North America. Initially established in 1983 as ARPANET rolled into production, IPv4 was initially developed to support 4.2 billion addresses. At the time, that seemed more than adequate.

About a decade later, it was obvious that 4.2 billion addresses wouldn't be nearly enough to support the growth of the commercial internet. In the late 1990s, the standards body that oversees global IP address allocation went to work creating a new standard that would allow the internet to continue its expansion and growth. IPv6 was that standard, and today supports the provisioning of 340 undecillion addresses.

It wasn't an easy change to implement. Network and systems engineers inside of their own organizations were tasked with devising transition plans so that their IPv4 sites would remain compatible with the operating systems that provided access to their sites. The migration to a new standard that gives businesses more flexibility to use the commercial web to expand their own businesses has taken decades and hundreds of millions of man hours to operationalize and continues to this day.

**Payments is now facing a similar crossroads.**

The Bank Identification Number (aka BIN) – the analog to the internet protocol that tells the worldwide web how to route traffic – is facing its own shortage of numbers.

BINs are the numerical sequence that serve as unique cardholder account identifiers that support the authorization process when a card is presented for payment. BINs carry critical information related to card programs and program benefits and tells processors how to route the payment – to what issuer for authorization and what card network for clearing and settlement. BINs are also the first line of defense in identifying fraud online – matching the geographic location of the cardholder with the individual presenting it for payment.

In other words, BINs are the backbone for how the payments industry communicates with each other when cardholders present a card credential for payment.

But in order to accommodate the growing number of issuers and use cases that will want and need to issue a variety of unique accounts in a rapidly expanding digital payments world, BIN ranges and protocols need to be expanded – and some even believe, totally rethought.

**A BIN BY ANY OTHER NUMBER …**

**MasterCard** has been preparing for this digital demand since November 2014 when it announced that it was acquiring a new block of BIN numbers that would work within the existing 6-digit BIN standard. MasterCard SVP for Franchise Development, Andrea Gilman, tells Karen Webster that

PLAINTIFF'S THIRD AMENDED COMPLAINT

MasterCard will be adding BIN ranges that begin with "twos" in addition to the "fives" that currently exist for MasterCard issuers to use beginning in October 2016. Merchants will have until June 2017 to ready their POS systems to accommodate this new set of cardholder account numbers.

Gilman says that this move is critical since the use of existing BINs has accelerated to the point of activation that nobody would have envisioned several years ago. Gilman pointed out that just a few decades ago, there were 38,000 cards in the field; today there are roughly 9 billion. As more digital end points involving commerce emerge, she emphasized that the ability to issue more cardholder accounts and support new types of digital credentialing via tokenization becomes paramount. Adding their new BIN range is one important step in giving issuers those tools and that flexibility.

To that end, said Gilman, MasterCard has been working on a multi-pronged approach to bringing the new BINs to the field through education and consistent dialogue with stakeholders so that the impact to their day-to-day payments activities is minimized.

One such initiative has been to build on account range functionality, something MasterCard has been doing for more than a decade. Account ranges allows MasterCard issuers to use a single BIN across portfolios that may have previously extended across several BINs. Flexibility of range and data groupings means the ability leverage information across product groups, from prepaid cards to travel to student debit cards with easier reconciliation while freeing up BIN number for issuers to use as needed.

Gilman emphasized that MasterCard has been active in informing their acquiring customers that they must be ready by October for the changeover, with "incremental" rollouts, and more importantly, reassurance that using these new BINs requires no switch needed or change in architecture that would cause disruption at the point of sale.

**SHIFTING THE BIN PARADIGM?**

The second BIN initiative is one MasterCard has been keeping close tabs on as part of the ISO working group assembled to study the looming worldwide shortage of BINs. ISO – the **International Organization for Standardization** – will release its recommendation for expanding the existing BIN structure later this week after examining a number of alternatives.

ISO's recommendation will be to adopt an eight-digit BIN for all new BINs issued by ISO. The account number standard will not change from 16 digits to 19, although that was contemplated and widely expected. It will be up to each payment network to decide if and when to implement this change.

While some in the industry view the ISO recommendation to move from a six-digit BIN to an eight-digit BIN a necessary move, Gilman says MasterCard does not.

Although the worldwide BIN shortage is of real concern, she says that the "heavy lift" required for the entire payments industry to retool its entire payments infrastructure will take years – possibility even decades — and will create system-wide implementation challenges. Other less time and resource intensive options, she asserts, that leverage technologies and existing resources are available for issuers to consider and implement, and that solve for the problem of more BINs in a digital commerce world.

Unlike MasterCard's move to the "twos," which is essentially the equivalent of a software update to remain compliant, Gilman said that the move to an eight-digit BIN will require that every single system across every single player in the payments ecosystem change in order to process these new cards. For example, Gilman points out that issuers today that use a six-digit BIN use "the two open slots" – positions 7 and 8 – to derive intelligence about their cardholders and their transactions. Eliminating those slots will mean that their own systems and operations must be reconfigured and business processes rethought so as not to lose what they already have and use to run their businesses.

Gilman likened the expansion of BINs, beyond six digits to eight digit major industry identifiers to a "one for 100 stock split," wherein a little bit of expansion produces a lot of available inventory for new BINs. But, as Gilman explained, there are less disruptive alternatives that can solve for the shortage of BINs yet not force a decade (or more) worth of investment in operational changes that could also mean taking the industry's eye off more important and value-adding digital initiatives.

So despite the ISO working group's recommendation, it is just that – a recommendation. This October we'll see MasterCard take one big step to usher in a new kinder and gentler warm-up act to solving for the realities of transacting in the digital age.

Unlike the internet back in the 1990s that didn't anticipate any other option but to totally reconfigure how internet access would happen, it seems that at least the payments industry has other less disruptive options to consider.

—————————

**Latest Insights:**

Our data and analytics team has developed a number of creative methodologies and frameworks that measure and benchmark the innovation that's reshaping the payments and commerce ecosystem. The **September 2019 Mobile Order-Ahead Tracker,** serves as a monthly framework for the space. It provides coverage of the most recent news and trends as well as a provider directory that highlights key players across the mobile order-ahead ecosystem.

PLAINTIFF'S THIRD AMENDED COMPLAINT

10/8/2019           MasterCard Challenges 8-Digit BIN Standard | PYMNTS.com



**RELATED ITEMS: BIN SHORTAGE, BINS, CREDIT CARDS, FEATURED NEWS, MAIN FEATURE, MASTERCARD, WHAT'S HAPPENING NOW**



---

B2B PAYMENTS

# QuickBooks Pushes For Truly Mobile SMB Management

By PYMNTS

Posted on June 13, 2016



Data is easy enough to come by. It's making sense of it on the fly that is difficult. QuickBooks, whose Android app lets users track multiple companies and operations across phones, tells PYMNTS why mobilizing SMBs matters.

[f SHARE]  [🐦 TWEET]  [in SHARE]  [SU SHARE]  [🖨 PRINT]  [✉ EMAIL]

Data can be a trickle or a deluge. And for companies that are increasingly reliant on data in real time and in far-flung locations, data management across mobile devices is of increasing importance. Earlier this month, **QuickBooks** said that it would **help simplify the process** of managing multiple subscriptions (across companies) in its QuickBooks Online offerings for Android.

John Shapiro, director of product management and payments at Intuit, told PYMNTS that the mobile offerings are aimed at firms that have multiple entities under the corporate umbrella — or, in another scenario, many customers — to see when data was last reconciled through bank statements, which can give insight into what is still pending. As Shapiro noted, QuickBooks integrates across several thousand financial institutions.

In one scenario offered up by the executive, an accounting firm with several, far-flung clients can keep up to date on data that clients need to populate into their own reports for weekly, monthly, even quarterly reporting, without, as Shapiro noted, having to "do all of those tasks under pressure" or even scrambling to find that data.

E.D. Tex. No. 2:19-cv-00331-JRG                                        Page | J-63

PLAINTIFF'S THIRD AMENDED COMPLAINT

The value of data collected in the field, so to speak, is magnified, according to Shapiro, with small to mid-sized businesses that are staffed by an average of half a dozen employees but are global in scope and reach. "These firms are often operating across different legal entities," Shapiro told PYMNTS, with, for example, central operations in the United States but also units and sales that are tied to the United Kingdom and Australia. The data flow across QuickBooks — and now, the newly installed app — allows for frequency of P&L reporting that can take place over a week, month or other tailored timeframe and can be disseminated by email.

Shapiro noted that the QuickBooks availability across Android takes its place in what he termed an "ecosystem" of more than 2,000 apps that connect into QuickBooks in general, and this lets users add reporting details and expand payments ability (in addition to invoicing, payments and ACH options already dovetailing with QuickBooks).

Most small business owners already use roughly 12 to 15 apps to track and run businesses on a daily basis, and Shapiro maintained that, in typical setups, it can take up to 14 steps until a business owner reaches the stage where an eInvoice is ready to be paid. Truncating those steps, of course, leads to better cash flow visibility and cash management.

———————————

**Latest Insights:**

Our data and analytics team has developed a number of creative methodologies and frameworks that measure and benchmark the innovation that's reshaping the payments and commerce ecosystem. The **September 2019 Mobile Order-Ahead Tracker,** serves as a monthly framework for the space. It provides coverage of the most recent news and trends as well as a provider directory that highlights key players across the mobile order-ahead ecosystem.



E.D. Tex. No. 2:19-cv-00331-JRG                                        Page | J-64

PLAINTIFF'S THIRD AMENDED COMPLAINT

10/8/2019                    MasterCard Challenges 8-Digit BIN Standard | PYMNTS.com

**RELATED ITEMS:** **ANROID APP**, **B2B**, **B2B PAYMENTS**, **INTUIT**, **MOBILE BUSINESS**, **QUICKBOOKS**

     

**INVESTMENTS**

# Symantec Sets Up To Buy Blue Coat Systems For $4.65B

By **PYMNTS**

Posted on June 13, 2016



     

**Symantec** is starting the week with a bang, **announcing** its intention to snap up **Blue Coat Systems** in a $4.65 billion deal that will broaden the security tech giant's portfolio of cyberdefense

tech and bring along a new CEO for good measure.

Greg Clark, CEO of Blue Coat, will be stepping into the leadership position at Symantec when the deal closes some time between now and October, according to a jointly released announcement. The coming installation of Clark finishes off a CEO search process that has been ongoing since Michael Brown stepped down after a disappointing financial performance during the first quarter of 2016.

Bain Capital, which currently controls Blue Coat, is slated to invest $750 million of the proceeds back into the combined company in the form of debt convertible into equity. Silver Lake will invest $500 million in convertible debt on top of $500 million it already agreed to put into Symantec this year. Blue Coat is currently used by more than 15,000 firms worldwide to block dangerous or otherwise inappropriate web content.

Blue Coat also brings value to Symantec as it is a cloud computing firm that delivers its solutions over the web and one successful enough that it had gotten as far as filing for an IPO earlier this year. Analysts' estimates for the value of the company, should it have taken that route, were in the range of what Symantec is paying.

"This is an extremely compelling combination," Symantec Chairman Daniel Schulman noted in a joint interview post-announcement with Clark.

"We now are going to have the scale, the portfolio of products and services and the resources necessary to protect customers against a constantly evolving threat landscape."

"There is virtually no product overlap between Blue Coat and Symantec," Clark added.

The acquisition comes as Symantec is having difficulty integrating its services into the modern security marketplace, despite growing concerns from all corners about the issue. The firm saw a 2 percent drop in the sales of its corporate security products; revenue in the company's consumer business dropped 9 percent. That has brought on a 27 percent share price decline over the last year.

This deal will be the largest Symantec has made since purchasing Veritas Software in 2005 and comes as one of a series of steps Symantec has pursed as it tries to work a comeback.

In January, Symantec sold off its Veritas data storage division to Carlyle Group for $7.4 billion, though it bought the firm for $10 billion.

Some layoffs are expected following the acquisition.

"I think, inevitably, in any combination of companies, there are some redundancies," Schulman said.

Estimates say the combined company's 2016 revenue would clock in at about $4.4 billion in FY 2016, over 60 percent of which comes via corporate security. Symantec ultimately expects $150 million of cost savings from the deal.

————————————

**Latest Insights:**

Our data and analytics team has developed a number of creative methodologies and frameworks that measure and benchmark the innovation that's reshaping the payments and commerce ecosystem. The **September 2019 Mobile Order-Ahead Tracker,** serves as a monthly framework for the space. It provides coverage of the most recent news and trends as well as a provider directory that highlights key players across the mobile order-ahead ecosystem.



**RELATED ITEMS:** **BLUE COAT**, **SYMANTEC**, **WHAT'S HOT!**

     

E.D. Tex. No. 2:19-cv-00331-JRG                                        Page | J-67
PLAINTIFF'S THIRD AMENDED COMPLAINT

# EXHIBIT 8



PLAINTIFF'S THIRD AMENDED COMPLAINT

# EXHIBIT 9

11/16/2018                          BIN Database - Search card issuing bank name and country

Sales Line: US +1 302-703-7976 & UK +44 20-8133-7772
Contact
Home Why BinDB Products Bin Search Pricing Developers Company

# Bin Database - Credit Card Bin Checker

## Find card's issuing bank name and country

The Bank Identification Number, also known as the credit card bin can tell you the name of the bank that issued the card, the type of card like Debit or Credit, brand of card Visa, MasterCard and level of card like Electron, Classic and Gold. From the bindatabase you can also check other details about the card and issuer. Credit card bin numbers are the first 6 digits of a card number.

You can use Free online **bin database** / bindatabase / credit card bin checker 10 times from a single computer or network. To avoid the limitations of the free BIN search, you can purchase our products from order section.

|  |  |
|---|---|
| Type BIN |   Assemble the image as you see at the upper right corner |
| **Complete the picture before sear**ching. | |
| Search | |

---

**Have a question?** For more information contact our sales team by phone:
US **+1 302-703-7976** & UK **+44 20-8133-7772** or by email: sales@bindb.com .



| | |
|---|---|
| Bin: | 455172 |
| Card Brand: | VISA |
| Issuing Bank: | SIMON CARD ISSUED BY METABANK |
| Card Type: | DEBIT |
| Card Level: | PREPAID |
| Iso Country Name: | UNITED STATES |
| Iso Country A2: | US |
| Iso Country A3: | USA |

E.D. Tex. No. 2:19-cv-00331-JRG                                              Page | J-71

PLAINTIFF'S THIRD AMENDED COMPLAINT

11/16/2018                                          BIN Database - Search card issuing bank name and country

Iso Country Number:        840

Bank's website:

Customer Care Line:

Bank Address:              ********    [?] Available on Ultimate Database

Formal Bank:               ********    [?] Available on Ultimate Database

Commercial/Personal        ********    [?] Available on Ultimate Database
Card:

Additional Info:

[ Report ]   *Report incorrect information

- Search
- 
- **Database Search**
- 
- Search by Bank System
- 
- **Eur o KartenSysteme**
- **Nets Visa Dankort**
- **Nets Dankort**
- Teller
- **Bank Card Company**
- PayLife
- Eur o6000
- 
- 

- Why BinDB
- Verify Card Details
- Fraud Prevention
- Recurring Payments
- Fraud Investigation

- Products
- Web Portal
- Premium License
- Ultimate License
- Priority Updates
- FAQ

- Structure
- Identify Prepaid Cards
- Bank Card Brands
- Visa Class Levels
- MasterCard Levels
- Amex Levels

- BIN Search

E.D. Tex. No. 2:19-cv-00331-JRG                                            Page | J-72

PLAINTIFF'S THIRD AMENDED COMPLAINT

- Euro KartenSysteme
- Nets Visa Dankort
- Nets Dankort
- Teller
- Bank Card Company
- PayLife
- Euro6000

- Developers
- Premium License
- Premium Samples
- Ultimate License
- Ultimate Samples

- About Us
- Customers
- News
- Contact Us

© 2009-2018 BinDB LLC. All rights reserved.

- Privacy Policy
- Sitemap

# EXHIBIT 10